No. 23-55404

# In the United States Court of Appeals for The Ninth Circuit

LINDSAY OKONOWSKY,
Plaintiff-Appellant,

v.

MERRICK B. GARLAND, ATTORNEY GENERAL,
UNITED STATES ATTORNEY GENERAL
Defendant-Appellee.

Appeal from the United States District Court
for the Central District of California
Honorable Virginia A. Phillips, Chief District Judge
(2:21-cv-07581-VAP-AS)

## PLAINTIFF-APPELLANT'S OPENING BRIEF

CORY H. HURWITZ
LINDSAY L. BOWDEN
  *Counsel of Record*
BROCK & GONZALES, LLP
6701 Center Drive West
  Suite 610
Los Angeles, CA 90045
(310) 294-9595
*lb@brockgonzales.com*

ANDREW S. PLETCHER
PLETCHER LAW, APC
3435 E. Thousand Oaks Blvd.
  Suite 6457
Westlake Village, CA
  91359-7997
(805) 630-3245
*Andrew@pletcher-law.com*

*Counsel for Plaintiff and Appellant*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................8

JURISDICTIONAL STATEMENT ....................................................11

  I.  SUBJECT MATTER JURISDICTION ......................................11

  II.  TIMELINESS OF THE APPEAL .............................................11

ISSUES PRESENTED FOR REVIEW ................................................12

STATUTORY AND REGULATORY FRAMEWORK .......................13

STATEMENT OF THE CASE ............................................................14

  I.  NATURE OF THE CASE .........................................................14

  II.  PROCEDURAL HISTORY .......................................................15

  III. SUMMARY OF THE FACTS ...................................................16

    A.  DR. OKONOWSKY'S STELLAR EMPLOYMENT HISTORY AT FCC LOMPOC ....................................................16

    B.  LIUTENANT STEVEN HELLMAN'S EMPLOYMENT AT FCC LOMPOC AND THE "UNOFFICIAL" LOMPOC INSTAGRAM PAGE ...................................................................17

    C.  DR. OKONOWSKY DISCOVERS THE "UNOFFICIAL" LOMPOC INSTAGRAM PAGE; REPORTS IT TO DEFENDANT; AND HELLMAN TARGETS OKONOWSKY IN RESPONSE ......................21

    D.  DR. OKONOWSKY CONTINUES TO ELEVATE HER COMPLAINTS WITH DEFENDANT AND THE "8_AND_HITTHE_GATE" INSTAGRAM PAGE BEGINS ALTERING THE CONDITIONS OF THE WORKPLACE ....................................................................24

    E.  MORE THAN TWO MONTHS AFTER DR. OKONOWSKY'S INITIAL COMPLAINTS, A THREAT ASSESSMENT TEAM WAS CONVENED ....................................................................32

STANDARD OF REVIEW .................................................................39

LEGAL ARGUMENT .........................................................................40

  I.  CONGRESS INTENDED TITLE VII TO BE REMDIAL LEGISLATION AND CONSTRUED BROADLY ....................40

II. THE DISTRICT COURT ERRED IN FINDING THAT NO TRIABLE
ISSUES OF FACT EXIST AS TO WHETHER HELLMAN'S CONDUCT
WAS SEVERE OR PERVASIVE TO ALTER THE CONDITIONS OF
EMPLOYMENT ............................................................................41

   A. TRIABLE ISSUES OF FACT EXIST TO SHOW THE
"8_AND_HITTHE_GATE" INSTAGRAM PAGE WAS SUFFICENTLY
INTERTWINED WITH THE WORKPLACE TO ALTER THE TERMS,
CONDITIONS, AND PRIVILEGES OF EMPLOYMENT ....................44

     1. Title VII Imposes No Such Requirement That There Be a Direct,
Personal Interaction Between the Plaintiff and the Harasser.................44

     2. Title VII Claims Need Not Be Committed in the Workplace to Alter the
Terms, Conditions, and Privileges of Employment................................46

     3. The District Court Erred in Declining to Consider the
"8_and_hitthe_gate" Instagram Posts Because They Were Never Sent to
Okonowsky Directly And Occurred Outside of the Workplace.............48

   B. THE DISTRICT COURT ERRED IN DECLINING TO CONSIDER THE
OTHER DISCRIMINATORY AND HARASSING
"8_AND_HITTHE_GATE" INSTAGRAM POSTS MADE BY
HELLMAN ...............................................................................52

III. GENUINE DISPUTES OF MATERIAL FACT EXIST AS TO WHETHER
FCC LOMPOC TOOK REMEDIAL MEASURES "REASONABLY
CALCULATED" TO END THE HARASSMENT ....................................60

CONCLUSION ...................................................................................69

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Acosta v. City of Costa Mesa*
(9th Cir. 2013) 718 F.3d 800................................................................39

*Albermarle Paper Co. v. Moody*
(1975) 422 U.S. 405...........................................................................40

*Anderson v. Liberty Lobby, Inc.*
(1986) 477 U.S. 242...........................................................................39

*Bostock v. Clayton County, Georgia* (2020)
140 S.Ct. 1731...................................................................................14

*Bradley v. Harcourt Brace and Co.* (9th Cir. 1996)
104 F.3d 267.....................................................................................39

*Brooks v. City of San Mateo*
(9th Cir. 2000) 229 F.3d 917..............................................................14

*Catlin v. United States*
(1945) 324 U.S. 229...........................................................................11

*Christian v. Umpqua Bank*
(9th Cir. 2020) 984 F.3d 801........................................................passim

*City of Los Angeles, Dept. of Water and Power v. Manhart*
(1978) 435 U.S. 702.....................................................................13, 40

*Craig v. M & O Agencies, Inc.*
(9th Cir. 2007) 496 F.3d 1047.............................................................52

*Davis v. Team Elec. Co.*
(9th Cir. 2008) 520 F.3d 1080.................................................43, 44, 53

*Davis v. Valley Distribution Co.*
(9th Cir. 1975) 522 F.2d 827..............................................................41

*Doe v. Oberweis Dairy*
(7th Cir. 2006) 456 F.3d 704..............................................................46

*Dominguez-Curry v. Nevada Transp. Dept.*
(9th Cir. 2005) 424 F.3d 1027.............................................................53

*EEOC v. PVNF, L.L.C.*
(10th Cir. 2007) 487 F.3d 790.............................................................54

*Ellison v. Brady*
(9th Cir. 1991) 924 F.2d 872........................................................passim

*Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*
(7th Cir. 2018) 903 F.3d 618..............................................................46

*Fisher v. Mermaid Manor Home for Adults, LLC*
(E.D.N.Y. 2016) 192 F.Supp.3d 323..............................................47, 52

*Forrest v. Brinker Int'l Payroll Co., LP*
(1st Cir. 2007) 511 F.3d 225 ................................................................31

*Frazier v. Delco Elecs. Corp.*
(7th Cir. 2001) 263 F.3d 663 ...............................................................46

*Freitag v. Ayers* (9th Cir. 2006)
468 F.3d 528.................................................................................41, 42

*Fried v. Wynn Las Vegas, LLC*
(9th Cir. 2021) 18 F.4th 643.................................................................39

*Fuller v. City of Oakland, Cal.*
(9th Cir. 1995) 47 F.3d 1522, *as amended* (Apr. 24, 1995) ............46, 61

*Gay v. Waiters' and Dairy Lunchmen's Union*
(9th Cir 1977) 549 F.2d 1330...............................................................41

*Griggs v. Duke Power Co.*
(1971) 401 U.S. 424 .............................................................................40

*Hafford v. Seidner*
(6th Cir. 1999) 183 F.3d 506................................................................54

*Harris v. Forklift Systems, Inc.*
(1993) 510 U.S. 17 ........................................................................13, 52

*Hernandez v. City of Phoenix*
(9th Cir. 2022) 43 F.4th 966..............................................................8, 9

*Hicks v. Gates Rubber Co.*
(10th Cir. 1987) 833 F.2d 1406......................................................53, 54

*Intlekofer v. Turnage*
(9th Cir. 1992) 973 F.2d 773..........................................................60, 67

*Kishaba v. Hilton Hotels Corp.*
(D. Hawai'I 1990) 737 F.Supp. 549......................................................53

*Kortan v. Cal. Youth Auth.*
(9th Cir. 2000) 217 F.3d 1104..............................................................42

*Lapka v. Chertoff*
(7th Cir. 2008) 517 F.3d 974................................................................44

*McAlindin v. County of San Diego*
(9th Cir. 1999) 192 F.3d 1226..............................................................39

*McGinest v. GTE Serv. Corp.*
(9th Cir. 2004) 360 F.3d 1103..........................................42, 60, 62, 66

*Meritor Sav. Bank, FSB v. Vinson*
(1986) 477 U.S. 57 ....................................................................13, 14, 53

*Moser v. Las Vegas Metropolitan Police Department*
(9th Cir. 2021) 984 F.3d 900.................................................................8

*Moyo v. Gomez*
(9th Cir. 1984) 40 F.3d 982..................................................................41

*Nichols v. Azteca Restaurant Enterprises, Inc.*
(9th Cir. 2001) 256 F.3d 864 ...................................................................42, 60, 62
*Oncale v. Sundowner Offshore Services, Inc.*
(1998) 523 U.S. 75 ..................................................................................43
*Packingham v. North Carolina*
(2017) 582 U.S. 98 ...................................................................................8
*Reeb v. Economic Opportunity Atlanta, Inc.*
(5th Cir. 1975) 516 F.2d 924 ..................................................................41
*Reeves v. Sanderson Plumbing Prods., Inc.*
(2000) 540 U.S. 133 ................................................................................39
*Reno v. American Civil Liberties Union*
(1997) 521 U.S. 844 ..................................................................................8
*Robinson v. York*
(9th Cir. 2009) 566 F.3d 817 ..................................................................52
*Rogers v. EEOC*
(5th Cir. 1971) 454 F.2d 234 ..................................................................14
*Schwapp v. Town of Avon*
(2nd Cir. 1997) 118 F.3d 106 ...........................................................54, 55
*Sharp v. S&S Activewear, L.L.C.*
(9th Cir. 2023) 69 F.4th 974 ....................................................................31
*Tcherepnin v. Knight*
(1967) 389 U.S. 332 ................................................................................40
*Vinson v. Taylor*
(D.C. Cir. 1985) 753 F.2d 141 ................................................................53
*Warren v. City of Carlsbad*
(9th Cir. 1995) 58 F.3d 439 ....................................................................39
*Woods v. Graphic Commc'ns*
(9th Cir. 1991) 925 F.2d 1195 ................................................................53

Statutes

28 U.S.C. § 1291 ......................................................................................11
28 U.S.C. § 1331 ...............................................................................11, 15
29 C.F.R. § 1604.11 ................................................................................14
Title VII (42 U.S.C. § 2000e-2(a)(1)) .............................................passim

Other Authorities

110 Congressional Record 2577-2584 (1964).........................................13
Stephanie A. Kevil, *When Your Boss "Friends" You: Social Media and the Hostile
    Environment Claim*, DePaul Journal of Woman, Gender and the Law, Vol. 1.,
    p.75 (2011)...........................................................................................9

Rules

Federal Rule of Civil Procedure 56 ............................................................11

Federal Rules Appellate Procedure 4(a)(1)(A) ......................................11

## **INTRODUCTION**

Since 1997 when the Supreme Court first observed "the content on the Internet is as diverse as human thought," technology has transformed from "chat rooms" and "newsgroups" on desktop computers to social media companies such as Facebook, Snapchat, Twitter, TikTok, and Instagram that can be seen, viewed, and shared through a phone in the palm of your hand. *See, Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 851-53 (internal citation omitted). Social media "has allowed Americans to connect with friends in far-flung places and to share their opinions on topics both mundane and momentous" (*Moser v. Las Vegas Metropolitan Police Department* (9th Cir. 2021) 984 F.3d 900, 902) and helped create what the Supreme Court has called the "modern public square" where any person "can 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Packingham v. North Carolina* (2017) 582 U.S. 98, 107. However, with nearly 7 in 10 American adults regularly using at least one Internet social networking service, social media "can also tempt people to impulsively make inflammatory comments that they later regret" and create workplace conditions where an employer may choose to discipline an employee for "ill-advised remarks" made on its profiles. *See, Moser v. Las Vegas Metropolitan Police Department* (9th Cir. 2021) 984 F.3d 900, 902; *cf., Hernandez v. City of Phoenix* (9th Cir. 2022) 43 F.4th 966 (involving a police officer, who while off-

duty posted various news articles and memes created by others to his personal social media account, in violation of department policy); *see also,* Stephanie A. Kevil, *When Your Boss "Friends" You: Social Media and the Hostile Environment Claim*, DePaul Journal of Woman, Gender and the Law, Vol. 1., p.75 (2011) ("Courts should not let the fact that the harassing comments or photos are posted online be a barrier to recovery for the victim… In instances when social media is part of the workplace culture, the court should give as much weight to online harassment as it does to face-to-face harassment."

This is such a case.

Lieutenant Steven Hellman, a supervisor at FCC Lompoc, ran an Instagram page with a username "8_and_hitthe_gate" that posted "memes" referencing the prison workplace, including many which were sexist, racist, and homophobic. These offensive posts would often get "liked" and commented on by the hundreds of FCC employees that followed the page. On February 16, 2020, Plaintiff-Appellant Lindsay Okonowsky ("Okonowsky"), a Staff Psychologist at the prison, discovered the page when it came up on her personal Instagram and promptly reported the page to two of her supervisors. However, the reactions of management upon learning about the graffiti indicate that Dr. Okonowsky's concerns about the "8_and_hitthe_gate" Instagram page were not being taken seriously as one manager told her "*sorry, not sorry*" the posts were "*funny*" and that she should get

a sense of humor and thicker skin.  More troubling, posts on Hellman's "8_and_hitthe_gate" Instagram page began to target Dr. Okonowsky directly with one post showing Nancy Pelosi ripping up President Trump's State of the Union address with the caption that read: "*When you get butt hurt by memes*" and "*Tomorrow's forecast: hot enough to melt a snowflake*" with the hashtag *#youcantakeadickbutnotjoke?*"  Another post, made after Hellman blocked Dr. Okonowsky from accessing the page, said "Big Sandy" (underlined in red) is a *giant cunt* who *loves inmates, and relentlessly tells on staff*.  These posts were liked by fellow FCC Lompoc employees leading Dr. Okonowsky to testify that she "felt ostracized at the brunt of the jokes" at the workplace because she knew that "employees had seen the memes targeting [her]" and "witnessed co-workers discussing the content of the page during working hours."  And, even after eventually conducting a two-day investigation and issuing a cease-and-desist letter to Hellman, the sexist and offensive memes continued raising triable issue of fact as to whether these remedial measures were sufficient to stop the harassment.

Unfortunately, even with these facts, the district court below granted summary judgment, holding, in part: "Plaintiff has failed to demonstrate a triable issue of fact as to Hellman's conduct being sufficiently severe or pervasive to establish a hostile work environment claim." [1-ER-0025.]  For this reason, Dr. Okonowsky seeks an appeal and respectfully requests this Court to reverse.

## JURISDICTIONAL STATEMENT

### I.    SUBJECT MATTER JURISDICTION

The district court had jurisdiction over Lindsay Okonowsky's causes of action under Title VII (42 U.S.C. § 2000e-2(a)(1)) pursuant to 28 U.S.C. § 1331, as this action is a civil action "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. [4-ER-0464.]

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of a District Court of the United States, Central District of California.  The final judgment appealed from is an order granting summary judgment as to all of Lindsay Okonowsky's claims. *See, Catlin v. United States* (1945) 324 U.S. 229, 233 (stating a final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the final judgment.")

### II.    TIMELINESS OF THE APPEAL

The district court entered final summary judgment for Merrick Garland on April 5, 2023. *See,* Fed. R. Civ. Proc. 56. [5-ER-0511-0512.]  Lindsay Okonowsky filed a Notice of Appeal on May 1, 2023.  [5-ER-0512.] This appeal is timely, as it was filed within 30 days of entry of the appealed judgment or order. *See,* Fed. R. App. Proc. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

1.      Did the District Court err in granting Merrick Garland's Motion for Summary Judgment and dismissing Okonowsky's claim under Title VII because she failed to demonstrate a triable issue of fact as to Hellman's conduct being sufficiently severe or pervasive to establish a hostile work environment claim?

2.      Did the District Court err in granting Merrick Garland's Motion for Summary Judgment and dismissing Okonowsky's claim under Title VII because the Federal Correctional Complex fulfilled its obligation to take remedial measures to stop the harassment?

## STATUTORY AND REGULATORY FRAMEWORK

Title VII of the Civil Rights Act of 1964 prohibits sex discrimination, including sexual harassment in employment. 42 U.S.C. § 2000e-2(a)(1). Under Federal Law, it is unlawful for "an employer… to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.[1]" *Id.* "The language of Title VII is not limited to "economic" or "tangible" discrimination." *Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57, 64. The phrase "terms, conditions, or privilege of employment" evinces a congressional intent "'to strike at the entire spectrum of disparate treatment of men and women'" in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *See, Id.* (quoting *Los Angeles Dept. of Water and Power v. Manhart* (1978) 435 U.S. 702, 707, n. 13); *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21.

---

[1] The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives. *See,* 110 Cong.Rec. 2577-2584 (1964). The principal argument in opposition to the amendment was that "sex discrimination" was sufficiently different from other types of discrimination that it ought to receive separate legislative treatment. *See, Id.* at 2577 (statement of Rep. Celler quoting letter from United States Department of Labor), 2584 (statement of Rep. Green). "This argument was defeated, the bill quickly passed as amended, and we are left with little legislative history to guide us in interpreting the Act's prohibition against discrimination based on 'sex.'" *Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57, 64.

The Supreme Court and the lower courts have interpreted this statute as giving rise to at least three types of sex discrimination claims: (1) disparate treatment; (2) quid pro quo sexual harassment; and (3) hostile work environment harassment. 29 C.F.R. § 1604.11; *see also, e.g., Bostock v. Clayton County, Georgia* (2020) 140 S.Ct. 1731; *Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57; *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917.

In 1980, the EEOC issued Guidelines defining "sexual harassment," as workplace "conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." CFR § 1604.11(a)(3); *see also, Rogers v. EEOC* (5th Cir. 1971) 454 F.2d 234, 238 ("[T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination… One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers…").

## STATEMENT OF THE CASE

## I.  NATURE OF THE CASE

This is an appeal from a final judgment of the U.S. District Court for the Central District of California, granting summary judgment to Defendant-Appellee

Merrick Garland in a suit filed by Plaintiff-Appellant Lindsay Okonowsky against her former employer. Okonowsky brought a claim under Title VII Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, et. seq.) for sexual discrimination and harassment under a hostile work environment, alleging that an Instagram page ran by Steven Hellman, a lieutenant and supervisor at the Federal Correctional Complex ("FCC") in Lompoc, contained sexist and vulgar posts, which other FCC Lompoc employees frequently liked, commented on, and ultimately caused a hostile work environment.

## II.  PROCEDURAL HISTORY

On September 22, 2021, Lindsay Okonowsky ("Okonowsky") filed a civil complaint in the United States District Court, Central District of California, pursuant to 28 U.S.C. § 1331, based on Okonowsky's allegations of a violation of the laws of the United States of America. [4-ER-0463-0469.] The Complaint alleged a single cause of action for violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et. seq.*) for sexual discrimination and harassment under a hostile work environment theory. [4-ER-0463-0469.]

On March 6, 2023, Defendant filed a Motion for Summary Judgment. [4-ER-0384-0402; 5-ER-0518.] On April 4, 2023, the Honorable Virginia A. Phillips issued an Order granting summary judgment in favor of Merrick Garland. [1-ER-0002-0030; 5-ER-0518.] Specifically, the Court held, in part, that "Plaintiff has

failed to demonstrate a triable issue of fact as to Hellman's conduct being sufficiently severe or pervasive to establish a hostile work environment claim." [1-ER-0025.]

On May 1, 2023, Okonowsky filed a Notice of Appeal from the District Court's Entry of Order and Judgment in favor of Garland granting summary judgment. [5-ER-0485-0515; 5-ER-0518.]

### III.  <u>SUMMARY OF THE FACTS</u>

#### A. DR. OKONOWSKY'S STELLAR EMPLOYMENT HISTORY AT FCC LOMPOC

Lindsay Okonowsky, Ph.D., a 35-year-old female, began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018. [3-ER_0250.]  She was never disciplined and received consistent positive reviews and feedback. [3-ER-0250.]  As a Staff Psychologist, Dr. Okonowsky completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. [3-ER-0250.]

///

**B. LIUTENANT STEVEN HELLMAN'S EMPLOYMENT AT FCC LOMPOC AND THE "UNOFFICIAL" LOMPOC INSTAGRAM PAGE**

Lieutenant Steven Hellman ("Hellman") worked alongside Dr. Okonowsky at FCC Lompoc and has been a supervisor at the facility for years. [2-ER-0037; 3-ER-0250.] As a Lieutenant, Hellman supervised the custody staff, oversaw operations of the facility, and was a member of the Special Investigative Services ("SIS.") [3-ER-0250.] As a SIS member, Hellman was also responsible for investigating suspected violations of the law and prison rules and polices by both inmates and staff. [3-ER-0250.]

Hellman also created and ran an Instagram page "8_and_hitthe_gate" which described the workplace at FCC Lompoc through its "meme" posts. [3-ER_0250; 4-ER-0432.]

///



[3-ER-0277.]

Hellman often posted offensive memes that referenced the workplace, including many which were sexist, racist, and homophobic. [2-ER-0037; 3-ER-0278-0305; 3-ER-0316-0320; 3-ER-0324-0332; 4-ER-0425; 4-ER-0428-0429; 4-ER-0452-0457.] These offensive posts would often get "liked" and commented on by the hundreds of FCC employees that followed the page, including Human Resources Manager, Taulbee McGinnis, Union President Ryan Enos, SIS Technician Justin Bender, and Safety Specialist Robert Trice. [3-ER-0250-0251.] Some of Hellman's sexist, demeaning, and derogatory posts included topics such as breastfeeding, gangbanging female co-workers, female vaginas after pregnancy,

and suicide. [3-ER-0250-0251; 3-ER-0278-0305; 3-ER-0316-0320; 3-ER-0324-0332; 4-ER-0425; 4-ER-0428-0429; 4-ER-0452-0457.]



[3-ER-0296.]



[3-ER-0324.]



[3-ER-0288.]



[3-ER-0320; 0324.]



[3-ER-0279.]

Dr. Okonowsky testified that around the time Hellman posted the Jefferey Epstein suicide meme, she "heard the officers in the SHU Department talking about how funny they thought the post was." [3-ER-0251.]

### C. DR. OKONOWSKY DISCOVERS THE "UNOFFICIAL" LOMPOC INSTAGRAM PAGE; REPORTS IT TO DEFENDANT; AND HELLMAN TARGETS OKONOWSKY IN RESPONSE

On February 16, 2020, Dr. Okonowsky became aware of Hellman's "8_and_hitthe_gate" Instagram page when it came up on her personal Instagram as a suggested page she should follow. [3-ER-0250; 3-ER-0258.] Upon her initial review of the page, Dr. Okonowsky stated she was "shocked at the content, especially since Lt. Hellman was a supervisor and Lieutenant at FCC Lompoc. [3-ER-0251.] As a woman, Dr. Okonowsky was especially offended at the sexist memes that were overtly demeaning and derogatory. [3-ER-0251.] Dr. Okonowsky

considered Lt. Hellman a high-level leader, and she was concerned about how many of my coworkers "liked" and commented on the posts. [3-ER-0251.] Dr. Okonowsky also believed that his page violated FCC Lompoc policy." [3-ER-0251; 3-ER-0261.] Notably, in her role as a psychologist, Dr. Okonowsky would routinely work with lieutenants in various situations at the prison and would have to rely on Hellman in an institutional emergency. [3-ER-0261; 3-ER-0346 - 0347.]

On February 17, 2020, Dr. Okonowsky reported the page to two supervisors, Dr. Carl Clegg and Drug Abuse Program Coordinator, Dr. Anne Clemmer. [3-ER-0251; 3-ER-0258 – 0259; 3-ER-0338 – 0339; 4-ER-0418.] On February 18, 2020, Dr. Okonowsky also complained to Safety Manager Robert Grice about the page. [3-ER-0251.] Grice quickly dismissed Dr. Okonowsky's complaint, telling her, "*sorry, not sorry*" the posts were "*funny*" and that Dr. Okonowsky should get a sense of humor and thicker skin. [3-ER-0251; 3-ER-0259.]

Dr. Okonowsky also spoke with Acting Warden James Engleman about the page and the offensive posts. [3-ER-0252; 3-ER-0340.] Acting Warden Engleman stated that he would have SIA Victor Gonzales, **_who was Lt. Hellman's supervisor_**, submit a referral to the Office of Internal Affairs. [3-ER-0252.] Later that day, after her shift concluded, Dr. Okonowsky saw a meme of Nancy Pelosi ripping up President Trump's State of the Union address on Hellman's "8_and_hitthe_gate" Instagram page, with a caption that read, "*When you get butt*

*hurt by memes*" and "*Tomorrow's forecast: hot enough to melt a snowflake*" with the hashtag *#youcantakeadickbutnotjoke?*" [3-ER-0252; 3-ER-0259-0260; 3-ER-0348.]



[3-ER-0281.]  In Dr. Okonowsky's written complaint to FCC Lompoc, she stated that "she did not feel comfortable going to work the next day" because "I read that 'tomorrow's forecast'" would mean "a difficult day for me at work" and "I felt my best course of action was to refrain from putting myself in a potentially hostile work environment." [3-ER-0281.]

///

### D. DR. OKONOWSKY CONTINUES TO ELEVATE HER COMPLAINTS WITH DEFENDANT AND THE "8_AND_HITTHE_GATE" INSTAGRAM PAGE BEGINS ALTERING THE CONDITIONS OF THE WORKPLACE

On February 19, 2020, when Dr. Okonowsky met with Gonzales and shared some of the printed memes, he told words to the effect of "*I looked at the page and I don't really see anything that's a problem*" and asked Dr. Okonowsky to explain why each post was sexist and harassing. [3-ER-0252; 3-ER-0260.] In response, Dr. Okonowsky highlighted that many of the posts were sexist, racist, sexually explicit, targeted her/other staff members, and poorly represented the institution and the Bureau of Prisons. [3-ER-0260.] One week after her initial meeting with SIA Victor Gonzales, Dr. Okonowsky met with him again and explained that the posts made specific reference to FCC Lompoc and that people working at prison were commenting and that only employees of FCC Lompoc would understand most of the purported humor.[2] [3-ER-0252.]

Between February 19, 2020 and early March 2020, Dr. Okonowsky continued to notify Dr. Clemmer regarding the posts and that her co-workers were "liking" the post and regularly interacting with it, including the acting HR

---

[2] Notably, before the meeting, Dr. Okonowsky stated that she was "uncomfortable" about SIS Gonzales and his ability "to maintain confidentiality in more nuanced ways than just not telling others about over conversations. ***For example, he asked Dr. Clemmer and [she] to meet him in his office with other staff nearby, summoned [her] over the radio system before the meeting, and insisted on printing the memes to a public printer***." [3-ER_0260.]

Manager, Union President and SIS staff who were supposed to be investigating this issue. [3-ER-0252.]  More troubling, Hellman began posting memes on "8_and_hitthe_gate" that seemed to be responding to Dr. Okonowsky's initial complaint about the page:



[3-ER-0289.]

As the posts continued, Dr. Okonowsky stated that she "felt ostracized at the brunt of the jokes" at the workplace because she knew that "employees had seen the memes targeting [her]" and "witnessed co-workers discussing the content of the page during working hours." [3-ER-0253.]  As a result, Dr. Okonowsky stated

the harassment had "effects on [her] mental health" and her "productivity suffered" as she "was confident that any employees who viewed the page would know that [she] was the subject of the offensive memes." [3-ER-0253.]

On March 7, 2020, Dr. Okonowsky was blocked from Hellman's "8_and_hitthe_gate" Instagram page before he posted a meme post that she believed targeted her. [3-ER-0253; 3-ER-0283; 3-ER-0350.] The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." [3-ER-0253.] At the time of viewing, Dr. Okonowsky saw that seventeen people "liked" the post (many of whom worked at FCC Lompoc) and two FCC Lompoc employees commented on the post. [3-ER-0253.]

///



[3-ER-0253; 3-ER-0283; 4-ER-0425.]

Dr. Okonowsky reported this post to Dr. Clegg and Acting Warden Engleman. [3-ER-0253.] The following day, SIA Victor Gonzales contacted Dr. Okonowsky and told her that he had not yet submitted the referral to the Office of Inspector General because he "*could not figure out how to print the memes*" and "*had other things going on*." [3-ER-0253.]

On March 9, 2020, Dr. Okonowsky was required to work in the Receiving and Discharge department with Hellman. [3-ER-0254; 3-ER-0342 – 0343.] This "petrified" Dr. Okonowsky, who felt that not only her complaints were being ignored, but she was now forced to stand guard in case Hellman attempted to

harass or retaliate against her. [3-ER-0254.]  Dr. Okonowsky later testified that this

wasn't the only time she had to work with him in person:

> Q. Okay. And then after that day, did not have any other
> interactions with Lieutenant Hellman?
> A. Yes, I did.
> Q. In person or I guess could you describe?
> A. Yes. In person. So the nature of our work as psychologists in
> prison settings requires us to work on call, and so if an inmates
> expresses, you know, suicidal thinking or statements, we have to
> come in. So I was on call and had to come into the Medium
> component where Mr. Hellman was working and I had to have
> interaction with him about the inmate.
> Q. And generally if you could pinpoint it for me, when was that
> interaction?
> A. I couldn't say for sure.
> Q. Would I have been, if you had to guess, March or in terms of
> the timeline would have been after February or –
> A. Yes. It was after February.

[3-ER-0343 – 0344.]

The following day, Dr. Okonowsky submitted a 48-page memorandum to

Associate Warden Gutierrez detailing the harassing memes that continued to be

posted by Hellman and detailing why there were offensive and harassing and how

they violated internal policies at the prison. [3-ER-0254; 3-ER-0257 – 3-ER-0305.]

At the time of submission, the page had over 570 posts – the report detailed thirty

of them. [3-ER-0254.]  Notably, one of the posts directly referenced a workplace

interaction involving Dr. Okonowsky. [3-ER-0254; 3-ER-0351 - 0353.]

Specifically:



[3-ER-0286.]

This post is also target towards me. During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. The staff members went as far as recommending that I work on Saturdays so I did not interfere with their daily tasks when I needed to see inmates, per policy. I emphasized that removing inmates from their cells is part of SHU staff members' responsibilities (assisting with pulling inmates, etc.) and accommodate their schedules. One staff member stated to me, "I intentionally don't help you" after I highlighted my concerns with their problematic feedback and suggestions. The interactions were uncomfortable and hostile; I felt incredibly disrespected as a fellow employee. I expressed my concerns to the former SHU Lieutenant, an Associate Warden, and SHU 1 after the training. One of the SHU staff present during the training commented on this post something to the effect of, "Last quarter's

SHU training," signaling that that this post is, in fact, directed toward me.

[3-ER-0286.]

In response, Dr. Okonowsky was provided a referral to the Employee Assistance Program, which provides free counseling services. [3-ER-0254; 4-ER-0419.]

On March 25, 2020, Dr. Okonowsky and her union representative met with SIA Gonzales and together expressed her concern that there is a conflict of interest in having him involved in investigating Hellman as Hellman is a direct subordinate of Gonzales. [3-ER-0307.] Gonzales responded that he did not see it as a conflict of interest and attempted to begin the interview. [3-ER-0307.] However, Dr. Okonowsky's union representative, Theo Cintora, requested that he speak with Warden Engleman before beginning the interview. [3-ER-0307.] At that point SIA Gonzales left the room and Cintora called the Warden and requested that someone else be brought into conduct the interview and investigation. [3-ER-0307.]

Between March 27, 2020 and March 30, 2020, Dr. Okonowsky submitted two follow-up memorandums, detailing the continued posts, the anti-harassment policy of the prison, her interactions with SIA Gonzales and continued belief that he cannot complete a confidential and impartial investigation, and a post made later that night that referred to "Big Sandy" (underlined in red) is a ***giant cunt*** who

***loves inmates, and relentlessly tells on staff***.[3] [3-ER-0255; 3-ER-0307 – 0309; 3-ER-0311 – 0313; 4-ER-0428 - 0430.]



[4-ER-0429.]

This post was liked by several FCC Lompoc staff members, including Safety Manager Robert Grice who Dr. Okonowsky had previously complained to. [3-ER-0255; 3-ER-0311.]

---

[3] "'A raft of case law … establishes that the use of sexually degrading, gender specific epithets, such as 'slut,' 'cunt,' whore,' and 'bitch,' … has been consistently held to constitute harassment based upon sex.'" *Sharp v. S&S Activewear, L.L.C.* (9th Cir. 2023) 69 F.4th 974, 879 (quoting *Forrest v. Brinker Int'l Payroll Co., LP* (1st Cir. 2007) 511 F.3d 225, 229).



[4-ER-0430.]

### E.  MORE THAN TWO MONTHS AFTER DR. OKONOWSKY'S INITIAL COMPLAINTS, A THREAT ASSESSMENT TEAM WAS CONVENED

On April 13, 2020, more than two months after Dr. Okonowsky's initial complaints, a Threat Assessment Team was convened to review Dr. Okonowsky's "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in the memorandum and supporting documentation submitted to management on March 11, 2020. [3-ER-0255; 4-ER-0431 – 0435.]  Among those on the team were James Engleman, Associate Warden, who later testified that *he was not* involved in the investigation of Dr. Okonowsky's complaints. [3-ER-0361 – 0363; 4-ER-0431] Specifically:

> Q. And at some point you were involved in investigating those complaints; is that also correct?
> A. I don't do the investigations, ma'am. I just refer on to investigators.

Q. Did you have any participation in the investigation into Ms. Okonowsky's complaints?
A. No. I don't do the investigations.
Q. So you had no involvement in the investigation into her complaints?
A. No. Not the investigation, no.

Deposition of James Engleman 7:8-7:21.[4] [3-ER-0362.]

During Dr. Okonowsky's interview with the Threat Assessment Team, she testified that she "felt the harassment not only occurred on the page but bled into the workplace because [of] interactions [she] was having at work were showing upon the page and people were talking about the page at work." [3-ER-0256.] Moreover, Dr. Okonowsky did ***not*** state in her interview that she "had no personal or direct knowledge as to who ran the page and that the offending conduct occurred exclusively online" unlike what the final report printed. [3-ER-0255 – 0256; 4-ER-0432.]

The Threat Assessment team spoke to Hellman on April 15, 2020. [4-ER-0432.] Hellman later wrote in a declaration that ***he was ever interviewed*** as part of

---

[4] However, in Engleman's declaration submitted at summary judgment he admits to investigating Ms. Okonowsky's concerns regarding the page. [4-ER-0421.]

Specifically:
"On April 13, 2020, Warden Von Blackenesee convened a six-member Threat Assessment Team, including myself, to further investigate Ms. Okonowsky's concerns regarding the page." [4-ER-0421.]

an investigation, ***did not know who investigated***, and ***believed the investigation was still ongoing***. [3-ER-0368.]  Specifically:

> Q. Was there an investigation?
> A. Apparently there is one going on, but I have not been interviewed.
> Q. Who investigated?
> A. I have no idea.
> Q. What was the outcome?
> A. My understanding is that it is still ongoing.

[3-ER-0368.]

On April 16, 2020, the findings of the Threat Assessment Team were released. [4-ER-0431.]  In the report, the Team noted that Hellman's adversarial position against Dr. Okonowsky on his "8_and_hitthe_gate" Instagram page arose out of the workplace as it "appears to have commenced in early 2020, when both of them were working in SHU and having conflicts pertaining to difficult inmates." [4-ER-0433.]  Notably, the report found that Hellman ***unconvincingly*** denied that the memes were directed at Dr. Okonowsky and that his actions "towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directly solely at her) fall within the 'bullying' language/definition" of the prison's anti-harassment policy. [4-ER-0434.]  Overall, the Threat Assessment Team made a number of recommendations including referring Lt. Hellman to the Office of Internal Affairs for further investigation; issuing a cease-and-desist letter from posting on social media any memes and/or information which violates internal

policy; and a referral to the Employee Assistance Program. [2-ER-0037; 4-ER-0434 – 0435.]

However, even after Hellman was issued a cease-and-desist letter, he continued to post sexist and offensive memes including one targeting Psychology Services and the workplace violence committee process. [3-ER-0256; 3-ER-0315 – 0332; 3-ER-0355 – 0356.]  These posts included:



[3-ER-0324.]









These posts are forms of explicit sexual harassment of employees who are women. The memes reduce women to sex objects and even make light of stalking behavior (figure 3). The pink panther picture (figure 1) is particularly disturbing, painting the imagery of male staff standing in key line with erections as they look at female TDY staff simply walking into work.

[3-ER-0325.]



These memes are additional examples of Mr. Hellman attempting to undermine Executive Staff and the new Captain using explicitly sexual content.

[3-ER-0330.]



[3-ER-0330.]

The page was not taken down until sometime after May 12, 2020. [3-ER-0256; 3-ER-0369.]

## STANDARD OF REVIEW

The standard of review on appeal of a grant of summary judgment is *de novo*. *See, McAlindin v. County of San Diego* (9th Cir. 1999) 192 F.3d 1226, 1232, amended 201 F.3d 1211, and *cert. denied,* 530 U.S. 143 (2000) (citing *Bradley v. Harcourt Brace and Co.* (9th Cir. 1996) 104 F.3d 267, 269); *Bagdadi v. Nazar* (9th Cir. 1996) 84 F.3d 1194, 1197 (citing *Warren v. City of Carlsbad* (9th Cir. 1995) 58 F.3d 439, 441). The appellate court must view the evidence in the light most favorable to the non-moving party and must determine whether there are any genuine issue of material fact and whether the district court correctly applied the relevant substantive law. *See, Fried v. Wynn Las Vegas, LLC* (9th Cir. 2021) 18 F.4th 643, 646-47.

Summary judgment is proper "if the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issues in the non-movant's favor, and a fact is "material" when it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 248. But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa* (9th Cir. 2013) 718 F.3d 800, 828 (citing *Reeves v. Sanderson Plumbing Prods., Inc.* (2000) 540 U.S. 133, 150). In sum, the

role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried.

## **LEGAL ARGUMENT**

### I. CONGRESS INTENDED TITLE VII TO BE REMDIAL LEGISLATION AND CONSTRUED BROADLY

In passing Title VII, Congress intended to enact a broad remedial statute that would achieve equality of employment opportunities and remove barriers that have operated in the past to favor one identifiable group over another. *See, Albermarle Paper Co. v. Moody* (1975) 422 U.S. 405, 417 (citing *Griggs v. Duke Power Co.* (1971) 401 U.S. 424, 429-30); *Griggs v. Duke Power Co., supra,* 401 U.S. at 429 ("The objective of Congress in the enactment of Title VII is plain from the language of the statute."). The basic policy of Title VII requires that we focus on fairness to individuals rather than fairness to classes. *See, City of Los Angeles, Dept. of Water and Power v. Manhart* (1978) 435 U.S. 702, 709.

Because the intention of Congress in passing Title VII was to prevent invidious workplace discrimination, the statute is entitled to ***broad construction*** and ***should not*** be read in an artificially restrictive way that would leave many Americans unprotected from sex-based discrimination. *See, Tcherepnin v. Knight* (1967) 389 U.S. 332, 336 (stating "we are guided by a familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"); *Reeb v. Economic Opportunity Atlanta, Inc.* (5th Cir. 1975) 516 F.2d

924, 928 ("Title VII is a broad remedial measure, designed to assure equality of employment opportunities").  This Court has affirmed this broad interpretation of Title VII as remedial legislation. *See, Gay v. Waiters' and  Dairy Lunchmen's Union* (9th Cir 1977) 549 F.2d 1330, 1333 (stating the "purpose of Title VII is to eliminate such class based discrimination"); *Moyo v. Gomez* (9th Cir. 1984) 40 F.3d 982, 985 (citing *Davis v. Valley Distribution Co.* (9th Cir. 1975) 522 F.2d 827) ("We also note that it has been long established that Title VII, as remedial legislation, is construed broadly."); *cf., Davis v. Valley Distributing Co.* (9th Cir. 1975) 522 F.2d 827, 832 ("The Equal Employment Opportunity Act is a remedial statute to be liberally construed in favor of victims of discrimination.").

## II.     THE DISTRICT COURT ERRED IN FINDING THAT NO TRIABLE ISSUES OF FACT EXIST AS TO WHETHER HELLMAN'S CONDUCT WAS SEVERE OR PERVASIVE TO ALTER THE CONDITIONS OF EMPLOYMENT

Title VII of the Civil Rights Act of 1964 prohibits sex discrimination, including sex harassment, in employment. 42 U.S.C. § 2000e-2(a)(1).  To succeed on a Title VII claim for hostile work environment, Okonowsky must show: (1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist. *See, Freitag v. Ayers* (9th Cir. 2006) 468 F.3d 528, 539. A hostile work environment is one where (1) the plaintiff was subjected to verbal or physical conduct of a harassing nature; (2) this conduct was unwelcomed; and (3)

the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Kortan v. Cal. Youth Auth.* (9th Cir. 2000) 217 F.3d 1104, 1110; *see also, Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 871-72 n.4 (describing the test as whether the workplace was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so").

As to the third element, courts are to consider the *totality of the circumstances* and whether the harassment was both objectively and subjectively abusive.[5] *See, Freitag v. Ayers, supra,* 468 F.3d at 539. "Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See, Kortan v. Cal. Youth Auth.* (9th Cir. 2000) 217 F.3d 1104, 1110. If the severity or frequency of the harassment is questionable, "it is more appropriate to leave the

---

[5] The district court held that "Plaintiff's multiple complaints to AW Engleman and other supervisors regarding Hellman's posts clearly establish that she subjectively perceived her work environment as hostile, see *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1113 (9th Cir. 2004); thus, only the objective severity of the harassment is at issue here." [1-ER-0019.]

assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.* (9th Cir. 2008) 520 F.3d 1080, 1096.

Moreover, the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81-82 (noting "the reason social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"); *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 879 (a "reasonable woman" standard).

At the district court, Garland argued that Dr. Okonowsky complained about conduct that occurred outside of the workplace and the alleged conduct was neither severe or pervasive. [4-ER-0394 – 0398.] In response, Okonowsky presented evidence that she was subjected to "workplace" harassment that was "intimately intertwined with conduct in the workplace that it is impossible to separate the offsite conduct from the onside activities." [3-ER-0167 – 0168.] Moreover, Okonowsky argued that Hellman's "8_and_hitthe_gate" Instagram posts outside of her immediate protected class are relevant to establishing the overall hostility of the work environment. [3-ER-0171 – 0172.] However, the District Court ignored this evidence and found that the Instagram posts occurred entirely outside of the

workplace and did not rise to conduct that was severe or pervasive to create a claim for a hostile work environment. [1-ER-0021 – 0024.]  Accordingly, for the reasons discussed below, this Court must reverse.

### A. TRIABLE ISSUES OF FACT EXIST TO SHOW THE "8_AND_HITTHE_GATE" INSTAGRAM PAGE WAS SUFFICENTLY INTERTWINED WITH THE WORKPLACE TO ALTER THE TERMS, CONDITIONS, AND PRIVILEGES OF EMPLOYMENT

#### 1. Title VII Imposes No Such Requirement That There Be a Direct, Personal Interaction Between the Plaintiff and the Harasser

This Court has previously affirmed that "Title VII imposes no such requirement" that there be a direct, personal interaction between the plaintiff and the harasser for an actionable claim at summary judgment. *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, 810 (citing *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 880; *Davis v. Team Elec. Co.* (9th Cir. 2008) 520 F.3d 1080, 1095).

In *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, Christian began working for Umpqua in 2009 as a Universal Associate. *Id.* at 805.  She received generally favorable performance reviews and was quickly promoted to Universal Associate III. *Id.*  In late 2013, a customer ("the customer") asked Christian to open a checking account for him. *Id.* at 806.  While this initial interaction was "unremarkable," the customer began visiting the bank to drop off "small notes" for Christian that asked her on a date and told her how beautiful she was. *Id.* Christian

became concerned and was told by her supervisor who was familiar with the situation to "watch out, you know, that it doesn't escalate." *Id.* However, the notes continued and escalated in nature becoming "affectionate and personal." *Id.* In addition, Christian learned from other employees that the customer had been in several times asking the employees over and over how he was going to get a date with her." *Id.* The conduct of the customer continued to escalate, and eventually Christian quit the bank out of fear for her safety and health. *See, Id.* at 806-808. She brought a claim against the bank for gender discrimination and retaliation and the bank moved for summary judgment which the district court granted. *Id.* at 808.

In reversing, this Court wrote, in part, that "the district court erred in declining to consider incidents in which Christian 'did not have any direct, personal interactions with the [c]ustomer, such as when he wrote her a letter describing her as his 'soulmate,' sent her flowers, and watched her in the bank lobby.'" *Id.* at 810. "Title VII imposes no such requirement." *Id.* "In *Ellison*, for instance, we concluded that a letter sent to the plaintiff by her co-worker describing how he 'had been "watching" and "experiencing" her' was actionable harassment. 924 F.2d at 880. That the plaintiff received the letter in the mail while on an out-of-state business trip – far from her harasser – had no bearing on our analysis. *Id.* at 874. Our obligation is to 'consider all the circumstances,' *Davis*, 520 F.3d at 1095, including those incidents that do not involve verbal

communication between the plaintiff and the harasser, physical proximity, or physical or sexual touching." *Id.* (citing *Fuller v. City of Oakland, Cal.* (9th Cir. 1995) 47 F.3d 1522, 1527-28, *as amended* (Apr. 24, 1995) (finding conduct actionable that involved repeated phone calls and physical threats but no physical touching); *Frazier v. Delco Elecs. Corp.* (7th Cir. 2001) 263 F.3d 663, 664-65 (same, with respect to stalking conduct that involved no physical touching); *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.* (7th Cir. 2018) 903 F.3d 618, 626 ("[Actional harassment] need not consist of … intimate touching.")).

### 2. Title VII Claims Need Not Be Committed in the Workplace to Alter the Terms, Conditions, and Privileges of Employment

In considering the totality of the circumstances for purposes of summary judgment, federal courts have found that harassing conduct need not be committed in the workplace to alter the terms, conditions, and privileges of employment for purposes of a Title VII claim. *See, Lapka v. Chertoff* (7th Cir. 2008) 517 F.3d 974, 983 (stating "harassment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences in the workplace"); *Doe v. Oberweis Dairy* (7th Cir. 2006) 456 F.3d 704, 715 (finding that, in a sexual harassment case, the sexual act need not be committed in the workplace to have consequences there).

In *Fisher v. Mermaid Manor Home for Adults, LLC* (E.D.N.Y. 2016) 192 F.Supp.3d 323, Lisa Fisher ("Fisher") began working for Mermaid Manor, a residential assisted living facility as a Home Health Aid in August 2010. *Id.* at 326. In late April of 2013, two co-workers brought an Instagram post to Fisher's attention. *Id.* "The Instagram post consisted of two photographs of Plaintiff contrasted with a photograph of the fictional chimpanzee Cornelius from the movie *Planet of the Apes*" with a caption reading "You dont my fucking coworker looks like cornellsussssssssssss from the movie PLANET of the APES lmfaooo." *Id.* After reading the post, Fisher did not immediately report the incident; however, it was brought to a supervisor's attention." *Id.* When asked why she didn't immediately report the incident, Fisher stated that she was "too ashamed to tell anyone." *Id.* And although the two employees were eventually reprimanded, Fisher brought an EEOC charge against Mermaid Manner claiming national origin discrimination. *Id.* at 326-27. In considering the issue at summary judgment, the Eastern District of New York court held that "a reasonable jury could find that the Instagram post, comparing Plaintiff to a fictional chimpanzee from the *Planet of the Apes* movie, created a hostile work environment." *Id.* at 329 (citing multiple cases involving single acts of hostility, including a supervisor tying a balloon around a monkey's neck; and a separate case where an employee was called a "monkey"). "The Instagram post, published to the world and seen by Plaintiff's

co-workers, humiliated Plaintiff to such an extent that she was found crying in the Mermaid Manor dining room." *Id.*

### 3. The District Court Erred in Declining to Consider the "8_and_hitthe_gate" Instagram Posts Because They Were Never Sent to Okonowsky Directly And Occurred Outside of the Workplace

At summary judgment, the district court declined to consider Hellman's "8_and_hitthe_gate" Instagram posts because they "were never sent to [Okonowsky] directly, never displayed in the workplace, never shown to [Okonowsky] in the workplace, and never discussed with [Okonowsky] in the workplace without her consent." [1-ER-0021.] However, following *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, this is reversable error as the district court was required to "consider all the circumstances,[6]" including how the "8_and_hitthe_gate" Instagram page was intertwined with the workplace culture of FCC Lompoc:

- Hellman's "8_and_hitthe_gate" Instagram page was followed by hundreds of FCC Lompoc employees, including the Human Resources Manager, Taulbee McGinnis, Union President Ryan Enos, SIS Technician Justin Bender, Acting Safety Manager Robert Grice, and Safety Specialist Robert Grice, who "liked" and commented on

---

[6] *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, 810.

many of its posts, including the "giant cunt" post that specifically targeted Dr. Okonowsky. [3-ER-0250 – 0251; 3-ER-0255; 3-ER-0277; 3-ER-0311; 4-ER-0429 – 0430.]



[4-ER-0430.]

- Some of the FCC Lompoc employees and "8_and_hitthe_gate" page followers admitted, when confronted with Dr. Okonowsky's written complaints, the posts were funny, they didn't see a problem with them, and that Dr. Okonowsky should get a sense of humor and thicker skin. [3-ER-0251 - 0352; 3-ER-0259 - 0260.]

- Hellman admitted in the Threat Assessment Report that he was the owner of the page, used it to post "dark prison humor" to "blow off steam," and **_unconvincingly_** denied that the memes were directed at Dr. Okonowsky. [4-ER-0432.]

- Dr. Okonowsky testified that she "felt ostracized at the brunt of the jokes" at work because she "witnessed co-workers discussing the content of the page during working hours" and knew that "employees had seen the memes targeting [her]" which had "effects on [her] mental health" because she "was confident that any employees who viewed the page would know that [she] was the subject of the offensive memes." [3-ER-0253.]

- Dr. Okonowsky wrote in one of her written complaints to Associate Warden Gutierrez that before her meeting with SIS Gonzales, he "insisted on printing the memes to a public printer." [3-ER-0260.]

- Some of Hellman's "8_and_hitthe_gate" Instagram posts referenced workplace interactions and named specific staff members. [3-ER-0286; 3-ER-0288; 3-ER-0297.] For example, in a post joking about "the gangbang," Dr. Okonowsky invited SHU staff to her residence in an attempt to build camaraderie and thank them for helping throughout the quarter. However, shortly after the Dr. Okonowsky sent out the invitations to SHU staff a meme was posted stating: "When a female co-worker invites guys only for an "End of Quarter" Party. Dr. Okonowsky subsequently canceled the party. [3-ER-0288.]



[3-ER-0288.]

- The Threat Assessment Report found that Hellman's Instagram posting regarding Dr. Okonowsky began from interactions in the workplace. [4-Er-0433.]

- The Threat Assessment Report found that Hellman violated Agency policy (including the Bureau of Prisons Anti-Harassment Policy and the Standards of Employee Conduct), and issued him a cease-and-desist letter from posting on social media in violation of Defendant's policy. [4-ER-0435.] This action of limiting Hellman's speech on the page demonstrate that the page was an "actual, material and substantial disruption," or 'reasonable predictions of disruption' in

the workplace. *See, Robinson v. York* (9th Cir. 2009) 566 F.3d 817, 824.

- After receiving the cease-and-desist letter, Hellman used his "8_and_hitthe_gate" Instagram to protest the workplace action, gain sympathy, and rally his "soldiers." [3-ER-0330 - 0331.]

Overall, like *Fisher v. Mermaid Manor Home for Adults, LLC* which involved a ***single*** Instagram post, a reasonable jury could find that each of Hellman's posts, including the one referring to Dr. Okonowsky as a "*giant cunt*," or that she *cantakeadickbutnotajoke*, were published to the world and seen, "liked," and commented on by Okonowsky's co-workers (who were in on the inside joke), which humiliated Okonowsky and eventually caused her to transfer to FCC Seagoville, Texas. [3-ER-0256.]

## B. THE DISTRICT COURT ERRED IN DECLINING TO CONSIDER THE OTHER DISCRIMINATORY AND HARASSING "8_AND_HITTHE_GATE" INSTAGRAM POSTS MADE BY HELLMAN

Under Title VII, objective hostility is determined by examining the ***totality of the circumstances*** and whether a reasonable person with the same characteristics as the victim would perceive the workplace as hostile. *Craig v. M & O Agencies, Inc.* (9th Cir. 2007) 496 F.3d 1047, 1055; *see also, Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 23 ("But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking ***at all the***

*circumstances*.").  As part of this analysis, a plaintiff may establish a violation of Title VII even if the hostility was not directly targeted at the plaintiff as the statue provides employees with "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson, supra,* 477 U.S. at 66; *Christian v. Umpqua Bank* (9th Cir. 2020) 894 F.3d 801, 810-11 (citing *Davis v. Team Elec. Co.* (9th Cir. 2008) 520 F.3d 1080, 1095 ("Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile.")); *Woods v. Graphic Commc'ns* (9th Cir. 1991) 925 F.2d 1995, 1202) (concluding the harassment was sufficiently severe or pervasive, even though the plaintiff "heard about most of the incidents through other employees," rather than being directly targeted"); *Dominguez-Curry v. Nevada Transp. Dept.* (9th Cir. 2005) 424 F.3d 1027, 1036 (finding the district court erroneously disregarded evidence of discriminatory comments that Stacey directed to other women in the division); *Kishaba v. Hilton Hotels Corp.* (D. Hawai'I 1990) 737 F.Supp. 549, 554-555 (citing *Vinson v. Taylor* (D.C. Cir. 1985) 753 F.2d 141, 146 ("Even if Plaintiff herself was never the object of racial harassment, she might nevertheless have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.")[7]

---

[7] *See also, Hafford v. Seidner* (6th Cir. 1999) 183 F.3d 506, 515 (evidence of religious harassment could help support racial hostile work environment); *Hicks v. Gates Rubber Co.* (10th Cir. 1987) 833 F.2d 1406, 1416 (court may aggregate

In *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, discussed in detail above and incorporated herein by reference, this Court reversed summary judgment in part by holding that "the district court erred in neglecting to consider record evidence of interactions between the customer and third persons, such as the customer's repeated visits to the Esther Short branch to 'badger [] [Christian's colleagues] about how he was going to get a date with [Christian.]'" as offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile. *Id.* at 810-11. "Christian learned from her colleagues that the customer was persistently contacting them to obtain information about her. That she did not witness the customer's conduct firsthand is no matter: She heard his message loud and clear. Where, as here, a plaintiff becomes aware of harassing conduct directed at other persons, outside her presence, that conduct may form part of a hostile environment claim and ***must be considered***." *Id.* at 811.

In *Schwapp v. Town of Avon* (2nd Cir. 1997) 118 F.3d 106, Schwapp was the first African American employed as a police officer by the Town of Avon and

---

evidence of racial hostility and sexual hostility in determining pervasiveness of harassment); *EEOC v. PVNF, L.L.C.* (10th Cir. 2007) 487 F.3d 790, 798 ("We have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim.").

was the only African-American police officer at the Avon Police Department for the entire duration of his employment. *Id.* at 108. After working for nearly two years for the Department, he resigned in 1994, asserting that his resignation was impelled by twelve incidents of racially derogatory comments and acts in the workplace,. *Id.* However, only four central incidents occurred in Schwapp's presence. *See, Id.* The second group of incidents occurred outside of Schwapp's presence. *See, Id.* at 108-109. The third group of incidents occurred during Schwapp's employment, but involved hostile comments directed at other minority groups. *Id.* at 109. At summary judgment, the district court only considered four of the twelve incidents and ruled that Schwapp failed to establish a triable issue of material fact of his claim of a pervasive and continuous atmosphere of racial discrimination. *Id.* at 111. However, the Second District reversed, noting the eight incidents that occurred outside of Schwapp's presence should also have been considered as part of the "totality of circumstances" to determine whether the alleged conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See, Id.* at 111-12 ("Likewise, the incidents relating to other minorities and those occurring before Schwapp's tenure may be of limited probative value, but cannot be ignored on summary judgment. Whether Schwapp was aware of them during his employment, and, more significantly, whether in light of these incidents, the incidents Schwapp

experienced more directly 'would reasonably be perceived, and [were] perceived, as hostile or abusive' … are factual issues that should be resolved by a trier of fact.").

Here, at summary judgment, the district court declined to consider the other discriminatory posts Hellman made on the "8_and_hitthe_gate" Instagram page because they were not specifically directed at Okonowsky and "took place outside the workplace." [1-ER-0024.] However, following *Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, this is reversable error as this evidence should have been considered as part of the "totality of the circumstances" analysis, as the meme posts establish the environment that Dr. Okonowsky was subjected to while working at FCC Lompoc. *See, Christian v. Umpqua Bank* (9th Cir. 2020) 984 F.3d 801, 809, 811 (stating the court must consider "all the circumstances"). Specifically, these meme posts, on subjects involving race, slavery, religion, homophobia, sexual violence, and the Holocaust, were intertwined with the day-to-day culture of the FCC Lompoc as they were "liked," commented on, and discussed by its employees. [3-ER-0250 – 0251; 3-ER-0253; 3-ER-0255; 3-ER-0277; 3-ER-0287; 3-ER-0290; 3-ER-0295; 3-ER-0302; 3-ER-0305; 3-ER-0311; 3-ER-0332; 4-ER-0429 – 0430.]



[3-ER-0332.]



[3-ER-0305.]



[3-ER-0302.]



[3-ER-0295.]



[3-ER-0290.]



[3-ER-0287.]

Moreover, for purposes of summary judgment, these posts establish genuine issues of material fact as to whether the conduct Dr. Okonowsky experienced was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. For this reason, summary judgment should be denied.

### III. GENUINE DISPUTES OF MATERIAL FACT EXIST AS TO WHETHER FCC LOMPOC TOOK REMEDIAL MEASURES "REASONABLY CALCULATED" TO END THE HARASSMENT

"[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1119-20 (citing *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 881; *Swinton v. Potomac Corp.* (9th Cir. 2001) 270 F.3d 794, 803). An employer may avoid liability for harassment by undertaking "reasonably calculated" measures to end the harassment. *Id.* at 1120. "The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in the harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Id.* (quoting *Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 875). "To be adequate, an employer must ***intervene promptly***." *Id.* (citing *Intlekofer v. Turnage* (9th Cir. 1992) 973 F.2d 773, 778). Remedial measures must include some form of disciplinary action, which must be

proportionate to the seriousness of the offense. *Id.* (citing *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 882) ("Title VII requires more than a mere request to refrain from discriminatory conduct.").

Here, the district court held that "Plaintiff fails to create a triable issue of fact that Defendant did not take adequate steps to address the alleged harassment" as Defendant "engaged in a methodical, albeit relatively lengthy, investigative and disciplinary process." [1-ER-0025 – 0026.]   However, as discussed below, the district court ignored genuine issues of material fact that warrant reversal.

First, its undisputed that FCC Lompoc was aware of the "8_and_hitthe_gate" Instagram posts long before Dr. Okonowsky first reported the discriminatory and harassing content to two supervisors on February 17, 2020, as the page was followed, "liked," and commented on by hundreds of FCC employees including Human Resources Manager Taulbee McGinnis and Safety Manager Robert Grice. [3-ER-0250-0251; 3-ER-0258 – 0259; 3-ER-0338 – 0339; 4-ER-0418.]   This raises questions of how much FCC Lompoc knew or should have known about the discriminatory and harassing posts, even before Dr. Okonowsky first reported it.  Moreover, it raises questions about the inaction taken by management level employees at FCC Lompoc regarding the posts. *See, Fuller v. City of Oakland* (9th Cir. 1995) (noting that Tile VII condemns "the existence of past harassment, every bit as much as the risk of future harassment); *Nichols v.*

*Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 875-76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.").

Moreover, the reactions of management upon learning about the posts indicate that Dr. Okonowsky's concerns about the "8_and_hitthe_gate" Instagram page were not being taken seriously. After being informed about the Instagram page, Safety Manager Robert Grice, who followed the page, told Dr. Okonowsky, "*sorry, not sorry*" the posts were "*funny*" and that she should get a sense of humor and thicker skin. [3-ER-0251; 3-ER-0259.] SIA Victor Gonzales, who Acting Warden James Engleman placed in charge of the initial investigation and referral to the Office of Internal Affairs, responded to Dr. Okonowsky's concerns with "*I looked at the page and I don't really see anything that's a problem*" and asked her to explain why each post was sexist and harassing. [3-ER-0252; 3-ER-0260.] Certainly, rather than remedying the harassment, both Safety Manager Robert Grice and SIA Victor Gonzales' behaviors appear to have added to it. *Compare, McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1121 (finding the reactions of management after learning about the graffiti indicate that the incident was not taken seriously. After being informed about the graffiti, supervisor Roberts first joked that he himself was responsible for it, and then added an

additional "humorous" comment that had racial overtones. Rather than remedying the harassment, Roberts' behavior appears to have added to it.").

Next, the district court ignored evidence showing that, while Dr. Okonowsky was transferred from working at the Medium to the Low on February 18, 2020, her interactions with Hellman continued. [3-ER-0254; 3-ER-0341 – 0343; 4-ER-0418; 4-ER-0435.] Specifically, Dr. Okonowsky testified:

> Q. Okay. And so were you reassigned then to the Low facility?
> A. Yeah, it wasn't, you know, necessarily formal, but yeah, soon after I did start working at the Low. But what was exceptionally concerning to me was that the first day I reported to the Low, Hellman was at the Low. And so I sent an E-mail to AW Gutierrez, asking for more information, like you know, I've been – I'm moving to Low to be away from Lieutenant Hellman but he's here. So can you provide – you know, while maintaining his confidentiality and rights, can you provide me some information about what's going on here so that I can feel comfortable. And never received any information.
>
> And then subsequent to that memo I was given an EAP referral[8] and also Dr. Clegg told me that AW Gutierrez told him that he didn't want to be included on any more of my memos. He didn't want me to include him on those E-mails.

[3-ER-0341 – 0342.]

While it may have been the intention of FCC Lompoc to separate Dr. Okonowsky from Lt. Hellman at work, these measures did not prove effective leaving Dr. Okonowsky feeling "petrified" that she was forced to stand guard in case Lt. Hellman attempted to harass or retaliate against her. [3-ER-0254.]

---

[8] The referral is available at [4-ER-0419.]

Moreover, Dr. Okonowsky testified that her workplace interactions with Hellman continued beyond her first day in Low. [3-ER-0262-0263; 3-ER-0343 – 0344.]

Fourth, FCC Lompoc's investigation and remediation of Hellman's actions also gives cause for concern. After being informed about the Instagram page, Acting Warden Engleman informed Dr. Okonowsky that he would have Hellman's supervisor, SIA Victor Gonzales, submit a referral to the Office of Internal Affairs raising concerns of impartiality. [3-ER-0252.] Dr. Okonowsky subsequently raised concerns regarding the selection of Mr. Gonzales' to lead the investigation and his inability to remain confidential:

> During the meeting with SIA Gonzales, he demonstrated a lack of awareness about Instagram, difficulty navigating his computer/printer system, and ignorance regarding systemic racism/sexism. His presentation also led me to feel uncomfortable about his ability to maintain confidentiality in more nuanced ways than just not telling others about our conversations. For example, he asked Dr. Clemmer and I to meet him in his office with other staff nearby, summoned me over the radio system before the meeting, and insisted on printing the memes to a public printer. By the conclusion of the meeting, I was, again, confident that I would have to spend personal time preparing my own report of events.

> [3-ER-0260.]

> On 03-25-2020, after postponing our meeting several times, SIA Gonzales requested to meet with me for an interview pertaining to my previous report of SIS Lieutenant Steven Hellman's problematic use of personal social media creating a hostile work environment. I asked to have union representative, Theo Cintora, present for the interview. Prior to meeting with SIA Gonzales, I briefed Mr. Cintora on the current situation. I expressed my concerns that SIA Gonzales has demonstrated bias and has led me

to question his ability to maintain confidentiality (discussed in a previous memorandum). Further, Mr. Cintora and I discussed our concerns that SIA Gonzales conducting the interview would be ill advised given Mr. Hellman is SIA Gonzales' subordinate and that they work in the same department/office. A clear conflict of interest issue is involved if SIA Gonzales investigates a matter related to Mr. Hellman's misconduct.

When Mr. Cintora and I met with SIA Gonzales on 03-25-2020, I immediately raised my concerns related to the conflict of interest and my perception that SIA Gonzales may be biased, given he has shared his unsolicited opinions about the Instagram page with me multiple times. I inquired about whether a member of OIA could come to conduct the interview. SIA Gonzales stated he did not see a conflict of interest and encouraged me to proceed with the interview. He asserted several times that OIA delegated the investigation to him. At that point, Mr. Cintora requested to call Warden Engleman prior to beginning the interview. SIA Gonzales left the room and Mr. Cintora called Warden Engleman. Mr. Cintora raised the conflict of interest issue and requested that Warden Engleman speak with OIA again about bringing someone else in to conduct my interview and the investigation. To my knowledge, Warden Engleman stated he would follow up with Mr. Cintora about this request.

[3-ER-0307.]

Then, and only after Hellman's posts continued,[9] was a Threat Assessment

Team ("TAT") assembled to conduct a two-day investigation.[10] [4-ER-0431 –

0435.]   Included on the team was James Engleman, Associate Warden, who later

---

[9] Notably, the "Big Sandy" (underlined in red) is a ***giant cunt*** who ***loves inmates, and relentlessly tells on staff*** post. [4-ER-0429.]

[10] The TAT would have finalized their investigation within a single day; however, "[t]he Team was unable to interview Lt. Hellman on April 13, 2020, because he was on previously scheduled leave." [4-ER-0432.]

testified that *he was not* involved in the investigation of Dr. Okonowsky's

complaints [3-ER-0361 – 0363; 4-ER-0431] only to contradict himself in his

declaration submitted at summary judgment. [4-ER-0421.]  More troubling, while

the TAT reports states that the Team interviewed Hellman on April 15, 2020,

Hellman stated to the EEOC he was never interviewed as part of an investigation,

does not know who was investigating the allegations, and believed that the

investigation was still ongoing as of September 2020. [3-ER-0366 - 3-ER-0370; 4-

ER-0432.]  Finally, one day after meeting with Hellman on April 15, 2020, the

TAT released their report recommending that: (1) A referral to the Office of

Internal Affairs for investigation of Hellman's alleged misconduct be made; (2)

Internal FCC Lompc staff not conduct the investigation to avoid any appearance of

a conflict of interest; (3) Dr. Okonowsky remain separated from Hellman while

this investigation occurs; (4) A letter be issued by his supervisor directing him to

immediately cease and desist from posting on social media any memes/information

which violates Agency policy; and (5) Hellman be issued an Employee Assistance

Program (EAP) referral.[11] [4-ER-0435.]  Ultimately, to be adequate under Title

VII, remedial actions must be designed not only to prevent future conduct by the

harasser, but also by other potential harassers. *McGinest v. GTE Service Corp.* (9th

Cir. 2004) 360 F.3d 1103, 1121.

---

[11] Dr. Okonowsky received the same referral. [4-ER-0419.]

The recommendations of the Threat Assessment Team, including issuing a cease-and-desist letter, raise genuine triable issues as to whether they were sufficient to stop the harassment. [2-ER-0037.] *See, Intlekofer v. Turnage* (9th Cir. 1992) 973 F.2d 773, 779 (citing *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 882) (holding that remedies must be "reasonably calculated to end the harassment" and "of a disciplinary nature"). While in most cases, counseling and a warning may suffice if successful in stopping the harassment (*Intlekofer v. Turnage* (9th Cir. 1992) 973 F.2d 773, 779), the facts show that Hellman continued to post sexist and offensive memes ***after*** receiving the letter, including memes that were sexually suggestive and openly mocked the Threat Assessment Team. [3-ER-0315 – 0332.]



[3-ER-0330.]

Additionally, based the findings of the Threat Assessment Team, the only person who appears to have been punished was Dr. Okonowsky, who had to remain transferred "while an investigation into Hellman's actions is completed and, if misconduct is sustained, any resulting discipline is implemented." [4-ER-0435.]  And while the report characterizes this as her "preference," at no time did it appear that FCC Lompoc considered moving Hellman and allowing Dr. Okonowsky to continue working within her originally assigned unit. [4-ER-0435.] Finally, based the Threat Assessment Team's recommendations, it remains unclear whether the Office of Internal Affairs ever completed an investigation or Hellman faced discipline beyond a cease-and-desist letter.  [4-ER-0435.]

Accordingly, because genuine issues of material fact exist as to the remedial measures taken by FCC Lompoc, this Court should reverse.

## **CONCLUSION**

In light of the above, *Plaintiff-Appellant* Lindsay Okonowsky respectfully requests that this Court reverse the district court's order granting summary judgment.

Date: September 8, 2023

         s/ Andrew S. Pletcher

Cory H. Hurwitz, Esq.
Lindsay Bowden, Esq.
BROCK & GONZALES, LLP

Andrew S. Pletcher, Esq.
PLETCHER LAW, APC

Attorneys for Plaintiff-Appellant
**LINDSAY OKONOWSY**

## <u>STATEMENT OF RELATED CASES</u>

There are no related cases pending in this Court.


Date: September 8, 2023

                s/ Andrew S. Pletcher

Cory H. Hurwitz, Esq.
Lindsay Bowden, Esq.
BROCK & GONZALES, LLP

Andrew S. Pletcher, Esq.
PLETCHER LAW, APC

Attorneys for Plaintiff-Appellant
**LINDSAY OKONOWSY**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55404

I am the attorney or self-represented party.

**This brief contains** | 11, 153 | **words,** including | 713 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | S/ Andrew S. Pletcher | **Date** | 09.08.2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-55404

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Plaintiff-Appellant's Opening Brief
Excerpts of Record (Volumes 1-5)

**Signature** | s/ Andrew S. Pletcher    **Date** | 09/08/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**      *Rev. 12/01/2018*