No. 23-55404

---

# In the United States Court of Appeals for The Ninth Circuit

---

LINDSAY OKONOWSKY,
Plaintiff-Appellant,

v.

MERRICK B. GARLAND, ATTORNEY GENERAL,
UNITED STATES ATTORNEY GENERAL
Defendant-Appellee.

---

Appeal from the United States District Court
for the Central District of California
Honorable Virginia A. Phillips, Chief District Judge
(2:21-cv-07581-VAP-AS)

---

## EXCERPTS OF RECORD – VOLUME 3 of 5

---

LINDSAY L. BOWDEN
  *Counsel of Record*
BROCK & GONZALES, LLP
6701 Center Drive West
  Suite 610
Los Angeles, CA 90045
(310) 294-9595
*lb@brockgonzales.com*

ANDREW S. PLETCHER
PLETCHER LAW, APC
3435 E. Thousand Oaks Blvd.
  Suite 6457
Westlake Village, CA
  91359-7997
(805) 630-3245
*Andrew@pletcher-law.com*

*Counsel for Plaintiff and Appellant*

**BROCK & GONZALES, LLP**

6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673

D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LINDSAY OKONOWSKY, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,<br><br>        Defendants. | **Case No.: 2:21-cv-07581-VAP-ASx**<br><br>**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay Okonowsky; Declaration of Lindsay L. Bowden; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*<br><br>**Hearing: April 3, 2023**<br>**Time: 2:00 pm**<br>**Courtroom: 6A** |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff LINDSAY OKONOWSKY hereby opposes Defendant MERRICK B GARLAND's Motion for Summary Judgment ("Motion").  Plaintiff's Opposition is based on the attached Memorandum of Points and Authorities; Plaintiff's Compendium of Evidence, filed concurrently herewith; all pleadings and documents on file in this matter; and any and all arguments that might be raised at the April 3, 2023, hearing in this matter.

DATED:  March 13, 2023                              BROCK & GONZALES, LLP

By: _____

D. AARON BROCK
CORY H. HURWITZ
LINDSAY L. BOWDEN
Attorneys for Plaintiff

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  DEFENDANT'S MOTION IS UNTIMELY BASED ON PARA. 6 OF THE
STANDING ORDER AND SHOULD BE STRICKEN ..................................... 3

III.  STATEMENT OF FACTS ................................................................................. 4

   A.  Dr. Okonowsky's Stellar Employment History ........................................... 4

   B.  Dr. Okonowsky Discovers An Unofficial FCC Lompoc Instagram Page
   Run By One Of Its Senior Lieutenants ......................................................... 4

   C.  Dr. Okonowsky Reported The Page To Defendant; Lt. Hellman
   Immediately Targeted Her .............................................................................. 6

   D.  After Lt. Hellman's Personal Attacks, Dr. Okonowsky Elevated Her
   Complaints ........................................................................................................ 7

   E.  Lt. Hellman's Unofficial FCC Lompoc Page Bled Into Dr. Okonowsky's
   Physical Workplace ......................................................................................... 8

   F.  Per Defendant's Request, Dr. Okonowsky Continued To Report New
   Offensive Posts ................................................................................................ 9

   G.  Defendant Failed To Promptly Investigate Dr. Okonowsky's Complaints
   And Allowed The Harassment To Continue ................................................. 10

   H.  Defendant's Own Threat Assessment Team Confirmed The Harassing
   Memes Were Directed at Dr. Okonowsky ................................................... 11

   I.  Defendant Issued Lt. Hellman A Cease-and-Desist Letter To Force Him
   To Take Down His Unofficial FCC Lompoc Instagram Page ................... 12

   J.  Lt. Hellman Continued To Harass Dr. Okonowsky Even After Being
   Issued A Cease-and-Desist Letter ................................................................ 13

IV.  LEGAL ARGUMENT ..................................................................................... 13

**A.** **Plaintiff Was Subject to "Workplace" Harassment** .............................. 14

**B.** **The Harassment Was Severe And Pervasive** ......................................... 18

*1.* *The Page's Discriminatory Posts Outside of Plaintiff's Protected Classes Are Relevant To Her Harassment Claim* ........................................................... 20

*2.* *Lt. Hellman Is A Supervisor; Therefore, Defendant Is Vicariously Liable Even If They Took Immediate And Corrective Action* ...................................... 21

*3.* *Defendant Failed To Immediately Take Steps To Prevent The Harassment After Becoming Aware Of It* ............................................................................ 22

**V.** **CONCLUSION** ............................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

Burlington Industries, Inc. v. Ellerth (1998) 524 US 742, 757 ............................. 21

Clairmont v. Sound Mental Health, 632 F.3d 1091, 1107 (9th Cir. 2011) (citation omitted) ...................................................................................................... 18

Davis v. Team Elec. Co. (9th Cir. 2008) 520 F3d 1080, 1096 ............................... 18

Dodge v. Evergreen, 56 F.4th 767, 781-82 (9th Cir. 2022) (citing Hufford v. McEnaney, 249 F.3d 1142, 1148 (9th Cir. 2001)) ............................................... 18

Doe v. Oberweis Dairy (7th Cir. 2006) 456 F3d 704, 715 ..................................... 14

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992  14

EEOC v. Fry's Electronics, Inc., 2:10-CV-1562-RSL ........................................... 15

EEOC v. PVNF, L.L.C. (10th Cir. 2007) 487 F3d 790, 798 .................................. 19

Faragher v. City of Boca Raton (1998) 524 US 775, 807 ...................................... 21

Ferris v. Delta Air Lines, Inc. (2nd Cir. 2001) 277 F.3d 128, 135 ......................... 14

Fisher v. Mermaid Manor Home for Adults, LLC, 192 F.Supp.3d 323, 326 (E.D.N.Y., 2016) ..................................................................................... 16

Hafford v. Seidner (6th Cir. 1999) 183 F.3d 506, 515 ......................................... 20

Harris v. Forklift Sys., Inc., (1993) 510 U.S. 17, 23 ............................................ 14

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). ................................................................................................. 19

Hicks v. Gates Rubber Co., (10th Cir. 1987) 833 F.2d 1406, 1416 ....................... 20

Huston v. Procter & Gamble Paper Products Corp., (3rd Cir. 2009) 568 F3d 100, 107-108 ....................................................................................................... 23

McGinest v. GTE Service Corp. (9th Cir. 2004) 360 F3d 1103, 1121 .................. 23

McGinest v. GTE Service Corp., (9th Cir. 2004) 360 F.3d 1103, 1117 ............... 21

Meritor Sav. Bank, FSB, v. Vinson, (1986) 477 U.S. 57, 65. ............................... 14

Parker v. Reema Consulting Services, Inc. (4th Cir. 2019) 915 F3d 297, 303 ...... 19

Robinson v. York, 566 F.3d 817, 824 (9th Cir. 2009) ........................................... 18

Schwapp v. Town of Avon, (2nd Cir. 1997) 118 F.3d 106, 111 ............................ 15

Swinton v. Potomac Corp. (9th Cir. 2001) 270 F3d 794, 804 ............................... 22

Vance v. Ball State Univ., (2016) 570 US 421, 431 ............................................. 22

Waltman v. International Paper Co. (5th Cir. 1989) 875 F2d 468, 471 ................. 22


**Other Authorities**

Young, Conaway, Stargatt & Taylor, *Six Sexual Harassment Myths Shattered,* 2

    No. 4 *Del. Employment L. Letter* 1 (April 1997) .................................................. 21

## **MEMORAUNDUM OF POINTS AND AUTHORITIES**

## I.   **INTRODUCTION**

There is a clear dispute whether MERRICK GARLAND, ATTORNEY GENERAL, DEP'T OF JUSTICE, BUREAU OF PRISONS ("Defendant") failed to prevent ongoing harassment of staff psychologist, LINDSAY OKONOWSKY, Ph.D. ("Dr. Okonowsky"), who was the repeated target of sexist memes. Defendant allowed a "supervisor," Lieutenant Steven Hellman, to run an Instagram page[1] that he used to make comments clearly referring to Dr. Okonowsky as a "staff member" that's a "giant cunt" that "loves inmates" and "tells on staff." Such an Instagram post, which is only one of many that is sexist and derogatory towards women, was viewed by Dr. Okonowsky's co-workers, supervisors, and human resources. Instead of taking corrective action, "liked" and commented on the posts, which created a hostile work environment.

Specifically, Defendant's Motion should be denied because abundant genuine issues of fact exist as to Dr. Okonowsky's hostile work environment claim based on sex/gender under Title VII.

First, Defendant claims that Dr. Okonowsky only complained about conduct outside of the workplace because it occurred online, however the critical inquiry is not whether the harassment occurred within the four corners of the worksite, but whether the harassment is sufficiently related to their employment to constitute a "work environment." Here, the off-site encounters between Dr. Okonowsky and Lt. Hellman on Lt. Hellman's Instagram page were sufficiently related to their employment, while also infiltrating the actual workplace, such as to constitute a hostile work environment. Lt. Hellman's page was followed by over a hundred employees at FCC Lompoc, including a Human Resources Manager and the

---

[1] "Instagram is a social media service that permits users to share, or 'post,' photographs through an online network." <u>Fisher v. Mermaid Manor Home for Adults, LLC</u>, 192 F. Supp. 3d 323, 326 n.2 (E.D.N.Y. 2016).

1

Union President. FCC Lompoc employees frequently liked and commented on posts pertaining to workplace interactions, including interactions with Dr. Okonowsky.

Second, the Instagram page was so intimately intertwined with conduct in the workplace that it is impossible to separate the offsite conduct from the onsite activities and was severe and pervasive. Not only did the memes refer to Dr. Okonowsky, but many of the memes posted would only make sense to FCC Lompoc employees. Dr. Okonowsky viewed the page as an unofficial FCC Lompoc Instagram page because her workplace activities and interactions were regularly referenced and ridiculed. Even beyond this, Defendant ultimately punished Lt. Hellman for violating Defendant's policy and issued him a cease-and-desist letter from posting on social media. Defendant's admission that it punished Lt. Hellman, is irrefutable evidence that Lt. Hellman's conduct offsite had a direct effect at the workplace.

Third, Defendant is strictly liable for Lt. Hellman's conduct *regardless of its subsequent actions* because he is a "supervisor." Defendant minimizes Lt. Hellman's position as "a corrections officer," and ignores the legal impact of his supervisory position. He supervised custody staff at FCC Lompoc and oversaw operations. He was also responsible for overseeing the facility, had several direct reports, and, as a member of the Special Investigative Services, was responsible for investigating suspected violations of the law and prison rules. Significantly, the Cease-and-Desist letter Defendant issued Lt. Hellman reminded him that as a "supervisor" he is held to a higher standard of conduct.

Lastly, even if Lt. Hellman is found not to be a supervisor (though there is nothing in the record indicating he is not), Defendant will nevertheless be held liable for failing to take immediate and corrective action. Defendant was aware of the harassment long before they allegedly took steps to end it. Here, Human Resources Manager Taulbee McGinnis was an active follower of Lt. Hellman's

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

page and had McGinnis, an H.R. manager responsible for dealing with sexual harassment complaints, taken steps to end the conduct, Dr. Okonowsky would never have been harassed. This alone is sufficient evidence to deny summary judgment on whether the Defendant took prompt corrective and preventative action.

Moreover, even after Dr. Okonowsky complained, the harassment continued without fail. Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020. *In the meantime, Dr. Okonowsky continued to be harassed* and Defendant repeatedly dismissed Dr. Okonowsky's complaints. Defendant could have, but failed, to curb the harassment Dr. Okonowsky had repeatedly complained of.

The explosion of social media has become part of the workplace culture. Title VII prohibits unlawful employment practice and "[c]ourts should not let the fact that the harassing comments or photos are posted online be a barrier to recovery for the victim…. In instances when social media is part of the workplace culture, the court should give as much weight to online harassment as it does to face-to face harassment."[2]

For all these reasons, Defendant's motion for summary judgement should be denied.

## II. DEFENDANT'S MOTION IS UNTIMELY BASED ON PARA. 6 OF THE STANDING ORDER AND SHOULD BE STRICKEN

According to Court's Standing Order: "The 'e-filing' of all documents required to be 'e-filed' in this matter pursuant to General Order No. 10-07 and Local Rule 5-4 shall be completed by **4:00 p.m. on the date due.** Any documents 'e-filed' after 4:00 p.m. on the date due will be considered **untimely**." (Court's Standing

---

[2] Stephanie A. Kevil, When Your Boss "Friends" You: Social Media and the Hostile Environment Claim When Your Boss "Friends" You: Social Media and the Hostile Environment Claim, DePaul Journal of Women, Gender and the Law, Vol. 1, p. 75, (2011).

3

Order, Para. 6; emphasis in original).

Defendant's motion was filed at 11:50 p.m. PST on March 6, 2023, almost 8 hours <u>after</u> the filing cutoff. Since the filing was untimely, Defendant's motion should be stricken as the moving papers require 28 days' notice prior to a hearing. (C.D. L.R. 6-1). Plaintiff has been prejudiced by limiting an already short opposition period and she respectfully requests that the Court strike Defendant's Motion.

## III. <u>STATEMENT OF FACTS</u>

### A. Dr. Okonowsky's Stellar Employment History

Lindsay Okonowsky, Ph.D., a 35-year-old female, began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018. Pl. SUF ¶ 1. She was never disciplined and received consistent positive reviews and feedback. Pl. SUF ¶ 2. As a Staff Psychologist, Dr. Okonowsky completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. Pl. SUF ¶ 3.

### B. Dr. Okonowsky Discovers An Unofficial FCC Lompoc Instagram Page Run By One Of Its Senior Lieutenants

On February 16, 2020, Dr. Okonowsky became aware of the Instagram page "8_and_hitthe_gate" when the page came up on her personal Instagram as a suggested page she should follow. Pl. SUF ¶ 4.

Lieutenant Steven Hellman created and ran the Instagram page. Pl. SUF ¶ 5. He is an FCC Lompoc employee, has been a supervisor for years, and worked with Dr. Okonowsky. Pl. SUF ¶ 6. As a Lieutenant, he had the authority to supervise the custody staff and oversee operations. Pl. SUF ¶ 7. He was also responsible for overseeing the facility, had several direct reports, and was a member of the Special Investigative Services ("SIS"). Pl. SUF ¶ 8. As an SIS Lieutenant, Lt. Hellman was also responsible for investigating suspected violations of the law and prison rules and policies by both inmates and staff. Pl. SUF ¶ 9.

1    Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc
2    employees, including the Human Resources Manager and Union President. Pl. SUF ¶
3    10. The prison and working conditions were regularly discussed as well as work
4    meetings and events. Pl. SUF ¶ 11. For example, Lt. Hellman posted a meme of
5    Jefferey Epstein on Valentine's Day and dedicated it to the "The SHU Crew" (aka
6    the Special Housing Unit) at FCC Lompoc and around that time, Dr. Okonowsky
7    heard the officers in the SHU Department talking about how funny they thought the
8    post was. Pl. SUF ¶ 12.

9    Based on the creator's high-level position, the subject matter of the page, and
10   the makeup of its followers, Dr. Okonowsky determined that this was an unofficial
11   FCC Lompoc employee Instagram page. Pl. SUF ¶ 13.

12   Unfortunately, Lt. Hellman often posted offensive memes that referenced
13   work, including those that were sexist, racist, and homophobic. Pl. SUF ¶ 14. Those
14   offensive memes would often get liked[3] and commented on by the other employees.
15   Pl. SUF ¶ 15.

16   

24   ///
25   ///

26

27   [3] The Instagram like button is indicated by a heart symbol. In addition to tapping the heart
     symbol on a post, users can double tap an image to "like" it. *See* Padilla, Mariel (18 July 2019).
28   "Instagram is Hiding Likes. Will That Reduce Anxiety?". The New York Times. Archived from
     the original on 26 November 2020.

5

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**



Pl. SUF ¶¶ 12-27.

Dr. Okonowsky was shocked at the content, especially since Lt. Hellman was a supervisor and Lieutenant at her workplace. Pl. SUF ¶ 28. As a woman, she was especially offended at the sexist memes that were overtly demeaning and derogatory. Pl. SUF ¶ 29. Dr. Okonowsky considered Lt. Hellman a high-level leader, and the co-worker "likes," and comments caused her concern. Pl. SUF ¶ 30. She also believed that his page violated FCC Lompoc policy. Pl. SUF ¶ 31.

**C. Dr. Okonowsky Reported The Page To Defendant; Lt. Hellman Immediately Targeted Her**

On February 17, 2020, the day after she found the Instagram page, Dr. Okonowsky reported the page to two supervisors, including her immediate supervisor, Dr. Carl Clegg and Drug Abuse Program Coordinator, Dr. Anne Clemmer. Pl. SUF ¶ 32.

On February 18, 2020, Dr. Okonowsky complained to Safety Manager Robert Grice about the page. Pl. SUF ¶ 33. Grice was one of many employees that regularly liked and commented on the memes. Pl. SUF ¶ 34. He said he thought the posts were "funny" and told her, "Sorry, not sorry" and told her to get thicker skin. Pl. SUF ¶ 35.

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

3-ER-0157

1    Dr. Okonowsky was shocked. Pl. SUF ¶ 36.

2         Later that day, Dr. Okonowsky saw a meme of Nancy Pelosi ripping up

3    President Trump's State of the Union address on Lt. Hellman's page, with captions

4    that said, "*When you get butt hurt by memes*" and "*Tomorrow's forecast: hot enough

5    to melt a snowflake*" and the hashtag, *#youcantakeadickbutnotajoke*. Pl. SUF ¶ 37.

6    Dr. Okonowsky felt the meme was in response to her complaint just hours earlier. Pl.

7    SUF ¶ 38. She did not feel safe at work. Pl. SUF ¶ 39.

8         **D. After Lt. Hellman's Personal Attacks, Dr. Okonowsky Elevated Her**

9         **Complaints**

10        On February 18, 2020, Dr. Okonowsky spoke with Acting Warden James

11   Engleman about the page and the offensive posts. Pl. SUF ¶ 40. Engleman said he

12   would have SIA Victor Gonzales, who was Lt. Hellman's supervisor, submit a

13   referral to the Office of Internal Affairs. Pl. SUF ¶ 41.

14        Dr. Okonowsky met with Gonzales and shared some of the printed memes. Pl.

15   SUF ¶ 42. Gonzales told her words to the effect of: "*I looked at the page and I don't

16   really see anything that's a problem*." Pl. SUF ¶ 43. Despite many of the memes

17   being obviously sexist, he insisted that Dr. Okonowsky explain why each one was

18   sexist and harassing. Pl. SUF ¶ 44.

19        During a second meeting a week later, Dr. Okonowsky explained to Gonzales

20   that the page contained posts that made explicit references to FCC Lompoc and that

21   people working at prison were commenting and that only employees of FCC Lompoc

22   would understand most of the purported humor. Pl. SUF ¶ 45.

23        Later, Dr. Okonowsky spoke with Defendant's Human Resources Manager,

24   Taulbee McGinnis, who was an active follower of Lt. Hellman's page and told her

25   the memes were "funny." Pl. SUF ¶ 46.

26        Throughout February and March 2020, Dr. Okonowsky complained to Dr.

27   Clemmer that many co-workers were "liking" Lt. Hellman's posts and regularly

28   interacting with the page. Pl. SUF ¶ 47. Dr. Okonowsky also told Dr. Clemmer

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

that she feared retaliation and also expressed concern that her complaints were not taken seriously because the investigators (i.e. the acting HR Manager, Union President and SIS staff) were followers of the page themselves. Pl. SUF ¶ 48.

## E. Lt. Hellman's Unofficial FCC Lompoc Page Bled Into Dr. Okonowsky's Physical Workplace

Lt. Hellman's postings continued to offend Dr. Okonowsky. Pl. SUF ¶ 49. Many of the posts were critical of her as a female employee. Pl. SUF ¶ 50. Dr. Okonowsky feared that since many employees liked and commented on the posts targeting her, her physical workspace could be in danger. Pl. SUF ¶ 51. She worked in a dangerous Federal Prison and if her co-workers were influenced by Lt. Hellman's disrespect towards her and other females, safety could be compromised. Pl. SUF ¶ 52. She wondered: if I'm attacked by an inmate, will Lieutenant Hellman's crew help me or treat me like the female joke he portrays? Pl. SUF ¶ 53.

Dr. Okonowsky repeatedly complained that she was offended by the posts and expressed that they affected her at work because she felt ostracized at the brunt of jokes and was constantly worried about which employees had seen her targeted memes. Pl. SUF ¶ 54. Because of the harassment and effects on her mental health, her productivity suffered, and she had to work harder to get the same tasks completed. Pl. SUF ¶ 55.

Dr. Okonowsky's fears were realized after she heard conversations among co-workers discussing Lt. Hellman's page. Pl. SUF ¶ 56. She also witnessed co-workers discussing the content of the page during working hours. Pl. SUF ¶ 57. Dr. Okonowsky was confident that any employees who viewed the page would know that she was the subject of the offensive memes. Pl. SUF ¶ 58.

On March 7, 2020, Dr. Okonowsky was shocked to see Lt. Hellman posted a meme that was clearly targeting her: Pl. SUF ¶ 59.

///

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**



Pl. SUF ¶ 60.

The meme shows Dr. Okonowsky's likeness and included comments that were derogatory towards women. Pl. SUF ¶ 61. The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." Pl. SUF ¶ 62. The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." (Id.) Seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post. Pl. SUF ¶ 63.

## F. Per Defendant's Request, Dr. Okonowsky Continued To Report New Offensive Posts

On March 7, 2020, Dr. Okonowsky reported to Dr. Clegg and Engleman that the social media posts targeting her on the Lompoc page had continued. Pl. SUF ¶ 64.

The following day, Gonzales called Dr. Okonowsky and informed her that he had not yet submitted the referral to the Office of Inspector General because he "*could not figure out how to print the memes*" and "*had other things going on*." Pl. SUF ¶ 65.

On March 9, 2020, Dr. Okonowsky expressed her frustration to Dr. Clemmer that the harassment was continuing. Pl. SUF ¶ 66. Later, Dr. Okonowsky was required to work in the Receiving and Discharge department along with Lt. Hellman. Pl. SUF ¶ 67. She was petrified. Pl. SUF ¶ 68. Not only did she feel that her complaints were ignored, but his physical presence caused her to shift focus

from helping prisoners with their mental health needs – i.e. her job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against her. Pl. SUF ¶ 69.

On March 11, 2020, Dr. Okonowsky submitted a 48-page memo to Associate Warden Gutierrez detailing the harassing memes that continued to be posted by Lt. Hellman and detailing why each meme was offensive and harassing. Pl. SUF ¶ 70. At this time, the page had over 570 posts and Dr. Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted her and other employees at FCC Lompoc. Pl. SUF ¶ 71.

For example, there was a meme that said, "*When psychology services doesn't get their way and they cry*" and an FCC Lompoc employee posted a comment directly referencing a SHU meeting, which was attended by Dr. Okonowsky and where a correctional officer told her: "*I intentionally don't help you.*" Pl. SUF ¶ 72. Dr. Okonowsky then saw the meme referencing her job at psychological services, that several FCC Lompoc employees had liked the meme including Grice, and that another FCC Lompoc employee who was also at that meeting left a comment referencing this specific workplace interaction that Dr. Okonowsky was involved in. Pl. SUF ¶ 73.

### G. Defendant Failed To Promptly Investigate Dr. Okonowsky's Complaints And Allowed The Harassment To Continue

Dr. Okonowsky's complaints were repeatedly dismissed by the Defendant and the memes only continued. Pl. SUF ¶ 74. On March 13, 2020, instead of addressing Dr. Okonowsky's complaints of harassment, Dr. Okonowsky was provided a referral to Defendant's Employee Assistance Program, which provides counseling to Defendant's employees to help them address concerns that may negatively impact job performance and overall well-being. Pl. SUF ¶ 75.

On March 27, 2020, Dr. Okonowsky submitted a memo to Defendant

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

3-ER-0161

detailing how Lt. Hellman continued to post offensive and sexist content. Pl. SUF ¶ 76. For example, one new meme suggested that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" Pl. SUF ¶ 77. Dr. Okonowsky detailed in her memo how Defendant had failed to promptly investigate her complaints and stop the harassing conduct. Pl. SUF ¶ 78.

That same day, March 27, 2020, Lt. Hellman targeted Dr. Okonowsky with a meme referring to her as a "*giant cunt*" and someone who "relentlessly tells on staff." Pl. SUF ¶ 79. Several FCC Lompoc staff members "liked" the post, including Grice, who Dr. Okonowsky previously lodged a complaint. Pl. SUF ¶ 80.



Pl. SUF ¶¶ 81-82.

Dr. Okonowsky immediately complained to Engleman. Pl. SUF ¶ 83. However, he did not investigate any of Dr. Okonowsky's complaints and only forwarded them on to Gonzales. Pl. SUF ¶ 84.

## H. Defendant's Own Threat Assessment Team Confirmed The Harassing Memes Were Directed at Dr. Okonowsky

On April 13, 2020, more than two months after Dr. Okonowsky's initial complaints, a Threat Assessment Team was convened to review Dr. Okonowsky's

11

"concerns about [a] hostile work environment and social media use in violation of policy," as detailed in a memorandum and supporting documentation she submitted to management on March 11, 2020. Pl. SUF ¶ 85.

Dr. Okonowsky told the Threat Assessment Team that since she submitted her memorandum, she continued to see memes on the page directed at her. Dr. Okonowsky also explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Pl. SUF ¶ 86. During meeting, Dr. Okonowsky was advised to both not look at the page but also to continue to look at the page to report any additional posts. Pl. SUF ¶ 87. Dr. Okonowsky did not consent to continue viewing the page, she was told by management that she needed to. Pl. SUF ¶ 88.

Significantly, on April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Pl. SUF ¶ 89. Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Pl. SUF ¶ 90.

## I. Defendant Issued Lt. Hellman A Cease-and-Desist Letter To Force Him To Take Down His Unofficial FCC Lompoc Instagram Page

The Threat Assessment Team also made several recommendations to Defendant including referring Lt. Hellman to the Office of Internal Affairs for possible policy violations; issuing a cease-and-desist letter from posting on social media any memes/information which violates Agency policy; and a referral to the Employee Assistance Program. Pl. SUF ¶ 91.

Defendant followed the recommendations. Pl. SUF ¶ 92. On April 16, 2020, Defendant issued Lt. Hellman a Cease-and Desist Order, ordering him to cease

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

and desist posting content on social media in violation of Defendant's policies, including content that could reasonably be deemed as harassing or bullying of another employee and any information which discredits the Bureau of Prisons. (Id.) This Cease-and-Desist Order reminded Lt. Hellman that as a "supervisor" he is held to a higher standard of conduct. Pl. SUF ¶ 93. On April 16, 2020, Defendant also issued Lt. Hellman a referral to the Employee Assistance Program. Pl. SUF ¶ 94.

### J. Lt. Hellman Continued To Harass Dr. Okonowsky Even After Being Issued A Cease-and-Desist Letter

Even after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Dr. Okonowsky's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee process. Pl. SUF ¶ 95.

Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020[4]. Pl. SUF ¶ 96. Lt. Hellman admits he ultimately took the page down because of Dr. Okonowsky's complaints and the related investigation. Pl. SUF ¶ 99. However, Lt. Hellman also claims that he was never interviewed as part of Defendant's alleged investigation. Pl. SUF ¶ 100.

Defendant also continues to allow its staff to be targeted by misogynistic Instagram posts. A copycat account from FCI Victorville made the news in 2022.[5]

## IV. LEGAL ARGUMENT

Considering all the evidence and considering such evidence in the light most

---

[4] On January 24, 2021, because of the harassment she experienced at FCC Lompoc, Dr. Okonowsky transferred to FCC Seagoville, TX. On July 6, 2022, Dr. Okonowsky resigned from Defendant and now works as a psychologist for Dallas Fire-Rescue. Pl. SUF ¶¶ 97-98.
[5] https://www.ktvu.com/news/whistleblower-outs-racist-misogynistic-instagram-page-at-california-federal-prison.

favorable to Dr. Okonowsky, while resolving any doubts her favor, Dr. Okonowsky has more than sufficient evidence to create triable issues as to her claim for gender/sex discrimination/harassment in violation of Title VII.[6] (*See* <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451, 456 (1992). To prevail on a hostile work environment claim, a plaintiff must prove: (1) that she was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. <u>Swinton v. Potomac Corp.</u>, 270 F.3d 794, 803-05 (9th Cir. 2001).

### A. Plaintiff Was Subject to "Workplace" Harassment

A hostile work environment claim must be evaluated by looking at the totality of the circumstances. *See* <u>Harris v. Forklift Sys., Inc.</u>, (1993) 510 U.S. 17, 23. Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." <u>Meritor Sav. Bank, FSB, v. Vinson</u>, (1986) 477 U.S. 57, 65. While the conduct complained of must occur at the "workplace" to be actionable, Courts have expanded the meaning of the "workplace" to recognize the reality that harassment not committed at the workplace may still have consequences there. *See* <u>Ferris v. Delta Air Lines</u>, *Inc.* (2nd Cir. 2001) 277 F3d 128, 135 [The rape of a female flight attendant by a male flight attendant in a hotel room the airline provided during a layover in a foreign country occurred in a "work environment" under Title VII.]; *see also* <u>Doe v. Oberweis Dairy</u> (7th Cir. 2006) 456 F3d 704, 715

---

[6] The 9th Circuit has "emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." (<u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1112 (9th Cir. 2004).) Therefore, "very little evidence" is needed to survive summary judgment. *(*<u>Lam v. Univ. of Hawaii</u>, 40 F3d 1551, 1564 (9th Cir. 1994).)

14

1  [A supervisor's statutory rape of a minor employee at his apartment was

2  workplace-related sexual harassment: "The sexual act need not be committed in the

3  workplace, however, to have consequences there."].

4       Indeed, the critical inquiry is not whether the harassment occurred within the

5  four corners of the worksite, or even if the victim was present at the time of the

6  harassing conduct, but whether the harassment between the employees is

7  sufficiently related to their employment to constitute a "work environment."

8  *See* <u>Schwapp v. Town of Avon</u>, (2nd Cir. 1997) 118 F.3d 106, 111; *see*

9  *also* <u>Young, Conaway, Stargatt & Taylor</u>, *Six Sexual Harassment Myths*

10  *Shattered,* <u>2 No. 4</u> *Del. Employment L. Letter* 1 (April 1997) (observing that "[i]t is

11  clear today that the fact that the harassment occurred away from the workplace will

12  carry little weight with the courts."). Thus, Courts have routinely found

13  "workplace" conduct extends to conduct in text messages and on social media. For

14  instance, in <u>EEOC v. Fry's Electronics, Inc.</u>, 2:10-CV-1562-RSL, Fry's Electronics

15  was ordered to pay $2.3 million to settle a lawsuit brought by the EEOC which

16  alleged sexual harassment based on an assistant store managers text messages to a

17  young employee. In addition, a court upheld a $1.6 million verdict in favor of an

18  employee who was harassed by co-workers on a blog outside the workplace. (*See*

19  <u>Espinoza v. County of Orange</u> (Cal. Ct. App., Feb. 9, 2012) 26 A.D. Cases 31, as

20  modified on denial of reh'g (Mar. 12, 2012).) Further, in <u>Blakey v. Continental</u>

21  <u>Airlines, Inc.</u> a court found that just because an electronic bulletin board may be

22  located outside of a workplace, does not mean that an employer has no duty to

23  correct off-site harassment by co-employees. <u>Blakey v. Continental Airlines,</u>

24  <u>Inc.</u> (2000) 164 N.J. 38, 57.[7]

25

26  _____

27  [7] The cases cited by Defendant in its Motion are all unpublished and/or distinguishable from the
   instant case. Defendant repeatedly cites to <u>Fuller v. Idaho Dep't of Corr.</u>, 694 F. App'x 590, 591

28  (9th Cir. 2017), and contrary to Defendant's assertions, the Court held, "In an opinion filed
   today, we vacate that summary judgment insofar as it involved Fuller's claim that a hostile work
   environment was caused by the IDOC's actions after she was raped." Additionally, in the

15

B&G | BROCK & GONZALES

Here, the off-site encounters between Dr. Okonowsky and Lt. Hellman on Lt. Hellman's Instagram page were sufficiently related to their employment, while also infiltrating the actual workplace, such as to constitute a hostile work environment. *See e.g.*, Fisher v. Mermaid Manor Home for Adults, LLC, 192 F.Supp.3d 323, 326 (E.D.N.Y., 2016) (holding that a reasonable juror could find that a single Instagram post comparing the plaintiff to a fictional chimpanzee from the Planet of the Apes movie, along with a post stating, "Yo dont my f***ing coworker looks like conellsussssssssssss from the movie PLANET of the APES lmfaooo," created a hostile work environment.)

First, Lt. Hellman's page was followed by over a hundred employees at FCC Lompoc, including a Human Resources Manager and the Union President. Employees frequently liked and commented on these posts about interactions in the workplace, including interactions with Dr. Okonowsky. Dr. Okonowsky also talked to several employees who regularly liked and commented on the page. In fact, both Safety Manager Robert Grice and HR Manager Taulbee McGinnis told Dr. Okonowsky at work that they thought the memes were funny. Dr. Okonowsky also overheard her coworkers talking about the page at work.

In the instant case, the Instagram page was so intimately intertwined with conduct in the workplace that it is impossible to separate the offsite conduct from

published opinion in Fuller, 865 F.3d 1154, 1162, that is not cited by Defendant, the Court explains its holding and found "viewing the evidence in the light most favorable to Fuller, a reasonable trier of fact could also find that the IDOC's actions were sufficiently severe or pervasive to create a hostile work environment." Several of the other unpublished cases cited by Defendant are also distinguishable from the instant case. *See* Candelore v. Clark Cnty. Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992) (holding that "A co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment."); Jenott v. St. Alphonsus Reg'l Med. Ctr., No. CV08-322-S-EJL, 2009 WL 5200524, at *7 (D. Idaho Dec. 23, 2009) (granting summary judgment when, " Significantly, the incidents occurred over a two and half year period and were never aimed at the Plaintiff."); Bottenberg v. Carson Tahoe Hosp., No. 5-cv-684, 2007 WL 9771085 at *4 (D. Nev. May 17, 2007) (granting summary judgement when Plaintiff never reported the harassing incidents to anyone at Defendant.)

16

the onsite activities. Not only did the memes refer to Dr. Okonowsky, but they would only make sense to FCC Lompoc employees. Further, Lt. Hellman posted memes that were in direct response to Dr. Okonowsky's complaints at the workplace, including one post with the hashtag *#youcantakeadickbutnotajoke* and another targeted post referring to Dr. Okonowsky as a "*cunt.*" Dr. Okonowsky also explained to the Threat Assessment Team, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and coworkers were talking about the page.

Finally, and as conclusive evidence that the conduct was workplace related, Defendant disciplined Lt. Hellman for his conduct for violating its Anti-Harassment policy. Defendant issued Lt. Hellman a cease-and-desist letter from posting on social media in violation of Defendant's policy. In fact, Lt. Hellman admitted that he took the page down after the continued complaints and investigation by Defendant. How and why would Defendant punish Lt. Hellman if his conduct was not related to the workplace? Defendant's admission that it punished Lt. Hellman, is evidence that Lt. Hellman's conduct offsite had a direct effect at the workplace.

By forcing Lt. Hellman to take his harassing page down, Defendant exercised its power as his employer. The enforcement of employer policies over a seemingly personal website demonstrates that Defendant recognized that his page was an extension of the workplace or could be seen as government sanctioned. This affirmative action creates a genuine issue as to whether the harassment occurred in the workplace.

A jury could certainly find that by enforcing its employment policies on a public employee's personal Instagram page and ordering him to take it down is strong evidence that the harassment was a workplace disruption. "[P]romoting workplace efficiency and avoiding workplace disruption" is a valid government interest that can justify speech restrictions. <u>Dodge v. Evergreen</u>, 56 F.4th 767, 781-

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

82 (9th Cir. 2022) (citing <u>Hufford v. McEnaney</u>, 249 F.3d 1142, 1148 (9th Cir. 2001)). Indeed, the 9th Circuit limits the speech of government employees under very limited circumstances:

> Whether speech disrupted the workplace is fact-specific and depends on 'the manner, time, and place in which' the employee's speech took place." <u>Clairmont v. Sound Mental Health</u>, 632 F.3d 1091, 1107 (9th Cir. 2011) (citation omitted). Speech is disruptive only when there is an 'actual, material and substantial disruption,' or [there are] 'reasonable predictions of disruption' in the workplace." Disruption 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' <u>Dodge</u>, 56 F.4th at 781-82 (citations omitted.)

Defendant's actions in limiting Lt. Hellman's speech demonstrates that the page was an "actual, material and substantial disruption,' or 'reasonable predictions of disruption' in the workplace." <u>Robinson v. York</u>, 566 F.3d 817, 824 (9th Cir. 2009). As such, in construing the facts in the light most favorable to Dr. Okonowsky, there is a genuine dispute as to whether she suffered "workplace" harassment.

## B. The Harassment Was Severe And Pervasive

Where the severity or pervasiveness of abuse is questionable, "it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." <u>Davis v. Team Elec. Co.</u> (9th Cir. 2008) 520 F3d 1080, 1096. "Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological

18

1   well-being is, of course, relevant to determining whether the plaintiff actually

2   found the environment abusive. But while psychological harm, like any other

3   relevant factor, may be taken into account, no single factor is required." <u>Harris v.</u>

4   <u>Forklift Sys., Inc.</u>, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).

5       It need not be shown that the offensive comments or conduct were intended

6   to be seen or heard by the victim. <u>EEOC v. PVNF, L.L.C.</u> (10th Cir. 2007) 487 F3d

7   790, 798 (vulgar and offensive email between 2 male employees concerning

8   female coworker's genitalia could be evidence of harassment even though she was

9   not intended recipient of the email.) It is enough that the conduct, whether blatant

10   or subtle, discriminates against a person solely *because of* the person's sex.

11   *See* <u>Parker v. Reema Consulting Services, Inc.</u> (4th Cir. 2019) 915 F3d 297, 303

12   (false workplace rumors that employee was promoted because of sexual

13   relationship with superior could support sex-based harassment claim "because

14   'traditional negative stereotypes regarding the relationship between the

15   advancement of women in the workplace and their sexual behavior stubbornly

16   persist in our society,' and 'these stereotypes may cause superiors and coworkers

17   to treat women in the workplace differently from men'")

18       In the present case, the harassment Dr. Okonowsky was both severe and

19   pervasive. Lt. Hellman posted over *900* hundred sexist, racist, homophobic,

20   transphobic, and otherwise offensive memes on his Instagram page that was

21   followed by of *hundreds* of FCC Lompoc employees. Lt. Hellman was also posting

22   memes clearly targeting Dr. Okonowsky. One such post referred to Dr.

23   Okonowsky as a "giant cunt," another referred to a party Dr. Okonowsky planned

24   on hosting as a "gang bang," another targeted Dr. Okonowsky based on her

25   complaints and her sex with a caption that said, "When you can't get a man, so you

26   get offended," and another using a sexist hashtag "#youcantakeadickbutnotajoke."

27   Lt. Hellman also regularly posted memes that included sexually explicit images of

28   woman in various states of undress including images of women with their breasts

<div align="center">19</div>

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

exposed and in short skirts and shorts. FCC Lompoc employees were "liking" and commenting on these posts and discussing them at work. As such, the harassment bled into the workplace because interactions Dr. Okonowsky was having at work were showing up on the page.

Dr. Okonowsky also feared for her safety at work as the posts targeting her increased. Dr. Okonowsky worked in an inherently dangerous environment and if her co-workers were influenced by Lt. Hellman's disrespect towards her and other women, safety would be compromised. Dr. Okonowsky was deeply offended by the posts and expressed that they affected her at work because she felt ostracized at the brunt of jokes and was constantly worried about which employees had seen her targeted in these memes. The harassment undoubtedly had effects on her mental health as her productivity suffered and she began having to work harder to get the same tasks completed. Again, Defendant's own Threat Assessment Team also determined that the memes were directed at Dr. Okonowsky and that Lt. Hellman's actions violated the definition of "bullying" from Defendant's Anti-Harassment Policy.

**1. The Page's Discriminatory Posts Outside of Plaintiff's Protected Classes Are Relevant To Her Harassment Claim**

To support a hostile work environment claim, plaintiffs can combine evidence of several different types of harassment. *See* Hafford v. Seidner (6th Cir. 1999) 183 F.3d 506, 515 (evidence of religious harassment could help support racial hostile work environment); Hicks v. Gates Rubber Co., (10th Cir. 1987) 833 F.2d 1406, 1416 (court may aggregate evidence of racial hostility and sexual hostility in determining pervasiveness of harassment). Because the inquiry focuses on the workplace environment as a whole, a hostile environment may exist even if some of the hostility is directed at other workers. Thus, where racial slurs have been directed at a minority race of which plaintiff is a member, similar slurs

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

3-ER-0171

directed at other minorities may contribute to the overall hostility of the working environment. <u>McGinest v. GTE Service Corp.</u>, (9th Cir. 2004) 360 F.3d 1103, 1117 ("if racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff.").

Lt. Hellman posted *hundreds* of sexist, racist, homophobic, and offensive memes that made explicit references to FCC Lompoc and its employees. At the time Dr. Okonowsky submitted her March 11, 2020 memorandum to Defendant, the page had over 570 posts and Dr. Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts. Lt. Hellman continued posting hundreds of sexist and discriminatory memes for at least another two months. Dr. Okonowsky's submitted another Memorandum to Defendant on May 12, 2020 detailing how Lt. Hellman had made over *930* posts since January 2020 most of which were explicitly sexist, racist, homophobic and harassing and how FCC Lompoc employees were continuing to view and interact with the page. Lt. Hellman's blatant hostility towards other protected groups is further evidence of the hostile work environment he created.

**2. <u>Lt. Hellman Is A Supervisor; Therefore, Defendant Is Vicariously Liable Even If They Took Immediate And Corrective Action</u>**

First, Defendant is strictly liable for Lt. Hellman's conduct *regardless of its subsequent actions*. Under Title VII, a supervisor is treated as the employer's agent so that the employer is subject to vicarious liability to a victimized employee for the supervisor's conduct. *See* <u>Faragher v. City of Boca Raton</u> (1998) 524 US 775, 807. Thus, where the requirements for sexual harassment exist, the employer is vicariously liable for the supervisor's harassment, and it is immaterial whether the employer was aware or should have been aware or was negligent in failing to prevent it. *See* <u>Burlington Industries, Inc. v. Ellerth</u> (1998) 524 US 742, 757.

An employee is a "supervisor" for purposes of subjecting the employer to Title VII vicarious liability when that employee has the authority to make tangible employment decisions. <u>Vance v. Ball State Univ.</u>, (2016) 570 US 421, 431.

Lt. Hellman is a supervisor. Critically, the Cease-and-Desist letter Defendant issued Lt. Hellman reminded him that as a "supervisor" he is held to a higher standard of conduct. He supervised the custody staff at FCC Lompoc and ran operations. He was also responsible for overseeing the facility, had several direct reports, and was a member of the Special Investigative Services and was responsible for investigating violations of the law and prison rules regarding the prison. . Even beyond this, there is nothing in the record indicating that he was not a supervisor. Therefore, Defendant is strictly liable for Lt. Hellman's harassing and discriminatory conduct and at a minimum, Lt. Hellman's status as a supervisor remains a genuine issue.

### 3. <u>Defendant Failed To Immediately Take Steps To Prevent The Harassment After Becoming Aware Of It</u>

Second, even if Lt. Hellman is not found to be a supervisor, Defendant was nonetheless aware of the harassment long before they allegedly took steps to end it. Initially, it must be noted that Defendant did not become aware of the harassment when Dr. Okonowsky reported it – *the record indicates they knew about the harassment long before then*! Specifically, Human Resources Manager Taulbee McGinnis was an active follower of Lt. Hellman's page. An employer may be liable when an employer's management knows or should have known of the harassment by plaintiff's coworkers or others or through other circumstances and failed to take appropriate corrective action. <u>Swinton v. Potomac Corp.</u> (9th Cir. 2001) 270 F3d 794, 804; *see* <u>Waltman v. International Paper Co.</u> (5th Cir. 1989) 875 F2d 468, 471 (employer had constructive notice of harassment where "sexually explicit pictures and graffiti derogating the plaintiff" were posted in common areas.) Knowledge of sexual harassment is imputed to the employer when

---

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

reported to an employee *specifically employed to deal with sexual harassment*; e.g., part of the employer's human resources, personnel or employee relations group or department. Huston v. Procter & Gamble Paper Products Corp., (3rd Cir. 2009) 568 F3d 100, 107-108. Merely persuading identified harassers to cease their activities may not be adequate remediation where the employer took no action to ensure that harassment did not continue by others. McGinest v. GTE Service Corp. (9th Cir. 2004) 360 F3d 1103, 1121.

In this case, McGinnis was an H.R. manager responsible for responding to harassment complaints. Had he taken affirmative steps to end the conduct, Dr. Okonowsky would either not have been harassed at all or the harassment would have ceased.

Moreover, even after Dr. Okonowsky complained, Defendant did not take immediate corrective and preventative action. Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020. *In the meantime, Dr. Okonowsky continued to be harassed* and Lt. Hellman posted *hundreds* of additional memes.

The evidence also indicates that the delay in Defendant's action was not due to the pandemic – Defendant certainly offered no evidence in the record to support such action. The more likely reason for the delay was because Dr. Okonowsky's complaints were repeatedly dismissed, forcing her to continue to complain. For instance, when she initially complained, management told her there was no reason to investigate or convene a Threat Assessment Team. Dr. Okonowsky was also told that the memes were not a problem, that she needed to get thicker skin, and that she should just stop looking at the page. Thus, the harassing memes targeting Dr. Okonowsky continued, and Defendant took no action. In fact, had Dr. Okonowsky not complained, Lt. Hellman would most likely still be targeting women at FCC Lompoc with his disgusting Instagram page.

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Finally, even after Defendant held put together a Threat Assessment Team on April 13, 2020, almost two months after Dr. Okonowsky's initial complaints, Lt. Hellman continued to post sexist and offensive memes targeting her. Importantly, Lt. Hellman claims that he was never even interviewed as part of Defendant's alleged investigation. Thus, Defendant failed to take immediate corrective action and Dr. Okonowsky utilized the appropriate complaint procedures so Defendant cannot utilize this defense. At a minimum, the issue remains a factual question for the jury.

## V. **CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied in its entirety.


DATED: March 13, 2023                 BROCK & GONZALES, LLP


                                      By: _____

                                      D. AARON BROCK
                                      CORY H. HURWITZ
                                      LINDSAY L. BOWDEN
                                      Attorneys for Plaintiff

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# PROOF OF SERVICE
## UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

Jessica Sanchez

3-ER-0176

**BROCK & GONZALES, LLP**

6700 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673

D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an
individual,

        Plaintiff,

    vs.

MERRICK GARLAND,
ATTORNEY GENERAL UNITED
STATES DEPARTMENT OF
JUSTICE, FEDERAL BUREAU
OF PRISONS,

        Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S STATEMENT OF
UNDISPUTED FACTS AND
CONCLUSIONS OF LAW**

*[Plaintiff's Notice of Opposition and Opposition
to Defendant's Motion for Summary Judgment;
Declaration of Lindsay Okonowsky; Declaration
of Lindsay L. Bowden; Plaintiff's Written
Objections to Defendant's Evidence; and
[Proposed] Order re: Plaintiff's Written
Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**
**Courtroom: 6A**

1
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS
AND CONCLUSIONS OF LAW**

**TO THE HONORABLE COURT, ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:**

Plaintiff Lindsay Okonowsky submits the following Oppositions to Defendant Merrick Garland's Statement of Undisputed Facts and Conclusions of Law in Support of her Opposition to Defendant's Motion for Summary Judgement.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S UNDISPUTED FACTS**

| Def's SUF No. | Fact | Supporting Evidence | Pl.'s Response |
|---|---|---|---|
| 1. | On February 18, 2020, Plaintiff complained to Acting Warden ("AW") James Engelman regarding content on the Page. | Engleman Decl. ¶ 3 | **1. Disputed.** Plaintiff did <u>not</u> complain to Engleman about "content on the Page." Rather, Plaintiff told him: "this Instagram page that is inappropriate, it's racist, it's sexist, it's homophobic. There's some material on that page that could pose a significant public relations issue for the prison and the BOP as a whole if somebody from the public were to see the page. There are, you know, posts that are targeting specific departments. And that was the most significant parts of our conversation." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 27:16-25. |
| 2. | At the time of Plaintiff's meeting | Engleman Decl. ¶ 3 | 2. Undisputed but immaterial. |

2

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | with AW Engleman, Plaintiff did not know nor identify the author of the Page | | |
| 3. | On February 18, 2020, AW Engleman instructed Special Investigative Agent ("SIA") Victor Gonzales to investigate Plaintiff's complaints. | Engleman Decl. ¶ 4 | **3.  Disputed.**<br><br>*See* Plaintiff's Objections to Evidence. |
| 4. | On February 18, 2020, Plaintiff's immediate supervisor, Chief Psychologist Dr. Carl Clegg re-assigned her, with her consent, from FCC Lompoc's Medium Facility to the Low Facility because she believed that staff working in Special Housing Unit ("SHU") likely made the memes on the Page. | Clegg Decl. ¶ 4, Ex. A | **4.  Disputed.**<br><br>*See* Plaintiff's Objections to Evidence. |
| 5. | On February 18, 2020, Plaintiff again visited the Page, viewing a meme containing a picture | Varshovi Decl. ¶ 2, Ex. A-1 (Pl.'s Dep. 100:12- | 5.  Undisputed. |

3

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | of former Speaker Nancy Pelosi tearing the State of the Union of Address in half, captioned with "When you get butthurt by memes," "Tomorrow's forecast?  Hot enough to melt a snowflake #youcantakeadickbutnotajoke." | 100:13); id. ¶ 3, Ex. B-1 (copy of Speaker Pelosi meme) | |
| 6. | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-1 (Pl.'s Dep. 100:14-101:5) | **6.  Disputed.**<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8.<br><br>Plaintiff explained that the post targeted her because two hours before the post was made, she had conversations at work with Grice, Engleman, and the chief psychologist where she reported the page. Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 101:12-25. |

4

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.<br><br>Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. Okonowsky Decl. ¶ 6.<br><br>The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26.<br><br>Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.<br><br>Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9.

Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20.

Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0182

happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21.

Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0183

manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16.

On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.

Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 7. | On February 19, 2020, at 7:07 AM, Plaintiff e-mailed the meme to AW Engleman, writing in relevant part, "I think the most recent post I sent you may warrant another conversation. If you have time today, please give me a call . . ." | Engleman Decl. ¶ 5, Ex. A | 7. Undisputed. |
| 8. | On February 19, 2020, at 7:50 AM, AW Engelman forwarded Plaintiff's e-mail to SIA Gonzales. | Engleman Decl. ¶ 5, Ex. A | 8. Undisputed. |
| 9. | On February 19, 2020, SIA Gonzales called Plaintiff to schedule a meeting to discuss her complaints. | Engleman Decl. ¶ 6 | **9. Disputed.**<br><br>*See* Plaintiff's Objections to Evidence. |
| 10. | On February 26, 2020, SIA Gonzalez met with Plaintiff to discuss her complaints regarding the Page. | Engleman Decl. ¶ 7 | **10. Disputed.**<br><br>*See* Plaintiff's Objections to Evidence. |
| 11. | On March 7, 2020, at 12:46 PM, Plaintiff e-mailed AW | Engleman Decl. ¶ 8, | 11. Undisputed. |

9

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | Engleman, attaching a meme from the Page, writing in relevant part "This is completely inappropriate and is setting the tone for a strikingly hostile work environment." | Ex. B, at 1-2 | |
| 12. | The meme, attached to Plaintiff's March 7, 2020 e-mail, which Plaintiff viewed by visiting the Instagram page, captioned a picture of a woman holding a milkshake, with "Feeling cute, might put on a watch later," and "If psychology had to cover the morning watch shifts all weekend, nobody'd [sic] ever go on watch #changemymind." | Engleman Decl. ¶ 8, Ex. B, at 2; Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 102:10-102:12). | **12. Disputed.**<br><br>The cited evidence does not provide *any* description of this meme. Plaintiff described the meme much differently: "it absolutely targets me" because right before it was posted, Lt. Hellman blocked her from the page and she believed "the woman in the photo is kind of like, you know, it exaggerated likeness to some degree." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 102:10-12; 103:2-25. |
| 13. | Plaintiff asserted that the meme "is derogatory toward women, is critical of women's (specifically my) | Varshovi Decl. ¶ 3, Ex. B-2 | **13. Disputed.**<br><br>The cited evidence does not provide *any* description of this meme. Plaintiff described the meme much differently saying: "it |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| bodies"), and diminishes the role of Psychology Services . . . and challenges the competency of the Psychology Services department." | | | absolutely targets me" because right before it was posted, Lt. Hellman blocked her from the page and she believed "the woman in the photo is kind of like, you know, it exaggerated likeness to some degree." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 102:10-12; 103:2-25. |
| 14. | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 102:13-103:1) | **14. Disputed.** <br><br> While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8. <br><br> Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8. <br><br> Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | | Union President. Okonowsky Decl. ¶ 6. |
|1| | | | | |
|2| | | | | The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26. |
|3| | | | | |
|4| | | | | |
|5| | | | | |
|6| | | | | |
|7| | | | | Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8. |
|8| | | | | |
|9| | | | | |
|10| | | | | |
|11| | | | | |
|12| | | | | |
|13| | | | | |
|14| | | | | Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1. |
|15| | | | | |
|16| | | | | |
|17| | | | | |
|18| | | | | |
|19| | | | | |
|20| | | | | Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9. |
|21| | | | | |
|22| | | | | |
|23| | | | | |
|24| | | | | Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20. |
|25| | | | | |
|26| | | | | |
|27| | | | | |
|28| | | | | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16.

14

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
|---|---|---|---|
| 15. | Even after Plaintiff was blocked from viewing the Page that day by its creator, she nevertheless created a fake Instagram account to continue viewing it on a daily basis as she had since February 18, 2020. | Varshovi Decl. ¶ 4, Ex. C, at 3; Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 103:10-103:11) | **15. Disputed.**<br><br>Plaintiff was told "of course, let [the investigators] know" if the offensive posting "continues to happen." She explained: "So I was really between a rock and a hard place. I was being advised not to look at the page, but then they also told me that they didn't have the resources to monitor the page but to tell them if it kept happening. Right? So I was kind of like -- that's all I could say, I was between a rock and a hard place. Like I |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | felt…nobody was communicating that they were going to protect me or do any kind of monitoring, and so again, I felt I was on my own and -- and had to take care of myself." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 60:1-20. |
|---|---|---|---|
| 16. | On March 9, 2020, at 7:52 AM, AW Engleman forwarded Plaintiff's e-mail to SIA Gonzales. | Engleman Decl. ¶ 8, Ex. B, at 1 | 16. Undisputed. |
| 17. | On March 9, 2020, AW Engleman directed SIA Gonzales to refer Plaintiff's complaints regarding the Page to the BOP's Office of Internal Affairs, in addition to the ongoing FCC Lompoc investigation. | Engleman Decl. ¶ 9 | 17. Undisputed. |
| 18. | On March 11, 2020, Plaintiff sent AW Gutierrez a 48-page memo regarding the Page. | Engleman Decl. ¶ 10 | **18. Disputed.**<br><br>Plaintiff did <u>not</u> send "a 48-page memo regarding the Page." Rather, on March 11, 2020, Okonowsky submitted a 48-page memo to Associate Warden Gutierrez detailing the harassing |

16

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | memes that continued to be posted by Hellman and detailing why each meme was offensive and harassing. At this time, the page had over 570 posts and Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted her and other employees at FCC Lompoc. Okonowsky Decl. ¶ 25, Exh. 1. |
|---|---|---|---|---|
| 19. | Plaintiff asserted that, in addition to the meme picturing Nancy Pelosi, the following memes, which she viewed by visiting the Page, were targeted at her: (1) a picture of "stay in your lane" traffic sign, captioned with "When Psychology tries to tell you where you can n [sic] can't cell somebody"; (2) a picture of a cartoon character appearing sad, captioned with "when psychology doesn't get their way"; (3) a picture of a woman wearing a | | Varshovi Decl. ¶ 3, Ex. B-3 (copy of stay in your lane meme); Ex. B-4 (copy of meme of cartoon character); Ex. B-5 (copy of meme of a woman with "struggle is real" sweater); Ex. B-6 (copy of meme of man's face) | **19. Disputed.**<br><br>There is no foundation as to any "assertion" by Plaintiff. The cited evidence merely states: "Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery." Defendant's evidence fails to support this fact.<br><br>Also, *see* Plaintiff's Objections to Evidence. |

17

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| sweater stating "the struggle is real," captioned with "When you piss of the SHU crew, and now you have to pull your own inmates" and "Don't bite the hand that feeds you"; and (4) an undated picture of a man's face, preceded by a caption stating "When a female co-worker invites guys only for an 'End of Quarter' Party" and followed by the caption: "I'm here for the gang bang." | | | |
| 20. | Regarding the meme of "stay in your lane" traffic sign, Plaintiff asserted "This post clearly highlights a lack of respect for psychology services." | Varshovi Decl. ¶ 3, Ex. B-3. | **20. Disputed.**<br><br>There is no foundation as to any "assertion" by Plaintiff. The cited evidence merely states: "Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery." Defendant's evidence fails to support this fact.<br><br>Also, *see* Plaintiff's Objections to Evidence. |

18

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 21. | Plaintiff admitted the meme of the "stay in your lane" traffic sign was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-3 (Pl.'s Dep. 104:16-105:6) | **21. Disputed.**<br><br>The cited evidence does not provide *any* description of this meme.<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8.<br><br>Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.<br><br>Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. Okonowsky Decl. ¶ 6.<br><br>The prison and working conditions were regularly discussed as well as |

19

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26.

Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.

Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9.

Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20.

Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21.

Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a

21

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16.

On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | | | Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
| 22. | Regarding the meme of a cartoon character appearing sad, Plaintiff asserted that "During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. . . . the staff member 'got his way' and me, as 'Psychology,' did not." | Varshovi Decl. ¶ 3, Ex. B-4 | **22. Disputed.**<br><br>There is no foundation as to any "assertion" by Plaintiff. The cited evidence merely states: "Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery." Defendant's evidence fails to support this fact.<br><br>Also, *see* Plaintiff's Objections to Evidence. |
| 23. | Plaintiff admitted that the meme of a | Varshovi Decl. ¶ 2, | **23. Disputed.** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | cartoon character appearing sad was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Ex. A-4 (Pl.'s Dep. 106:6-106:23) | The cited evidence does not provide *any* description of this meme.<br><br>Plaintiff explained an FCC Lompoc employee commented on the post and "the employee's comment references a SHU meeting that I and only I, the only psychologist, was part of. So that to me indicates that yes, other people had the idea that it targeted me as well." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 108:1-6.<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8.<br><br>Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8. |

24

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0200

| | | | | Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. Okonowsky Decl. ¶ 6.

The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26.

Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.

Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9. |
|---|---|---|---|---|

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20.

Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees |

26

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21.

Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0203

| | | | | like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16.<br><br>On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
| 24. | Regarding the meme of a woman wearing a sweater stating "the struggle is real," Plaintiff asserted that "I believe these posts targeted me as the former SHU psychologist. . . . I | Varshovi Decl. ¶ 3, Ex. B-5 | **24. Disputed.**<br><br>There is no foundation as to any "assertion" by Plaintiff. The cited evidence merely states: "Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery." Defendant's evidence fails to support this fact. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0204

| | | | |
|---|---|---|---|
| | believe the posts also reflect Mr. Hellman's pattern of critiquing my physical appearance." | | |
| 25. | Plaintiff admitted that the meme of a woman wearing a sweater stating "the struggle is real," was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-5 (Pl.'s Dep. 116:15-117:7) | **25.  Disputed.**<br><br>The cited evidence does not provide *any* description of this meme.<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8.<br><br>Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.<br><br>Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Union President. Okonowsky Decl. ¶ 6.

The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26.

Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.

Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9.

Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20. |

30
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16. |
|---|---|---|---|---|

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
| 26. | Plaintiff admitted that the meme of a man's face was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-6 (Pl.'s Dep. 109:2-109:17) | **26. Disputed.**<br><br>The cited evidence does not provide *any* description of this meme.<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8. |

33

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8. |
| --- | --- | --- | --- | --- |
| | | | | Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. Okonowsky Decl. ¶ 6. |
| | | | | The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26. |
| | | | | Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8. |
| | | | | Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and |

34

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9.

Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20.

Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21.

Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16.<br><br>On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
|---|---|---|---|---|

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| 27. | On March 11, 2020, at 3:41 PM, Plaintiff e-mailed AW Engelman a copy of her memo. At 7:47 AM, AW Engelman forwarded Plaintiff's memo to SIA Gonzales. | Engleman Decl. ¶ 10, Ex. C | 27. Undisputed. |
| 28. | Also on March 11, 2020, AW Engelman directed SIA Gonzales to provide Ms. Okonowsky's memo to OIA in connection with the original referral submitted on March 9, 2020. | Engleman Decl. ¶ 11 | 28. Undisputed. |
| 29. | On March 11, 2020, as a result of Plaintiff's allegation in her memo as to the identity of the Page's creator that individual was assigned to a different facility at FCC Lompoc while her complaints were investigated. | Engleman Decl. ¶ 12 | **29. Disputed.**<br><br>Plaintiff continued to see the Page's creator Lt. Hellman at work. Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 36:25-38:2; 39:18-23.<br><br>On March 9, 2020, Plaintiff was required to work in the Receiving and Discharge department along with Lt. Hellman. Okonowsky Decl. ¶ 24. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0214

| | | | | Not only did she feel that her complaints were ignored, but his physical presence caused her to shift focus from helping prisoners with their mental health needs – i.e. her job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against her. Okonowsky Decl. ¶ 24.<br><br>During Defendant's alleged investigation, Plaintiff's complaints were repeatedly dismissed and the memes only continued. Okonowsky Decl. ¶ 27. |
|---|---|---|---|---|
| 30. | On March 13, 2020, Dr. Clegg referred Plaintiff to the Employment Assistance Program ("EAP"), which provides free, voluntary counseling to employees. | Clegg Decl. ¶ 5, Ex. B | | **30. Disputed.**<br><br>Clegg referred Plaintiff to the Employment Assistance Program ("EAP") as it offers "confidential counseling to BOP employees **to help them address concerns that may negatively impact job performance** and overall well-being." Engelman Decl., ¶ 19 (emphasis added). |
| 31. | On March 27, 2020, at 9:32 PM, Plaintiff e-mailed AW Engleman, attaching a meme she viewed on the Page, asserting | Engleman Decl. ¶ 13, Ex. D, at 1; Varshovi Decl. ¶ 2, Ex. A-7 | | 31. Undisputed. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | "It is obvious these posts are targeted toward me.  Is anything going to be done to curb this behavior as the investigation takes place?  I shouldn't have to work in an environment with people who refer to me as a [c***] on a public forum."  The next day, at 11:50 AM, AW Engelman forwarded Plaintiff's e-mail to SIA Gonzales. | (121:8-122:9) | |
| 32. | The meme had the caption "The one staff member that's a giant [c***], loves inmates, and relentlessly tells on staff," with a colon before a picture of "United States Penitentiary Big Sandy, Kentucky," in which "Big Sandy" is underlined in red, with a second caption beneath stating "You | Engleman Decl. ¶ 13, Ex. D, at 2 | **32.  Disputed.**<br><br>The cited evidence does not provide *any* description of this meme. Rather, Plaintiff described this meme as "bullying and harassment." Engleman Decl. ¶ 13, Ex. D, at 1; Varshovi Decl. ¶ 2, Ex. A-7 (121:8-122:9) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| 1 | | know, on account of their vaganga [sic]." | | |
| 2 | 33. | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-7 (121:10-122:5) | **33. Disputed.**<br><br>Plaintiff explained, "All of the people on the next page that liked the post are Lompoc employees. So whether it's displayed or not, it's something that permeated the workplace. Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 121:16-23.<br><br>While it's true that the meme was not shown to her in her physical workplace, it was displayed in her extended workplace, namely an unofficial FCC Lompoc Instagram page entitled "8_and_hitthe_gate." Okonowsky Decl. ¶¶ 4, 8.<br><br>Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.<br><br>Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Union President. Okonowsky Decl. ¶ 6.

The prison and working conditions were regularly discussed as well as work meetings and events. Okonowsky Decl. ¶¶ 6-7, 26.

Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Plaintiff determined that this was an unofficial FCC Lompoc employee Instagram page. Okonowsky Decl. ¶ 8.

Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Okonowsky Decl. ¶¶ 6, 25, Exh. 1.

Those offensive memes would often get "liked" and commented on by the other employees. Okonowsky Decl. ¶¶ 7, 9.

Plaintiff's heard conversations at work among co-workers discussing Lt. Hellman's page. Okonowsky Decl. ¶ 20. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Plaintiff explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33.

Plaintiff explained while the posts were not necessarily shown to her in the workplace, they were nevertheless connected to the workplace: "this line of questioning about these posts and whether it was shown to me in the workplace or not really captures, you know, the situation. Like with this post in particular, there was a comment from an employee referencing a meeting that did happen in the workplace. So this is kind of what I'm referencing with that kind of bidirectional relationship with the workplace and the Instagram page. It was a page created by a Lompoc employee for Lompoc employees where Lompoc matters were discussed. So I just think that's important." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 106:21-107:21. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0219

| | | | | Plaintiff further explained that she felt unsafe at work because of Lt. Hellman's posts: "If there is going to be content on that page that's about me, juxtaposed with a previous meme about tomorrow's forecast hot enough to melt a snowflake. Right? I felt that I needed to know what was going on on that page to -- to potentially protect myself from a heated situation. If everybody in the institution knows and not me, that's potentially an unsafe situation because we rely on each other as coworkers, especially in a prison environment. Right? So if there are things circulating on this page that are about me that are, you know, characterizing me in a problematic manner. Right? And I potentially have an emergency in the institution and it's -- it's these employees who engage with this page who are going to be responding to the emergency, I have to rely on them. And so I felt like I needed to know what was going on on that page to --to -- I needed to be well informed." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16. |
|---|---|---|---|---|

44

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | On April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Engleman Decl. ¶ 17, Exh. E, at 2.<br><br>Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 4. |
| 34. | In early April 2020, Barbara Von Blanckensee was assigned as Warden at FCC Lompoc. | Engleman Decl. ¶ 14 | | 34.  Undisputed. |
| 35. | Shortly thereafter, Warden Von Blanckensee was assigned as Warden, AW Engleman apprised her of Plaintiff's complaints regarding the Page and the ongoing | Engleman Decl. ¶ 15 | | 35.  Undisputed. |

45

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | investigation into the same. | | |
|---|---|---|---|---|
| | 36. | On April 13, 2020, Warden Von Blanckensee convened a six-member Threat Assessment Team to review Plaintiff's concerns regarding the Page. | Engleman Decl. ¶ 16 | 36.  Undisputed. |
| | 37. | On April 13, 2020, the Team reviewed Plaintiff's March 11, 2020 memo and interviewed her in-person. | Engleman Decl. ¶ 17, Ex. E, at 2. | **37.  Disputed.**<br><br>Plaintiff "sat down with a group of people and they asked [her] questions and -- yeah."  Plaintiff was told that that he "wouldn't want to fight this case, which [she] thought was striking and stuck with [her] and kind of validated some of [her] concerns." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 131:3-13; 132:7-13. |
| | 38. | During her April 13, 2020, Plaintiff stated that she had "no personal or direct knowledge" as to who ran the Page and that the offending conduct occurred exclusively online. | Engleman Decl. ¶ 17, Ex. E, at 2. | **38.  Disputed.**<br><br>During the meeting, Plaintiff did not state that she had "no personal or direct knowledge as to who ran the page and that the offending conduct occurred exclusively online." She would not have said that because it is not true.  She was told prior to this meeting that Lt. |

46

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | Hellman was operating the page so she would not have said she did not know. Also, she did not ever believe that the harassment occurred "exclusively online." As she explained to the investigators, she felt the harassment not only occurred on the page but bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Okonowsky Decl. ¶ 33. |
| --- | --- | --- | --- | --- |
| | 39. | On April 15, 2020, the Team interviewed the Page's creator in-person upon his return from previously scheduled leave. | Engleman Decl. ¶ 17, Ex. E, at 2. | 39. Undisputed. |
| | 40. | The Page's creator, a correctional officer, admitted that he was the Page's owner and sole contributor, and that the "account was just a joke, 'dark prison humor,' and a way for him to blow off steam." | Engleman Decl. ¶ 17, Ex. E, at 2. | **40. Disputed.**<br><br>The Page's creator was not "a correctional officer." He was Lieutenant Hellman, an admitted Supervisor. Okonowsky Decl. ¶ 5; Bowden Decl. ¶ 5, Exh. D.<br><br>The site was not "just a joke" or "a way for [Lieutenant Hellman] to blow off steam." Rather, this was blatant harassment that violated BOP policy. Engleman Decl. ¶ 17, Exh. E. |

47

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | On April 16, 2020, the Threat Assessment Team issued a report and determined that Hellman "unconvincingly" denied that the memes were directed at Okonowsky. Engleman Decl. ¶ 17, Exh. E.<br><br>Additionally, Threat Assessment Team determined that "Hellman's actions towards Plaintiff (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within this 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E.<br><br>On April 16, 2020, Defendant also issued Lt. Hellman a referral to the Employee Assistance Program. Engleman Decl. ¶ 19.<br><br>Even after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Plaintiff's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee |
|---|---|---|---|---|

48

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | | | process. Okonowsky Decl. ¶ 34, Exhs. 4-5. |
| 41. | But the Page's creator denied that any of his memes were directed at Plaintiff and that he never intended to offend her nor anyone else. | Engleman Decl. ¶ 17, Ex. E, at 2. | **41. Disputed.**<br><br>On April 16, 2020, the Threat Assessment Team issued a report and determined that Hellman "unconvincingly" denied that the memes were directed at Okonowsky. Engleman Decl. ¶ 17, Ex. E.<br><br>Additionally, Threat Assessment Team determined that "Hellman's actions towards Plaintiff (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within this 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Ex. E. |
| 42. | On April 16, 2020, the Team issued a memo to Warden Von Blanckensee, concluding that Plaintiff "did not suffer physical harm or damage to her property, nor was she exposed to potential danger or harm as a result of" the Page's creator actions. | Engleman Decl. ¶ 17, Ex. E, at 3. | 42. Undisputed. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0225

| | 43. | But because the Team found Page's creator actions towards Plaintiff, specifically "posting of several memes that reasonably appear to have been directed solely at her," could constitute bullying, the Team recommended that Page's creator be a Cease-and-Desist Order and that he and Plaintiff should continue to remain in separate complexes. | Engleman Decl. ¶ 17, Ex. E, at 4-5. | **43. Disputed.** |
|---|---|---|---|---|
| | | | | On April 16, 2020, the Threat Assessment Team issued a report and determined that Hellman "unconvincingly" denied that the memes were directed at Plaintiff. Additionally, Threat Assessment Team determined that "Hellman's actions towards Plaintiff (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within this 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Engleman Decl. ¶ 17, Exh. E, at 2-4.<br><br>The Threat Assessment Team also made several recommendations to the Agency including referring Hellman to the Office of Internal Affairs for possible policy violations; issuing a cease-and-desist letter from posting on social media any memes/information which violates Agency policy; and a referral to the Employee Assistance Program. Engleman Decl. ¶ 17, Exh. E, at 4-5.<br><br>On April 16, 2020, Defendant also issued Lt. Hellman a referral to the Employee Assistance Program. Engleman Decl. ¶ 19. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | | This Cease-and-Desist Order reminded Lt. Hellman that as a "supervisor" he is held to a higher standard of conduct. Bowden Decl. ¶ 5, Exh. D.<br><br>Even after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Plaintiff's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee process. Okonowsky Decl. ¶ 34, Exhs. 4-5. |
| 44. | On April 16, 2020, following the Threat Assessment Team's recommendations, a Cease-and-Desist Order was issued to the Page's creator, which ordered the Page's creator to cease and desist posting content on social media in violation of BOP policy, including content that could reasonably be deemed harassing or | Engleman Decl. ¶ 18 | **43. Disputed.**<br><br>This Cease-and-Desist Order reminded Lt. Hellman that as a "supervisor" he is held to a higher standard of conduct. Bowden Decl. ¶ 5, Exh. D.<br><br>However, after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Plaintiff's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee process. Okonowsky Decl. ¶ 34, Exhs. 4-5. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | bullying of another employee. | | |
| 45. | Also on April 16, 2020, following the Threat Assessment Team's recommendations, a referral to the Employee Assistance Program was issued to the Page's creator, which offers free, voluntary confidential counseling to BOP employees to help them address concerns that may negatively impact job performance and overall well-being. | Engleman Decl. ¶ 19 | 45.  Undisputed. |
| 46. | Subsequently, Plaintiff complained of new memes she found offensive, none of which she alleged were directed at her. | Pl.'s Compl. ¶ 25 | **46.  Disputed.** <br><br> The cited evidence does not support this fact. The cited evidence merely states: "Following the Threat Assessment Report on April 16, 2020, almost two months after Plaintiff's initial complaints, Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services."  There is no indication that Plaintiff complained about them or whether any were |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0228

| | | | | directed towards her. Pl.'s Compl. ¶ 25.

Even after the Threat Assessment Team was convened, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and at least one mocking the workplace violence committee meeting process, which Okonowsky took as ridiculing her. Okonowsky submitted several additional memorandums to Defendant detailing the continued posts including one on April 27, 2020 and another on May 12, 2020. Okonowsky Decl. ¶ 34, Exhs. 4-5.

Plaintiff also explained that when Hellman continued to post memes after the workplace violence committee meeting she was scared because he was "flaunting his disregard for that meeting" and "didn't take it seriously and he didn't stop posting at that point." Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 127:14-128:11. |
| 47. | On May 12, 2020, the Page's creator deleted the Page entirely. | Pl.'s Compl. ¶ 26 | **47. Disputed.**

The cited evidence does not support this fact. The cited evidence merely states: "Plaintiff initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, |

---

53

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0229

| | | | 2020." There is no indication that Hellman was the one who "deleted" the entire page or any portion of it. Also, the cited evidence states that the page was "taken down" – not "deleted." Pl.'s Compl. ¶ 26 |
|---|---|---|---|
| 48. | Following the deletion of the Page, Plaintiff made no further complaints and remained a BOP employee for over two years. | Varshovi Decl. ¶ A, Ex. A-8 (Pl.'s Dep. 92:8-92:12); Pl.'s Compl. ¶ 26 | **48. Disputed.** <br><br> The cited evidence does not support this fact. The cited evidence merely states: "Plaintiff initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020." The cited evidence states that the page was "taken down" – not "deleted." Pl.'s Compl. ¶ 26 |
| 49. | Plaintiff continued to receive retention bonuses. | Varshovi Decl. ¶ 2, Ex. A-8 (Pl.'s Dep. 87:13-87:16) | 49. Undisputed but immaterial. |
| 50. | On January 24, 2021, she was promoted to a new position at Federal Correctional Institute Seagoville, Texas, which she received along with a pay raise. | Varshovi Decl. ¶ 2, Ex. A-8 (Pl.'s Dep. 91:13-91:25) | 50. Undisputed but immaterial. |
| 51. | In July of 2022, Plaintiff resigned | Varshovi Decl. ¶ 2, | 51. Undisputed but immaterial. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| | from the Bureau of Prisons. | Ex. A-8 (Pl.'s Dep. 90:21) | |

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

55

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

# PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | Lindsay Okonowsky, Ph.D., a 35-year-old female, began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018. | Okonowsky Decl. ¶ 2. |
| 2. | She was never disciplined and received consistent positive reviews and feedback. | Okonowsky Decl. ¶ 3. |
| 3. | As a Staff Psychologist, Dr. Okonowsky completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. | Okonowsky Decl. ¶ 3. |
| 4. | On February 16, 2020, Dr. Okonowsky became aware of the Instagram page "8_and_hitthe_gate" when the page came up on her personal Instagram as a suggested page she should follow. | Okonowsky Decl. ¶ 4. |
| 5. | Lieutenant Steven Hellman created and ran the Instagram page "8_and_hitthe_gate." | Okonowsky Decl. ¶ 4. <br><br> Engleman Decl. ¶ 17, Ex. E, at 2. <br><br> Bowden Decl. ¶ 4, Exh. C, Hellman EEO Decl. at 4. |
| 6. | Lt. Hellman was a supervisor at FCC Lompoc and worked with Dr. Okonowsky. | Okonowsky Decl. ¶ 5. <br><br> Bowden Decl. ¶ 5, Exh. D. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0232

| 7. | As a Lieutenant, Lt. Hellman had the authority to supervise the custody staff and oversee operations. | Okonowsky Decl. ¶ 5. |
|---|---|---|
| 8. | Lt. Hellman was also responsible for overseeing the facility, had several direct reports, and was a member of the Special Investigative Services ("SIS"). | Okonowsky Decl. ¶ 5. |
| 9. | As an SIS Lieutenant, Lt. Hellman was also responsible for investigating suspected violations of the law and prison rules and policies by both inmates and staff. | Okonowsky Decl. ¶ 5. |
| 10. | Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. | Okonowsky Decl. ¶ 6. |
| 11. | The prison and working conditions were regularly discussed as well as work meetings and events. | Okonowsky Decl. ¶¶ 6-7, 26. |
| 12. | For example, Lt. Hellman posted a meme of Jefferey Epstein on Valentine's Day and dedicated it to the "The SHU Crew" (aka the Special Housing Unit) at FCC Lompoc and around that time, Dr. Okonowsky heard the officers in the SHU Department talking about how funny they thought the post was. | Okonowsky Decl. ¶ 7. |
| 13. | Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page. | Okonowsky Decl. ¶ 8. |
| 14. | Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. | Okonowsky Decl. ¶ 6. |
| 15. | Those offensive memes would often get "liked" and commented on by the other employees. | Okonowsky Decl. ¶¶ 7, 9. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

3-ER-0233

| 16. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 25, Exh. 1, at 32. |
|---|---|---|
| |  | |
| 17. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 25, Exh. 1, at 31. |
| |  | |
| 18. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 25, Exh. 1, at 39. |
| |  | |
| 19. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 34, Exh. 5, at 3. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 20. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 25, Exh. 1, at 32. |
|---|---|---|
| |  | |
| 21. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 25, Exh. 1, at 46. |
| |  | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| 22. | Dr. Okonowsky complained of several harassing memes, including:<br><br> | Okonowsky Decl. ¶ 25, Exh. 1, at 33. |
| 23. | Dr. Okonowsky complained of several harassing memes, including:<br><br> | Okonowsky Decl. ¶ 34, Exh. 4, at 6. |
| 24. | Dr. Okonowsky complained of several harassing memes, including:<br><br> | Okonowsky Decl. ¶ 34, Exh. 4, at 5. |
| 25. | Dr. Okonowsky complained of several harassing memes, including: | Okonowsky Decl. ¶ 34, Exh. 5, at 10. |

60

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| |  | | |
| | 26. | Dr. Okonowsky complained of several harassing memes, including:<br> | Okonowsky Decl. ¶ 34, Exh. 4, at 3. |
| | 27. | Dr. Okonowsky complained of several harassing memes, including:<br> | Okonowsky Decl. ¶ 25, Exh. 1, at 22. |
| | 28. | Dr. Okonowsky was shocked at the content, especially since Lt. Hellman was a supervisor and Lieutenant at her workplace. | Okonowsky Decl. ¶ 9. |
| | 29. | As a woman, she was especially offended at the sexist memes that were overtly demeaning and derogatory. | Okonowsky Decl. ¶ 9. |

61

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| 1 2 | 30. | Dr. Okonowsky considered Lt. Hellman a high-level leader, and the co-worker "likes," and comments caused her concern. | Okonowsky Decl. ¶ 9. |
| 3 4 | 31. | She also believed that his page violated FCC Lompoc policy. | Okonowsky Decl. ¶¶ 9, 25, Exh. 1. |
| 5 6 7 8 | 32. | On February 17, 2020, the day after she found the Instagram page, Dr. Okonowsky reported the page to two supervisors, including her immediate supervisor, Dr. Carl Clegg and Drug Abuse Program Coordinator, Dr. Anne Clemmer. | Okonowsky Decl. ¶ 10.<br><br>Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 25:21-26:11. |
| 9 10 | 33. | On February 18, 2020, Dr. Okonowsky complained to Safety Manager Robert Grice about the page. | Okonowsky Decl. ¶ 11. |
| 11 12 | 34. | Grice was one of many employees that regularly liked and commented on the memes. | Okonowsky Decl. ¶ 11. |
| 13 14 | 35. | He said he thought the posts were "funny" and told her, "Sorry, not sorry" and told her to get thicker skin. | Okonowsky Decl. ¶ 11. |
| 15 | 36. | Dr. Okonowsky was shocked. | Okonowsky Decl. ¶ 11. |
| 16 17 18 19 20 | 37. | Later that day, Dr. Okonowsky saw a meme of Nancy Pelosi ripping up President Trump's State of the Union address on Lt. Hellman's page, with captions that said, "*When you get butt hurt by memes*" and "*Tomorrow's forecast: hot enough to melt a snowflake*" and the hashtag, *#youcantakeadickbutnotajoke*. | Okonowsky Decl. ¶ 12. |
| 21 | 38. | Dr. Okonowsky felt the meme was in response to her complaint just hours earlier. | Okonowsky Decl. ¶ 12. |
| 22 23 24 25 | 39. | She did not feel safe at work. | Okonowsky Decl. ¶ 12.<br><br>Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 70:18-71:16. |
| 26 27 28 | 40. | On February 18, 2020, Dr. Okonowsky spoke with Acting Warden James Engleman about the page and the offensive posts. | Okonowsky Decl. ¶ 13. |

<div align="center">62</div>

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 41. | Engleman said he would have SIA Victor Gonzales, who was Lt. Hellman's supervisor, submit a referral to the Office of Internal Affairs. | Okonowsky Decl. ¶ 13. |
|---|---|---|
| 42. | Dr. Okonowsky met with Gonzales and shared some of the printed memes. | Okonowsky Decl. ¶ 14. |
| 43. | Gonzales told her words to the effect of: "*I looked at the page and I don't really see anything that's a problem.*" | Okonowsky Decl. ¶ 14. |
| 44. | Despite many of the memes being obviously sexist, he insisted that Dr. Okonowsky explain why each one was sexist and harassing. | Okonowsky Decl. ¶ 14. |
| 45. | During a second meeting a week later, Dr. Okonowsky explained to Gonzales that the page contained posts that made explicit references to FCC Lompoc and that people working at prison were commenting and that only employees of FCC Lompoc would understand most of the purported humor. | Okonowsky Decl. ¶ 15. |
| 46. | Later, Dr. Okonowsky spoke with Defendant's Human Resources Manager, Taulbee McGinnis, who was an active follower of Lt. Hellman's page and told her the memes were "funny." | Okonowsky Decl. ¶ 16. |
| 47. | Throughout February and March 2020, Dr. Okonowsky complained to Dr. Clemmer that many co-workers were "liking" Lt. Hellman's posts and regularly interacting with the page. | Okonowsky Decl. ¶ 17. |
| 48. | Dr. Okonowsky told Dr. Clemmer that she feared retaliation and expressed concern that her complaints were not taken seriously because the investigators (i.e. the acting HR Manager, Union President and SIS staff) were followers of the page themselves. | Okonowsky Decl. ¶ 17. |
| 49. | Lt. Hellman's postings continued to offend Dr. Okonowsky. | Okonowsky Decl. ¶ 18. |

63

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| 50. | Many of the posts were critical of her as a female employee. | Okonowsky Decl. ¶ 18. |
| 51. | Dr. Okonowsky feared that since many employees liked and commented on the posts targeting her, her physical workspace could be in danger. | Okonowsky Decl. ¶ 18. |
| 52. | She worked in a dangerous Federal Prison and if her co-workers were influenced by Lt. Hellman's disrespect towards her and other females, safety could be compromised. | Okonowsky Decl. ¶ 18. |
| 53. | She wondered: if I'm attacked by an inmate, will Lt. Hellman's crew help me or treat me like the female joke he portrays? | Okonowsky Decl. ¶ 18. |
| 54. | Dr. Okonowsky repeatedly complained that she was offended by the posts and expressed that they affected her at work because she felt ostracized at the brunt of jokes and was constantly worried about which employees had seen her targeted memes. | Okonowsky Decl. ¶ 19. |
| 55. | Because of the harassment and effects on her mental health, her productivity suffered, and she had to work harder to get the same tasks completed. | Okonowsky Decl. ¶ 19. |
| 56. | Dr. Okonowsky's fears were realized after she heard conversations among co-workers discussing Lt. Hellman's page. | Okonowsky Decl. ¶ 20. |
| 57. | She also witnessed co-workers discussing the content of the page during working hours. | Okonowsky Decl. ¶ 20. |
| 58. | Dr. Okonowsky was confident that any employees who viewed the page would know that she was the subject of the offensive memes. | Okonowsky Decl. ¶ 20. |
| 59. | On March 7, 2020, Dr. Okonowsky was shocked to see Lt. Hellman posted a meme that was clearly targeting her. | Okonowsky Decl. ¶ 21. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 60. | Dr. Okonowsky complained of several harassing memes, including:  | Okonowsky Decl. ¶ 25, Exh. 1, at 26. |
|---|---|---|
| 61. | The meme shows Dr. Okonowsky's likeness and included comments that were derogatory towards women. | Okonowsky Decl. ¶ 21. |
| 62. | The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." | Okonowsky Decl. ¶¶ 21, 25, Exh. 1, at 26. |
| 63. | Seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post. | Okonowsky Decl. ¶¶ 21, 25, Exh. 1, at 26. |
| 64. | On March 7, 2020, Dr. Okonowsky reported to Dr. Clegg and Engelman that the social media posts targeting her on the Lompoc page had continued. | Okonowsky Decl. ¶ 22. |
| 65. | The following day, Gonzales called Dr. Okonowsky and informed her that he had not yet submitted the referral to the Office of Inspector General because he "*could not figure out how to print the memes*" and "*had other things going on.*" | Okonowsky Decl. ¶ 23. |
| 66. | On March 9, 2020, Dr. Okonowsky expressed her frustration to Dr. Clemmer that the harassment was continuing. | Okonowsky Decl. ¶ 24. |

65

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 67. | Later, Dr. Okonowsky was required to work in the Receiving and Discharge department along with Lt. Hellman. | Okonowsky Decl. ¶ 24. |
|-----|---------------------------------------------------|----------------------|
| 68. | She was petrified. | Okonowsky Decl. ¶ 24. |
| 69. | Not only did she feel that her complaints were ignored, but his physical presence caused her to shift focus from helping prisoners with their mental health needs – i.e. her job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against her. | Okonowsky Decl. ¶ 24. |
| 70. | On March 11, 2020, Dr. Okonowsky submitted a 48-page memo to Associate Warden Gutierrez detailing the harassing memes that continued to be posted by Lt. Hellman and detailing why each meme was offensive and harassing. | Okonowsky Decl. ¶ 25, Exh. 1. |
| 71. | At this time, the page had over 570 posts and Dr. Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted her and other employees at FCC Lompoc. | Okonowsky Decl. ¶ 25, Exh. 1. |
| 72. | For example, there was a meme that said, "*When psychology services doesn't get their way and they cry*" and an FCC Lompoc employee posted a comment directly referencing a SHU meeting, which was attended by Dr. Okonowsky and where a correctional officer told her: "*I intentionally don't help you.*" | Okonowsky Decl. ¶ 26. |
| 73. | Dr. Okonowsky then saw the meme referencing her job at psychological services, that several FCC Lompoc employees had liked the meme including Grice, and that another FCC Lompoc employee who was also at that meeting left | Okonowsky Decl. ¶ 26. |

66

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | | |
|---|---|---|---|
| 1 2 | | a comment referencing this specific workplace interaction that Dr. Okonowsky was involved in. | |
| 3 4 | 74. | Dr. Okonowsky's complaints were repeatedly dismissed by the Defendant and the memes only continued. | Okonowsky Decl. ¶ 27. |
| 5 6 7 8 9 10 | 75. | On March 13, 2020, instead of addressing Dr. Okonowsky's complaints of harassment, Dr. Okonowsky was provided a referral to Defendant's Employee Assistance Program, which provides counseling to Defendant's employees to help them address concerns that may negatively impact job performance and overall well-being. | Okonowsky Decl. ¶ 27.<br><br>Engelman Decl. ¶ 19. |
| 11 12 13 14 | 76. | On March 27, 2020, Dr. Okonowsky submitted a memo to Defendant detailing how Lt. Hellman continued to post offensive and sexist comments, including those clearly targeting her. | Okonowsky Decl. ¶ 28, Exh. 2. |
| 15 16 | 77. | For example, one new meme suggested that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" | Okonowsky Decl. ¶ 28, Exh. 2. |
| 17 18 19 | 78. | Dr. Okonowsky detailed in her memo how Defendant had failed to promptly investigate her complaints and stop the harassing conduct. | Okonowsky Decl. ¶ 28, Exh. 2. |
| 20 21 22 23 | 79. | That same day, March 27, 2020, another meme targeting Dr. Okonowsky was posted after Lt. Hellman learned of her complaints and clearly referred to Dr. Okonowsky as a "*giant cunt*" and "relentlessly tells on staff." | Okonowsky Decl. ¶ 29. |
| 24 25 | 80. | Several FCC Lompoc staff members "liked" the post, including Grice, who Dr. Okonowsky previously complained to. | Okonowsky Decl. ¶ 29. |
| 26 27 | 81. | On March 30, 2020, Dr. Okonowsky submitted another memorandum and | Okonowsky Decl. ¶ 31, Exh. 3, at 2. |

28

67

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | included the meme that referred to me as a "giant cunt."<br><br> | |
| 82. | On March 30, 2020, Dr. Okonowsky submitted another memorandum and included the meme that referred to me as a "giant cunt" and had several employee followers.<br><br> | Okonowsky Decl. ¶ 31, Exh. 3, at 3. |
| 83. | Dr. Okonowsky immediately complained to Engleman. | Okonowsky Decl. ¶ 30. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 84. | However, Engleman did not investigate any of Dr. Okonowsky's complaints and only forwarded them on to Gonzales. | Bowden Decl. ¶ 2, Exh. B, Engleman Depo. 7:8-8:4. |
|---|---|---|
| 85. | On April 13, 2020, more than two months after Dr. Okonowsky's initial complaints, a Threat Assessment Team was convened to review Dr. Okonowsky's "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in a memorandum and supporting documentation she submitted to management on March 11, 2020. | Okonowsky Decl. ¶ 32.<br><br>Engleman Decl. ¶ 17, Exh. E, at 1. |
| 86. | Dr. Okonowsky also explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. | Okonowsky Decl. ¶ 33. |
| 87. | During meeting, Dr. Okonowsky was advised to both not look at the page but also to continue to look at the page to report any additional posts. | Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 60:1-20. |
| 88. | Dr. Okonowsky did not consent to continue viewing the page, she was told by management that she needed to. | Bowden Decl. ¶ 2, Exh. A, Okonowsky Depo. 60:1-20. |
| 89. | Significantly, on April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. | Engleman Decl. ¶ 17, Exh. E, at 2. |
| 90. | Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. | Engleman Decl. ¶ 17, Exh. E, at 4. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 91. | The Threat Assessment Team also made several recommendations to Defendant including referring Lt. Hellman to the Office of Internal Affairs for possible policy violations; issuing a cease-and-desist letter from posting on social media any memes/information which violates Agency policy; and a referral to the Employee Assistance Program. | Engleman Decl. ¶ 17, Exh. E, at 4-5. |
|---|---|---|
| 92. | Defendant followed the recommendations. On April 16, 2020, Defendant issued Lt. Hellman a Cease-and Desist Order, ordering him to cease and desist posting content on social media in violation of Defendant's policies, including content that could reasonably be deemed as harassing or bullying of another employee and any information which discredits the Bureau of Prisons. | Engleman Decl. ¶ 18. |
| 93. | This Cease-and-Desist Order reminded Lt. Hellman that as a "supervisor" he is held to a higher standard of conduct. | Bowden Decl. ¶ 5, Exh. D. |
| 94. | On April 16, 2020, Defendant also issued Lt. Hellman a referral to the Employee Assistance Program. | Engleman Decl. ¶ 19. |
| 95. | Even after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Dr. Okonowsky's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee process. | Okonowsky Decl. ¶ 34, Exhs. 4-5. |
| 96. | Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020. | Okonowsky Decl. ¶ 35. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

| 97. | On January 24, 2021, because of the harassment she experienced at FCC Lompoc, Dr. Okonowsky transferred to FCC Seagoville, TX. | Okonowsky Decl. ¶ 36. |
|-----|-----|-----|
| 98. | On July 6, 2022, Dr. Okonowsky resigned from Defendant and now works as a psychologist for Dallas Fire-Rescue. | Okonowsky Decl. ¶ 37. |
| 99. | Lt. Hellman admits he ultimately took the page down because of Dr. Okonowsky's complaints and the related investigation. | Bowden Decl. ¶ 4, Exh. C, Hellman EEO Decl. at 3-4. |
| 100. | However, Lt. Hellman also claims that he was never interviewed as part of Defendant's alleged investigation. | Bowden Decl. ¶ 4, Exh. C, Hellman EEO Decl. at 3-4. |
| 101. | Defendant also continues to allow its staff to be targeted by misogynistic Instagram posts. | https://www.ktvu.com/news/whistleblower-outs-racist-misogynistic-instagram-page-at-california-federal-prison |
| 102. | A copycat account from FCC Victorville made the news in 2022. | https://www.ktvu.com/news/whistleblower-outs-racist-misogynistic-instagram-page-at-california-federal-prison |

DATED: March 13, 2023          BROCK & GONZALES, LLP

By:    _____

D. AARON BROCK

CORY H. HURWITZ

LINDSAY L. BOWDEN

Attorneys for Plaintiff

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☐ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☐ **By U.S. Mail**, I deposited such envelope(s) in the mail at Los Angeles, California, with postage thereon fully prepaid.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **By Personal Service**, I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

Jessica Sanchez

**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an individual,

         Plaintiff,

    vs.

MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,

         Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**DECLARATION OF LINDSAY OKONOWSKY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*[Plaintiff's Notice of Opposition and Opposition to Defendant's Motion for Summary Judgment; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay L. Bowden; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**
**Courtroom: 6A**

# DECLARATION OF LINDSAY OKONOWSKY

I, Lindsay Okonowsky, declare and state as follows:

1.  I am over the age of 18 and I have personal knowledge of the matters set forth herein. If called to testify, I could and would testify competently to the following facts:

2.  I am a 35-year-old female and began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018.

3.  My immediate supervisor was Chief Psychologist, Dr. Carl Clegg. As a Staff Psychologist, I completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. I was never disciplined and received consistent positive reviews and feedback.

4.  On February 16, 2020, I became aware of the Instagram page "8_and_hitthe_gate" when the page came up on my personal Instagram as a suggested page I should follow. I later learned that Lieutenant Steven Hellman created and ran the Instagram page "8_and_hitthe_gate."

5.  When I first began working at FCC Lompoc, I was informed about the chain of command at the prison and the reporting structure. At this time, Lt. Hellman was an SIS Lieutenant, so he had the authority to supervise the custody staff at FCC Lompoc and oversaw operations. Lt. Hellman also was responsible for overseeing the facility in the absence of the wardens, had several direct reports, and was a member of the Special Investigative Services ("SIS"). As an SIS Lieutenant, Lt. Hellman was also responsible for investigating suspected violations of the law, prison rules, and policies by both inmates and staff.

6.  I saw that Lt. Hellman's page "8_and_hitthe_gate" was followed by over a hundred employees at FCC Lompoc, including Human Resources Manager, Taulbee McGinnis, Union President Ryan Enos, SIS Technician Justin Bender, and

**DECLARATION OF LINDSAY OKONOWSKY**     3-ER-0250

1    Safety Specialist Robert Grice. There were many sexist posts on the page that were
2    overtly demeaning and derogatory towards women and he often posted offensive
3    memes that referenced work, including those that were sexist, racist, and homophobic.

4         7.     In viewing the page, I also saw that FCC Lompoc employees frequently
5    liked and commented on these offensive posts. I also witnessed FCC Lompoc
6    employees speaking about the posts at work. For example, Lt. Hellman posted a
7    meme of Jefferey Epstein on Valentine's Day and dedicated it to the "The SHU
8    Crew" (aka the Special Housing Unit) at FCC Lompoc and around that time, I heard
9    the officers in the SHU Department talking about how funny they thought the post
10   was.

11        8.     Based on the creator's high-level position, the subject matter of the page,
12   and the makeup of its followers, I determined that this was an unofficial FCC Lompoc
13   employee Instagram page.

14        9.     I was shocked at the content, especially since Lt. Hellman was a
15   supervisor and Lieutenant at FCC Lompoc. As a woman, I was especially offended at
16   the sexist memes that were overtly demeaning and derogatory. I considered Lt.
17   Hellman a high-level leader, and I was concerned about how many of my coworkers
18   "liked," and commented on the posts. I also believed that his page violated FCC
19   Lompoc policy.

20        10.    On February 17, 2020, the day after I found the Instagram page, I
21   reported the page to two supervisors, including my immediate supervisor, Dr. Carl
22   Clegg.

23        11.    On February 18, 2020, I also complained to Safety Manager Robert
24   Grice about the page. Grice was one of many employees that regularly liked and
25   commented on the memes. He said he thought the posts were "funny" and told me,
26   "Sorry, not sorry" and told me to get thicker skin. I was shocked by his response and
27   how quickly he dismissed me.

28

DECLARATION OF LINDSAY OKONOWSKY          3-ER-0251

12.     Later that day, I saw a meme of Nancy Pelosi ripping up President Trump's State of the Union address on Lt. Hellman's page, with captions that said, "When you get butt hurt by memes" and "Tomorrow's forecast: hot enough to melt a snowflake" and the hashtag, #youcantakeadickbutnotajoke. It was clear to me that the meme was in response to my complaint just hours earlier and I did not feel safe at work.

13.     On February 18, 2020, I spoke with Acting Warden James Engleman about the page and the offensive posts. Engleman told me he would have SIA Victor Gonzales, who was Lt. Hellman's supervisor, submit a referral to the Office of Internal Affairs.

14.     I subsequently met with Gonzales and shared some of the printed memes.  Gonzales told me words to the effect of: "I looked at the page and I don't really see anything that's a problem." Despite many of the memes being obviously sexist, he insisted that I explain why each one was sexist and harassing and subsequently continued to express his personal disagreement.

15.     During a second meeting a week later, I explained to Gonzales that the page contained posts that made explicit references to FCC Lompoc and that people working at prison were commenting and that only FCC Lompoc employees would understand most of the purported humor.

16.     Later, I spoke with Defendant's Human Resources Manager, Taulbee McGinnis, who was an active follower of Lt. Hellman's page and he also told me that he thought the memes were "funny."

17.     Throughout February and March 2020, I continued to complain to Dr. Clemmer that many co-workers were "liking" Lt. Hellman's posts and regularly interacting with the page. I also told Dr. Clemmer that I feared retaliation and the concerns that I had about my complaints not being taken seriously because the investigators (i.e. the acting HR Manager, Union President and SIS staff) were followers of the page themselves.

DECLARATION OF LINDSAY OKONOWSKY          3-ER-0252

18.     Lt. Hellman's postings continued to offend me. Many of the posts were critical of me as a female employee. I also feared that since many employees liked and commented on the posts targeting me, that my physical workspace could be in danger. I worked in a dangerous Federal Prison and if my co-workers were influenced by Lt. Hellman's disrespect towards me and other women, safety could be compromised. I wondered: if I'm attacked by an inmate, will Lt. Hellman's crew help me or treat me like the female joke he portrays?

19.     I repeatedly complained that I was offended by the posts and expressed that they were affecting me at work because I felt ostracized at the brunt of jokes and was constantly worried about which employees had seen the memes targeting me. Because of the harassment and effects on my mental health, my productivity suffered, and I had to work harder to get the same tasks completed.

20.     My fears were realized when I witnessed co-workers discussing the content of the page during working hours. I was confident that any employees who viewed the page would know that I was the subject of the offensive memes.

21.     On March 7, 2020, I was shocked to see Lt. Hellman posted a meme that was clearly targeting me. The meme showed a woman with my likeness and included comments that were derogatory towards women.  The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." I saw that seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post.

22.     On March 7, 2020, I reported to Dr. Clegg and Engelman that the social media posts targeting me on the FCC Lompoc page had continued.

23.     The following day, Gonzales called me and told me that he had not yet submitted the referral to the Office of Inspector General because he "could not figure out how to print the memes" and "had other things going on."

DECLARATION OF LINDSAY OKONOWSKY     3-ER-0253

24.     On March 9, 2020, I again expressed my frustration to Dr. Clemmer that the harassment was continuing.  She told me she had confirmed that Lt. Hellman was operating the page. Later that day, I was required to work in the Receiving and Discharge department along with Lt. Hellman.  I was petrified. Not only did I feel that my complaints were ignored, but his physical presence caused me to shift focus from helping prisoners with their mental health needs – i.e. my job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against me, or observe me with the intent to create additional disparaging content about me for his Instagram page.

25.     On March 11, 2020, I submitted a 48-page memorandum to Associate Warden Gutierrez detailing the harassing memes that continued to be posted by Lt. Hellman and detailing why each meme was offensive and harassing. At this time, the page had over 570 posts and my 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted me and other employees at FCC Lompoc. Attached hereto as **Exhibit 1** is a true and correct copy of my March 11, 2020 Memorandum.

26.     One of the memes contained in the memo said, "When psychology services doesn't get their way and they cry" and an FCC Lompoc employee posted a comment directly referencing a SHU meeting, that I attended and where a correctional officer told me: "I intentionally don't help you." I then saw the meme referencing me and my role in psychology services, that several FCC Lompoc employees had liked the meme including Grice, and that another FCC Lompoc employee who was also at that meeting left a comment referencing this specific workplace interaction that I was clearly involved in.

27.     My complaints were repeatedly dismissed by management and the memes only continued. On March 13, 2020, instead of addressing my complaints of harassment, I was provided a referral to the Employee Assistance Program, which provides free counseling services.

6

DECLARATION OF LINDSAY OKONOWSKY          3-ER-0254

28.     On March 27, 2020, I submitted another memorandum detailing how Lt. Hellman continued to post offensive and sexist comments, including those additional memes targeting me. For example, one new meme suggested that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" I also detailed in my memo how management had failed to promptly investigate my complaints and stop the harassing conduct. Attached hereto as **Exhibit 2** is a true and correct copy of my March 27, 2020 Memorandum.

29.     That same day, on March 27, 2020, another meme targeting me was posted after Lt. Hellman learned of my complaints and clearly referred to me as a "giant cunt" that "relentlessly tells on staff." Several FCC Lompoc staff members "liked" the post, including Grice, who I had previously complained to.

30.     I immediately complained to Engleman. However, he did not respond to my email.

31.     On March 30, 2020, I submitted another memorandum and included the meme that referred to me as a "giant cunt" and expressed that I felt management was not taking my complaints seriously and how Lt. Hellman was the first person I had seen that morning in the parking lot. Attached hereto as **Exhibit 3** is a true and correct copy of my March 30, 2020 Memorandum.

32.     On April 13, 2020, more than two months after my initial complaints, a Threat Assessment Team was convened to review my "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in the memorandum and supporting documentation I submitted to management on March 11, 2020.

33.     During the meeting, I did not state that I had "no personal or direct knowledge as to who ran the page and that the offending conduct occurred exclusively online." I would not have said that because it is not true.  I was told prior to this meeting that Lt. Hellman was operating the page so I would not have said I did not

DECLARATION OF LINDSAY OKONOWSKY          3-ER-0255

1 know. Also, I did not ever believe that the harassment occurred "exclusively online,"

2 so I would not have said that. As I explained to the investigators, I felt the harassment

3 not only occurred on the page but bled into the workplace because interactions I was

4 having at work were showing up on the page and people were talking about the page

5 at work.

6    34.   Even after the Threat Assessment Team was convened, Lt. Hellman

7 continued to post sexist and offensive memes including at least one post targeting

8 Psychology Services and at least one mocking the workplace violence committee

9 meeting process, which I took as ridiculing me. I submitted several additional memos

10 detailing the continued posts including one on April 27, 2020 and another on May 12,

11 2020. Attached hereto as **Exhibits 4 and 5** are true and correct copies of my April 27,

12 2020 and May 12, 2020 Memorandums.

13    35.   I initially complained about Instagram page on February 18, 2020;

14 however, the page was not taken down until sometime after May 12, 2020.

15    36.   On January 24, 2021, because of the harassment I experienced at FCC

16 Lompoc, I transferred to FCC Seagoville, TX.

17    37.   On July 6, 2022, I resigned from the Bureau of Prisons and I now work

18 as a psychologist for Dallas Fire-Rescue working with first responders.

19    Pursuant to Title 28 U.S.C. § 1746, I declare under penalty of perjury that

20 the foregoing is true and correct to the best of my knowledge and belief.

21

22    Executed this March 11, 2023, at _____Forney_____, Texas.

23    _____
      Lindsay Okonowsky (Mar 11, 2023 12:37 CST)

24    Lindsay Okonowsky

25

26

27

28

**DECLARATION OF LINDSAY OKONOWSKY**     3-ER-0256

# EXHIBIT 1

Case 2:20-cv-02381-VAP-AS Document 42-2 Filed 08/18/23 Page 10 of 185 Page ID #:348



## UNITED STATES GOVERNMENT
## MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

March 11, 2020

**MEMORANDUM FOR:**     G. Gutierrez, Associate Warden

**FROM:**     L. Okonowsky, Ph.D., Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy**

**Supplementary Materials:**
    **-Highlighted "Guidance on the personal Use of Social Media by Department Employees"**
    **-Catalogue of Lieutenant Hellman's Memes with Explanations Illustrating Contribution to a**
      **Hostile Work Environment/Poor Representation of the Bureau and FCC Lompoc**

---

On 02-16-2020, I, Lindsay Okonowsky, Ph.D., became aware of an Instagram page (Attachment B) containing hundreds of "memes" clearly targeting the Bureau of Prisons, FCC Lompoc staff, and inmates. Further, I felt several of the memes targeted me, specifically, given they clearly referenced previous conversations I have had with staff and also included derogatory images resembling my likeness in an exaggerated, defamatory, manner.

The attached memorandum titled, "Guidance on the Personal Use of Social Media by Department Employees" (March 24, 2014) (Attachment A) highlights standards of conduct applying to online communications using personal social media. At all times, regardless of whether department employees are at work or outside of the office, they are expected to refrain from discrimination or harassment. I have highlighted information in the memorandum pertinent to the current situation. I request that readers of letter visit the attached memorandum. A close reading will illuminate that the conduct I outline below is strikingly contradictory to the guidance provided in the attached memorandum, violates policy, and contributes to a hostile work environment.

On 02-17-2020, I forwarded the images to the Chief Psychologist, Dr. Carl Clegg, and NRDAP Coordinator, Dr. Anne Clemmer, via text message. I expressed my concern, disapproval, and discomfort about the images. At that time, I also shared my belief that these images created a

Page **1** of **48**

hostile work environment for me and other staff members. That same weekend, I contacted another staff member, Mr. Robert Grice (Acting Safety Manager) via the Instagram messaging platform. At that time, I had an existing friendly relationship with Mr. Grice. I was concerned that Mr. Grice was was "liking" and commenting on the page. In an attempt to handle this matter on an individual basis, I expressed my concern about the content of the page to Mr. Grice and also noted that I felt disappointed that he was condoning the behavior. I stated that he previously had been supportive of me, so I was having difficulty reconciling why he was affirming the same derogatory messages about which he had formerly been critical. He then said, "Sorry, not sorry," and also commented further that he thought many of the posts were funny and suggested I did not have a sense of humor. I share this information to highlight that his response reflects how I believe others at my institution would also respond. Further, my conversation with Mr. Grice led me to believe that he was aware of who was posting the memes; I asked Mr. Grice who was posting the memes, and he said he would talk to me in person about it at work.

On the morning of 02-18-2020, I met with the Chief Psychologist, Dr. Clegg, to further discuss the Instagram page and my concerns related to personally being targeted, as well as my concerns about the content of the page poorly representing the institution and the Bureau of Prisons. I noted that if a member of the community or the media came across the public page, the Bureau of Prisons would have a significant public relations problem given the memes are routinely racist, sexist, homophobic, and transphobic. Further, the memes and images convey harmful messages about inmate suicide, inmate homicide/deaths, and PREA. Given the negative press the Bureau of Prisons has been facing subsequent to the death of Mr. Jeffrey Epstein, I found the potential for the media to see the content of the page as significantly problematic. Notably, there is a meme which makes light of Jeffrey Epstein's suicide (Attachment C). By the end of the conversation with Dr. Clegg, I came to the conclusion that I believed the issue was serious enough to warrant me speaking directly with Acting Warden Engleman. Dr. Clegg also stated that he was concerned enough about the situation to relocate my office from USP Lompoc to FCI Lompoc, which has required disruptions in the Psychology Services department as many of us adjust to new roles.

At about 11:00am on 02-18-2020, I requested to meet with Warden Engleman in his office. We spent about 10 minutes briefly discussing my concerns. Warden Engleman informed me that he would ask SIA Gonzales to submit a referral to the Office of Inspector General.

Later in the day on 02-18-2020, while I was at home, I received an Instagram message from Mr. Grice. He mentioned that he saw me at mainline and supposed that I was angry with him because I did not greet him at mainline. I stated that I did not see him at mainline. I again expressed my dissatisfaction with the content of the page. Notably, Mr. Grice's wife, the Associate Warden's Secretary, who also follows the Instagram page, was working in the Warden's office area when I went to sit down with Warden Engleman earlier in the day.

On 02-18-2020, two hours after I had the brief Instagram conversation with Mr. Grice, a meme,

clearly targeting me, was posted (Attachment D). The meme is a picture of Nancy Pelosi ripping up President Trump's State of the Union Address. The caption above the meme states, "When you get butthurt by memes." The caption below the meme states, "Tomorrow's forecast? Hot enough to melt a snowflake." The hashtag under the second caption states, "#youcantakeadickbutnotajoke." I believe Mr. Grice informed the creator of the memes that I was upset. I interpreted the meme as menacing and did not feel comfortable attending work the following day (02-19-2020). I had been feeling sick, but was going to attempt to try to go to work that day. However, after seeing the post, I decided I did not want to put myself in a potentially hostile work situation. Further, I was sickened by the insinuation that I "could take a dick, but not a joke." On 02-19-2020, after seeing the meme, I sent an email to Warden Engleman requesting to speak with him again. I felt the post was menacing, felt I was being targeted for reporting the Instagram page, and wanted him to be aware of my feelings and the severity of the situation. I did not receive a phone call from Warden Engleman.

I received a call from SIA Gonzales on 02-19-2020, after I had requested to speak again with Warden Engleman, during which SIA Gonzales indicated he wanted to meet to discuss the situation so he could put together a referral to the Office of Inspector General. He stated he did not want to meet while I was feeling sick, so we decided to meet with each other after I returned from my vacation. During the phone call, SIA Gonzales stated, "I looked at the page and I don't really see anything that's a problem." I highlighted that many of the posts were sexist, racist, sexually explicit, targeted me/other staff members, and poorly represented the institution/Bureau of Prisons. I did not feel comfortable upon the conclusion of the phone call with SIA Gonzales and have repeatedly internally questioned his ability to accurately capture the severity of the situation and my concerns in his referral to the Office of Inspector General. My concerns led me to compose and forward this detailed memo to appropriate staff.

I took previously scheduled leave from 02-20-2020 through 02-24-2020. During this time, the individual running the Instagram page posted around 10 memes with problematic content per day. When I returned to work on 02-25-2020 I had to catch up on my duties and spend time adjusting to my new work environment at FCI Lompoc. Dr. Clemmer and I met with SIA Gonzales in his office on 02-26-2020. Notably, while we met, SIS Technician Justin Bender saw Dr. Clemmer and I enter SIA Gonzales' office. Importantly, Mr. Bender has "liked" and commented on several posts on the page, including posts I feel are targeted toward me. During the meeting with SIA Gonzales, he demonstrated a lack of awareness about Instagram, difficulty navigating his computer/printer system, and ignorance regarding systemic racism/sexism. His presentation also led me to feel uncomfortable about his ability to maintain confidentiality in more nuanced ways than just not telling others about our conversations. For example, he asked Dr. Clemmer and I to meet him in his office with other staff nearby, summoned me over the radio system before the meeting, and insisted on printing the memes to a public printer. By the conclusion of the meeting, I was, again, confident that I would have to spend personal time preparing my own report of events.

Several days went by without any update on the status of the situation. At some point, Dr.

Clemmer contacted Acting Human Resources Manager Taulbee McGinnis to inquire about the
Instagram page, which he followed. To my knowledge, during the conversation, Mr. McGinnis
reported to Dr. Clemmer that the person running the Instagram page was a Lieutenant. Learning
this heightened my concern given the person is in a position of power and is someone on whom I
would rely in an institutional emergency. Additionally, as a psychologist, I routinely work with
lieutenants in various situations. Of further concern, many of the memes speak about line staff
in a disparaging manner. I did not think it was appropriate for a supervisor to be posing in
racist, sexist, and homophobic manners about his subordinates and the inmates for whom they
are charged with caring. A supervisor condoning racist, sexist, and hostile language perpetuates
and condones problematic ideologies and rhetoric among line staff. Further, the fact that the
Acting Human Resource Manager was aware of the page and failed to report the policy violations
is another significant concern.

On Saturday 03-07-2020, the creator of the Instagram page blocked me from being able to view
the content of the page. Given my belief that I would have to submit a detailed memo of my
own, I felt it pertinent for me to be able to continue to view the content of the page. I created
another Instagram account and was able to view the page once again. On 03-07-2020, shortly
after my first account was blocked from viewing the page, another meme was posted, clearly
targeting me. My belief is that the poster blocked me before posting the new meme because it
was strikingly offensive and he did not want me to see the post (Attachment E). The post
depicts a heavy woman in minimal clothing, coyly posed, and states, "Feeling cute, might put one
on watch later." The caption of the post states, "If psychology had to cover the morning watch
shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." Seventeen people
"liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees
commented on the post. The post is derogatory toward women, is critical of women's bodies,
and diminishes the role of Psychology Services. Further, it minimizes the importance of placing
inmates on suicide watch, which protects inmates and the Bureau of Prisons from an inmate
dying while under the Bureau's care. I found this post significantly upsetting, and the fact that I
was blocked from the page shortly before it was posted leads me to feel confident in my belief
that it was directed toward me.

After seeing this post, on 03-07-2020, I emailed Warden Engleman and stated, "Is there any
update on this situation? I'm growing increasingly more uncomfortable. This is completely
inappropriate and is setting the tone for a strikingly hostile work environment." I did not receive
a call from Warden Engleman. SIA Gonzales called me at home on 03-08-2020. He stated he
had not yet submitted the referral to the Office of Inspector General because he "could not figure
out how to print the memes" and "had other things going on." He stated he was scheduled to
take leave the following week, but planned to come to work on 03-09-2020 to finish the referral
and submit it to the Office of Inspector General. I was shocked to hear that after making my
initial report to Warden Engleman on 02-18-2020, the referral still had not been submitted.
Apparently, the referral was eventually submitted on 03-09-2020.

On 03-09-2020, Dr. Clemmer contacted Mr. McGinnis about the Instagram page again. During

Page 4 of 48

3-ER-0261

the contact, to my knowledge, Mr. McGinnis confirmed that the individual running the Instagram account was SIS Lieutenant Steven Hellman. SIS Lieutenants are in positions of power and increased trust. They are charged with handling sensitive information and situations. A reasonable expectation of an SIS Lieutenant would be to take a report from someone like me expressing concerns about a hostile work environment. I do not believe an individual engaging in behavior resembling Mr. Hellman's should maintain this position. Further, I do not believe I should be subjected to working in an environment in which Mr. Hellman is someone on whom I am expected to rely in potentially dangerous work situations (i.e., day watch Operations Lieutenant). Further, the role of a psychologist frequently involves closely working with lieutenants, especially on day watch. I have concerns about Mr. Hellman's ability to work with me in a productive, respectful, and collaborative manner given his repeated decisions to defame my character, criticize my physical appearance, diminish the role of Psychology Services, shame me via jokes for reporting unethical behavior, and question my competence/decisions as a psychologist.

On 03-09-2020, I had a conversation with Dr. Clegg about our concerns subsequent to being informed the creator of the page was Mr. Hellman, a supervising lieutenant in the SIS department. Dr. Clegg stated he would contact his supervisor to obtain more of an understanding on the status of the situation. Later that day, my job duties required me to go to Receiving and Discharge (R&D) at FCI Lompoc to conduct Intake Screenings on 18 inmates. Mr. Hellman was in R&D conducting Intake Screenings at the same time. The situation required me to maintain professionalism, screen inmates for mental health issues/suicide risk, and navigate my concerns about a hostile work environment simultaneously. I successfully completed the demands of my job, but believe it is inappropriate for me to have to juggle completing my duties alongside an individual who has made it so apparent that he does not respect me and has created a hostile work environment for me.

On 03-10-2020 at approximately 11:00am, Dr. Clegg and I sat down with AW Gutierrez to discuss the situation further, given very little had been done up until that point. I expressed my concerns about the culture of the institution as a whole, and noted that individuals charged with taking reports of hostile work environment were following the Instagram page. For example, the Union President Ryan Enos and Acting Human Resource Manager Taulbee McGinnis both follow the page. This institution is currently experiencing a cultural issue related to individuals perpetuating racist, sexist, sexually explicit, and homophobic ideology by condoning and providing support for the content of the page. There is a striking pattern of employees failing to report unethical behavior that violates policy. Dr. Clegg emphasized his concerns about my wellbeing and safety and suggested that a Workplace Violence committee be convened. I expressed my willingness to sit down and talk with Mr. Hellman to AW Gutierrez. Later that day, Dr. Clegg and I were informed that AW Engleman did not determine a Workplace Violence meeting was warranted. I expressed my dissatisfaction that a Workplace Violence meeting would not be held to AW Gutierrez via phone at the end of the day on 03-10-2020.

After Dr. Clegg and I expressed concern about me having to work in the same location as

**Page 5 of 48**

Lieutenant Hellman, and requesting a workplace violence committee meeting, which was not granted (03-10-2020), Lieutenant Hellman was the first person I saw in the parking lot this morning (03-11-2020) and is also working day watch operations today at FCI Lompoc. While I was never told explicitly that anyone counseled Mr. Hellman directly yesterday, based on conversations I had with my supervisor and AW Gutierrez on the afternoon of 03-10-2020, I was able to infer that someone likely spoke with Mr. Hellman about the situation. Problematically, Mr. Hellman published more posts on his Instagram account last night (03-10-2020), after likely being counseled. While the posts last night were not directed toward me, this behavior demonstrates poor decision making, risk taking, and willful disregard of anything he may have been told yesterday, if he in fact was counseled. A point of further concern is that, if Mr. Hellman was counseled, I was not provided any information about what he was told, whether he knew I was the individual raising concern (I believe he does know), or whether I would continue to have to be working alongside him; he was provided information, and, as the party expressing hostile workplace concerns, I was not. Showing up to work this morning with him working the Operations Lieutenant post confirms my concerns about not being insulated from the situation or well-informed were valid. If I encounter a dangerous situation today, which is possible in a prison environment, the person in charge of responding to my needs is potentially aware that I have made a report about his behavior, has demonstrated hostility toward me on his social media page, and has demonstrated poor decision making by continuing to post on the Instagram page.

I will continue to perform my job duties with a high degree of professionalism, efficiency, expediency, accuracy, a focus on ethics, and attention to detail. My priority is, and has always been, providing good mental health care to inmates in an effort to uphold the mission of the Bureau of Prisons and my ethical standards as a psychologist. FCC Lompoc is currently facing an overwhelmingly problematic culture among its employees. FCC Lompoc employees should not have to fear being mocked on a public forum, which many of their peers follow, by a supervisor, simply for doing their jobs or even making mistakes; this is the essence of a hostile work environment. My hope is that my experience will shed light on our areas of growth as an institution. I am making this report while harboring serious concerns about my reputation and potential retaliation moving forward. As a relatively new psychologist in the Bureau of Prisons, I fear my attention to this matter will contribute to others thinking of me as a difficult individual with whom to work or a squeaky wheel. Correctional work cultures often perpetuate silence regarding unethical behavior by shaming and making fun of those who "don't have a sense of humor." Given the negative press the Bureau of Prisons has been facing, I feel an ethical obligation to do whatever is in my power to illuminate behavior that could potentially harm the image, credibility, and reputation of the Bureau of Prisons.

Sincerely,

Lindsay Okonowsky, Ph.D., Staff Psychologist
FCC Lompoc

Attachment A

3-ER-0264

 

U.S. Department of Justice

Office of the Deputy Attorney General

The Deputy Attorney General   Washington, D.C. 20530

March 24, 2014

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:   James M. Cole
     Deputy Attorney General

SUBJECT:  Guidance on the Personal Use of
     Social Media by Department Employees

   This memorandum provides guidance to Department employees regarding their responsibilities when using social media. It is critically important that Department employees understand that engaging in internet and electronic communications regarding matters affecting the Department, as with other forms of communication, implicate the Department's core mission of administering justice in a fair, effective, and even-handed manner. Before using social media to communicate about matters affecting the Department, employees should ask themselves at least two common sense questions: "Is there any risk that I am disclosing confidential or non-public information?" "Might my use of social media adversely affect the Department's mission?" The exercise of sound judgment will go a long way towards ensuring that Department employees meet the high standards we have set for them.

   While the tools and technologies of social media present new ways to connect with friends, colleagues, and the world, Department employees should remain aware that existing policies apply when communicating about matters affecting the Department. Importantly, Department employees are required to adhere to certain government-wide standards of conduct and rules of professional conduct that apply to online communications at all times, regardless of whether they are at work, outside the office, or using government equipment. Additional guidance is discussed in the attached memorandum, but the following standards, rules, and policies warrant particular attention:

- **Protection of Information:** Department employees must properly safeguard confidential, privileged, classified, privacy-protected and/or sensitive Department information. Attorneys must comply with additional rules of professional conduct that prohibit them from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices.

- **Case-Related Comments or Information:** Department employees are generally restricted from publicly releasing any comments or information that may reasonably be expected to influence the outcome of a pending or future trial, including observations about a defendant's character or about their opinion as to a defendant's guilt.

Page 8 of 48

- **Comments about Judges:** Department employees should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity.



- **Discrimination or Harassment:** Department employees should not make comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis.



- **Attempts at Anonymous Communications:** Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful. Employees must take care not to engage in activity anonymously (or using a pseudonym) that they otherwise would not be permitted to engage in if their identities were known.

- **Use of Department Computers and Official Time:** Employees using Departmental computer systems and electronic devices are subject to certain guidelines, including restrictions on the use of Department computers and prohibitions on tools that hide the user's identity.

All supervisors should ensure that Department employees receive this guidance, and fully understand these important standards, rules, and policies. If employees have questions or concerns, please contact human resources, a designated ethics or professional responsibility officer, or a supervisor.

Attachment

**Page 9 of 48**

3-ER-0266

## GUIDANCE ON THE PERSONAL USE OF SOCIAL MEDIA BY
## DEPARTMENT EMPLOYEES

### Introduction

As the internet and electronic communications take an ever increasing role in our work and personal lives, we must always be mindful of our responsibilities as Department of Justice employees. More specifically, various forms of social media[1] give employees the opportunity to interact with friends and colleagues, but as with other forms of communication, employees need to be aware of the potential for pitfalls. The line between public and private, personal and professional, is often blurred, especially when an employee using social media includes his or  her Department affiliation or title, or comments on matters related to his or her work, or the work of the Department.

As a result, when using social media, Department employees should use caution and, as in everything they do, exhibit sound judgment and common sense. Before using social media to communicate about matters affecting the Department, employees should ask themselves: "Is there any risk that I am disclosing confidential or non-public information?" "Might my use of social media adversely affect the Department's mission?" "Are there Department policies and procedures governing my conduct such that I should consult a supervisor or ethics officer prior to posting, commenting, or blogging online?" By resolving these and other issues discussed more fully below, Department employees will go a long way to assuring that they conduct themselves in a manner consistent with the high standards we have set for Department employees.[2]

Two types of social media commenting merit special attention and should cause Department  employees to exercise extreme care: comments that can be perceived as showing prejudice based on race, gender, sexual orientation, or any other protected basis; and comments on the work of the Department, including cases and investigations. It is critically important that Department employees act, and are perceived to act by the public we serve, in a fair, just, and unbiased manner. Online comments by Department employees exhibiting animus based on any protected basis, including race, gender, or sexual orientation, that adversely affect our ability to

---

[1] For the purposes of this memorandum, "social media" covers tools and technologies that allow an employee to share communications, postings or information, or participate in social networking, including but not limited to: blogs (*e.g.* Twitter, Tumblr), social networks (*e.g.*, Facebook, LinkedIn, Google+), video and photo sharing websites (*e.g* Instagram, Flickr), on-line forums and discussion boards (including commenting on-line using media websites), and automated data feeds. "Social media" does not include non-public tools and technologies, such as Departmental intranet sites.

[2] Based on particular operational concerns, agencies and components may retain existing policies or promulgate additional guidelines on the use of social media so long as they are consistent with the guidance provided in this memorandum.

1

3-ER-0267

carry out our important mission will not be tolerated, as explained in this policy. Likewise, Department employees should not post or comment about Department cases or investigations when their comments could reveal non-public information, influence the outcome of an investigation or proceeding, or adversely affect the subject of an investigation, a defendant, party, or witness in a case.

In addition, Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful. Employees therefore must take care not to engage in activity anonymously, or using a pseudonym, that they otherwise would not be permitted to engage in if their identities were known. The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

**Standards Governing Communications by Department Employees**

Department employees should remain aware that, even though there are new ways to connect with the world, existing policies, rules, and standards are still implicated when communicating about matters affecting the Department. Attorneys should also recognize that they have additional responsibilities under the applicable local court rules and rules of professional conduct, and should consult those rules when considering a particular communication.

It is important to note that while vastly accelerating the speed of communication and greatly broadening the size of the audience, the advent of social media neither restricts nor expands the existing limitations on Department employee speech.[3] Department employees do not surrender their First Amendment rights as a result of their employment; however, the Supreme Court and lower courts have held that the Government may restrict the speech of its employees when employees are not speaking as private citizens on matters of public concern or when the Government's interest in the efficient provision of public services outweighs its employees' interest in the speech. This memorandum is intended to educate and remind Department employees about the limitations in their communications that derive from their status as government employees.[4] To that end, this memorandum on the personal use of social media:

---

[3] While the focus of this memorandum is to provide guidance for communications made on social media, Department employees should recognize that the standards and rules of appropriate professional conduct stated in this guidance are not limited to internet or electronic communications, but rather apply to any public communication, whether written or oral.
[4] The memorandum provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice.

2

Page 11 of 48

3-ER-0268

(1) reinforces the relevant government-wide standards of conduct that apply to all employees' online communications, including when an employee is not at work and not using government equipment;

(2) reiterates the relevant attorney rules of professional conduct that apply to Department attorneys' online communications, including when an attorney is not at work and not using government equipment;

(3) reminds employees of the rules regarding their use of Department computers and equipment and use of official time; and

(4) provides guidelines for personal social media activities that may impact employees' official work for the Department.

This memorandum is not intended to limit or restrict strictly personal social media activities that do not affect the Department and involve the use of personal computers or other devices.[5] Finally, this memorandum is not intended to cover the use of social media by employees in the course of their officially sanctioned work for the Department.

## I. Government-Wide Standards of Conduct

All Department employees are required to adhere to certain government-wide standards of conduct that apply to online communications at all times. In general, the restrictions on Department employee communications are contained in statute and the Code of Federal Regulations (C.F.R.). While not exhaustive, the following restrictions apply to all employees, and violations may be cause for disciplinary action by the Department:

- **Ethical standards:** Employees shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the  Government. 5 C.F.R. § 735.203.

- **Misuse of Position:** Employees shall not use their public office for private gain, for the endorsement of any product, service, or enterprise, or for the private gain of friends, relatives, or other acquaintances. Also, employees shall not use or permit the use of their Government position or title or any authority associated with their public office in a manner that is intended to coerce or induce another person to provide any benefit, financial or otherwise, to themselves or to friends, relatives, or persons with whom the

---

[5] This memorandum is consistent with and does not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to: (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this memorandum and are controlling. 5 U.S.C. § 2302(b)(13).

3

3-ER-0269

employees are affiliated in a nongovernmental capacity. Finally, with limited exceptions,[6] employees shall not use their Government position or title in a manner that could reasonably be construed to imply that the Government endorses or sanctions their personal activities or those of another. 5 C.F.R. § 2635.702.

- **Use of Non-Public Information:** Employees shall not allow the improper use of non-public information to further their own private interest or that of another, whether by engaging in financial transactions using such information, through advice or recommendation, or by knowing unauthorized disclosure. Non-public information is information that that the employee gains by reason of Federal employment and that he or she knows or reasonably should know has not been made available to the general public. 5 C.F.R. § 2635.703.

- **Political Activity:** Certain restrictions on political activity by Department employees apply regardless of whether they are on duty or on their personal time. Hatch Act (5 U.S.C. §§ 7321-7326). For example, no employee may solicit, accept, or receive political contributions, at any time or in any forum. *Id.* § 7323(a)(2). Other restrictions are discussed further below and in the footnoted memoranda.[7]

- **Discrimination and Harassment:** All employees are responsible for treating fellow employees with basic respect and dignity, and must not harass or discriminate against fellow employees based on race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other non-merit factor. *See* 5 U.S.C. §§ 2301-2302 (prohibited personnel practices); DOJ Order 1200.1, Chapter 4-1, Equal Employment Opportunity Program; Attorney General Memorandum, Prevention of Harassment in the Workplace (Dec. 14, 1998); *see also* American Bar Association Model Rules of Professional Conduct ("Model Rules") Rule 8.4(d) & 8.4 cmt. [3].

- **Case-Related Comments or Information:** Subject to limited exceptions, all Department employees are restricted from publicly releasing any comments or information that "may reasonably be expected to influence the outcome of a pending or

---

[6] *See* 5 C.F.R. § 2635.702(b), (c).
[7] These restrictions are set forth in two memoranda, one for career employees, http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-career-employees.pdf, and one for non-career appointees, http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-noncareer-employees.pdf. Additional information is available on the Department's ethics website, http://www.justice.gov/jmd/ethics/politic.html and the U.S. Office of Special Counsel web site, "Frequently Asked Questions Regarding Social Media and the Hatch Act," U.S. Office of Special Counsel (April 4, 2012) at:
http://www.osc.gov/documents/hatchact/federal/Social%20Media%20and%20the%20Hatc h%20Act%202012.pdf.

4

Page 13 of 48

future trial." 28 C.F.R. § 50.2 (b)(2) & § 50.2 (c) (restrictions on extrajudicial speech).[8] In particular, Department employees shall not communicate with non-Department individuals concerning their observations about a defendant's character or about their opinion as to a defendant's guilt. *Id.* § 50.2(b)(6)(iv).

## II. Rules of Professional Conduct

Department attorneys are required to adhere to applicable rules of professional conduct in their communications, regardless of whether they are at work or outside the office, the medium of communication, the forum in which they are communicating, whether they are using government equipment, and whether they communicate anonymously or pseudonymously. These rules apply to Department attorneys who engage in all types of Department work, including litigation, investigation, and providing legal advice. Moreover, the rules require attorneys to make reasonable efforts to ensure that non-lawyers working with the attorney conduct themselves in a manner that is compatible with the rules. *See* Model Rule 5.3. The Department may discipline attorneys for violations of applicable rules of professional conduct. The following professional conduct principles are contained in the American Bar Association Model Rules of Professional Conduct;[9] although this list is not exhaustive, it highlights rules that attorneys should be particularly mindful of when using social media:

- **Protection of Information:** Department attorneys are required to safeguard and are prohibited from disclosing confidential Department information relating to the representation of the United States (or other clients (*e.g.*, *Bivens* defendants)). *See* Model Rule 1.6(a). The relevant Model Rules also prohibit a Department attorney from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices. *See* Model Rule 1.6 & cmt. [2], [3], [4], [5], [20]; Model Rule 1.10 & cmt. [2]. Confidential information is broadly defined and applies to "all information relating to [a] representation whatever its source," as well as information that reasonably could lead to the discovery of confidential information. Model Rule 1.6 cmt. [3] & [4]. This includes, but is not limited to, information deemed privileged, classified, privacy protected and/or sensitive.

---

[8] *See* 28 C.F.R. § 50.2 (b)(3) & § 50.2 (c) (discussing limited information that may be released to the public).
[9] The Model Rules are cited because most jurisdictions' versions of the professional responsibility rules are based on the Model Rules. A Department lawyer, when confronting an issue of professional conduct, should consider the rules that apply to that particular situation because, in most instances, a specific jurisdiction's rules will govern, rather than (or in some cases, in addition to) the Model Rules.

5

3-ER-0271

- **False or Misleading Statements:** Department attorneys should not make a false statement of material fact or law regarding their representation of a client to a third person or engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See* Model Rules 4.1 & 8.4(c).
- **Comments about Judges:** Attorneys should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity. Model Rule 8.2.
- **Conflict of Interest:** Attorneys should not make statements that would result in the Department attorney being materially limited or impaired in representing the United States, such as by posting personal opinions contrary to those that the attorney is advocating on behalf of the United States, comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis, or comments that may cause the attorney to be called as a witness. *See* Model Rule 1.7(a)(2); Model Rule 8.4(d) & cmt. [3]; Model Rule 3.7(a).[10]
- **Trial Publicity:** Attorneys should not make statements they know or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding, or that are likely to heighten condemnation of an accused in a prosecution being handled by the Department.[11] Model Rules 3.6 & 3.8(f); *see also* USAM §§ 1-7.000 et. seq. (establishing specific guidelines restricting the release of information relating to criminal and civil cases by Department attorneys).

### III.    Use of Department Computers and Official Time

All employees have a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes. 5 C.F.R. § 2635.704. Further, employees shall use official time in an honest effort to perform official duties. 5 C.F.R. §2635.705. Use of Departmental computer systems, including Blackberries and all electronic devices, is subject to the same restrictions on use as are other government-furnished resources provided for the use of employees. While Departmental computer systems are provided for

---

[10] Although the Department may be able to consent to an attorney's continued representation of the United States notwithstanding the conflict of interest created by such comments, the decision whether to consent may involve a time-consuming investigation and assessment of the extent to which the conflict might impair the Department attorney's ability to effectively represent the United States in a particular matter or at all. In addition, the attorney may need to consider whether his or her statements are required to be disclosed subject to the Government's discovery obligations. *See, e.g.*, Deputy Attorney General Memorandum, Guidance on the Use, Preservation, and Disclosure of Electronic Communications in Federal Criminal Cases (March 30, 2011).

[11] The local court rules implemented by courts also govern attorneys' conduct and frequently contain restrictions on attorney speech related to matters pending before the court.

6

official use, some personal use of government computer systems is permitted in accordance with existing policy on personal use of government property, where there is negligible cost to the government and no interference with official business. *See* 28 C.F.R. § 45.4; DOJ Order 2740.1A.

Employees must keep the following restrictions and guidelines in mind when using Department computers and computer systems during working hours or nonworking hours. Note that unauthorized or improper use of Department computers and equipment could result in loss of use or limitations on the use of equipment, disciplinary or adverse actions, and/or criminal penalties:

- **Limited expectation of privacy:** Employees should not expect privacy in the use of Department computers or computer systems except in very limited circumstances when the Department has specifically authorized them to engage in attorney-client communications *with private clients*, for example, employees sued in their individual capacity or approved pro bono clients. *See* 28 C.F.R. § 50.15; DOJ Policy Statement on Pro Bono Legal and Volunteer Services. System administrators and others with access privileges may receive authorization from Department senior management officials to review an employee's computer activity, including email communications and internet activity, when there is a legitimate government purpose to do so. DOJ Order 2740.1A, §3(e), (f).
- **Prohibited Uses of Department Computers:** Non-official use of Department computers that could cause congestion, delay, or disruption of service is prohibited.[12] Additional prohibitions include the unauthorized use of internet sites that cause additional charges to the Department, viewing or downloading sexually explicit material, and use for commercial purposes or in support of outside employment or business activities. A list of other prohibited activities on Department computers can be found in DOJ Order 2740.1A, § 3(c).
- **Political Activity:** While on duty, in a Federal facility, using Federal property such as a computer, or while representing the Department, employees are prohibited from engaging in activity directed toward the success or failure of a political party, a candidate for partisan political office, or a partisan political group. Hatch Act (5 U.S.C. §§ 7321-7326).
- **Attempts at Anonymity/Pseudonymity:** Employees must remember that internet activity and posts made from Department computers can be traced back to the Department through the Internet Protocol (IP) address. Note that employees are

---

[12] For example, electronic greeting cards, video, sound or other large file attachments can degrade the performance of the entire network, and should not be viewed or sent on Department computers. Accessing continuous data streams (such as viewing streaming video or listening to streaming audio/radio on a media website) could also degrade the performance of the entire network and is inappropriate when not for official purposes.

7

3-ER-0273

prohibited from using anonymizer sites or similar tools that hide the user's identity on Department computers (sites that attempt to hide the user's identity from the internet sites being visited). DOJ Order 2740.1A, § 3(c)(2)(c).

**IV. Personal Social Media Activity Guidelines**

The following guidelines apply to employees' personal social media activities:

- **Department computers:** Only on a limited basis, where there is negligible expense to the Department and no interference with official business, may personal social media activities be conducted on Department computers, telecommunications devices, and networks, provided such activity does not interfere with the conduct of Department business and does not violate the computer and equipment usage restrictions discussed above in DOJ Order 2740.1A and 28 C.F.R. § 45.4.

- **Use of title and email address:** Employees may use their official title and Department affiliation on their personal social media page for professional identification or biographic data as long as they do not create an impression that they are speaking in an official capacity. Employees should not use their government email addresses when setting up personal social media accounts.

- **Communicating in personal capacity:** Employees must avoid stating, implying, or creating the impression that they are communicating in an official capacity on behalf of the Department in their personal social media activities.[13] To the extent that there may be confusion about whether an employee is communicating in an official or personal capacity, the employee must include a disclaimer indicating that the employee is communicating in a personal capacity.[14]



- **Work or Department-related posts:** Employees may post, comment, or share public information on matters related to their work or the work of the Department provided such communications fully comport with the restrictions set forth in this guidance. As discussed above, Department employees must properly safeguard privileged, confidential, classified, privacy-protected and/or sensitive Department information. Attorneys must also comply with the applicable jurisdiction's Rules of Professional

---

[13] Implying that one is communicating in an official capacity on behalf of the Department may, for attorneys, also constitute dishonesty, fraud, deceit or misrepresentation, which is prohibited by Model Rule 8.4(c).
[14] For example, DOJ Order 2740.1A provides that "[o]ne acceptable disclaimer is 'The contents of this message are mine personally and do not reflect any position of the Government or my agency.'" DOJ Order 2740.1A, § 3(d).

8

3-ER-0274

Conduct. Finally, absent express supervisory approval, employees should not engage in official Department business on personal social media pages.[15]

- **Engaging with colleagues:** Employees are permitted to engage with colleagues, including superiors and subordinates, on their personal social media sites. That said, care must be exercised to ensure that other rules are not inadvertently violated. For example, supervisors who "friend" their subordinates on their social media pages should ensure that they do not solicit contributions for personal causes on their pages in a way that could violate the regulation that prohibits fundraising from subordinates. *See* 5 C.F.R. §2635.808(c)).

- **Political activity:** While most employees can engage in certain political activities while away from the workplace on their own time, including on their social media pages, some prohibitions exist, such as the prohibition on fundraising described above. Employees must understand the prohibitions that apply to their positions and be mindful of them as they engage in personal social media activities. *See* Hatch Act (5 U.S.C. §§ 7321-7326) and other restrictions discussed above in footnote 7 and the associated text.

- **Discrimination and harassment:** As with Department communications, employees may be subject to discipline if they use social media to engage in harassing or discriminatory conduct toward other employees (or individuals or groups) based on their race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other protected status.

- **Anonymous and pseudonymous postings:** As indicated previously, employees should recognize that attempts to post anonymously or pseudonymously are often unsuccessful, and therefore should take care not to engage in activity that they otherwise would not be permitted to engage in if their identity was known. The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

The exercise of sound judgment and an awareness of applicable rules will go a long way towards avoiding problems that may result in violations of the Standards of Conduct, Rules of Professional Conduct, or Department policy, or potential disruptions to the efficiency of the Department. If you have questions or concerns about the above guidance, or are unsure how it may apply to you, please contact human resources, a designated ethics or professional responsibility officer, or your supervisor.

---

[15] As discussed above, attorneys should also recognize that online communications may need to be reviewed and potentially disclosed in accordance with applicable statutes, the United States Constitution, or Department policies.

9

3-ER-0275

Attachment B

Page 19 of 48



The name of the Instagram page is 8_and_hitthe_gate. The page was created on or around
January 6th, 2020 and already has over 570 posts. There are 235 followers as of this date.
Many of the followers are employees of FCC Lompoc. Several employees regularly "like" and
comment on the page. Problematically, the Assistant Human Resource Manager, Union
President, and an SIS Technician all follow the page. The SIS Technician, which is a position of
increased trust, frequently likes and comments posts on the page.

Attachment C

Page 21 of 48



This post makes light of the serious issue related to inmate suicide. Further, the negative press the Bureau of Prisons has been facing subsequent to Mr. Epstein's death calls for employees to exercise a high degree of professionalism both in and out of the workplace. Bureau of Prison employees are ethnically charged with positively representing the Bureau of Prisons. Posts like these are exceptionally concerning.

Page **22** of **48**

3-ER-0279

Attachment D

Page 23 of 48

3-ER-0280



This post is certainly directed toward me. Earlier this day, I first reported my concerns about the page to the Chief Psychologist and Acting Warden. Two hours before this post was published, after the work day had concluded, I had a conversation with another staff member about how I was disappointed about the content of the page and that he was "liking" and commenting on the page. Shortly thereafter, this post was published. The caption at the top of the page states, "When you get butthurt by memes." The other caption at the bottom of the meme says, "Tomorrow's forecast? Hot enough to melt a snowflake." The hashtag says, "#youcantakeadickbutnotajoke?" I interpreted this post as menacing and did not feel comfortable going to work the next day. When I read that "tomorrow's forecast" would include a difficult day for me at work, I felt my best course of action was to refrain from putting myself in a potentially hostile work environment.

Attachment E

Page 25 of 48

3-ER-0282



I believe this post is targeted toward me. Just before the post was published, the owner of the page blocked me from being able to see the page, further cementing my belief that the post is targeted toward me. This post is derogatory toward women, is critical of women's (specifically my) bodies, and diminishes the role of Psychology Services. The post also makes light of the issue of inmate suicide and challenges the competency of the Psychology Services department.

Attachment F
Additional Problematic Posts

3-ER-0284



This post clearly highlights a lack of respect for Psychology Services. Over the past 1.5 years, I have had conversations with SHU staff about cell assignment recommendations. More than once, my recommendations have not been considered, resulting in subsequent PREA allegations and inmate-on-inmate assaults.



This post is also targeted toward me. During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. The staff members went as far as recommending that I work on Saturdays so I did not interfere with their daily tasks when I needed to see inmates, per policy. I emphasized that removing inmates from their cells is part of SHU staff members' responsibilities and stated I have attempted, and would continue to attempt, to make every effort to be helpful (assisting with pulling inmates, etc.) and accommodate their schedules. One staff member stated to me, "I intentionally don't help you" after I highlighted my concerns with their problematic feedback and suggestions. The interactions were uncomfortable and hostile; I felt incredibly disrespected as a fellow employee. I expressed my concerns to the former SHU Lieutenant, an Associate Warden, and SHU 1 after the training. One of the SHU staff present during the training commented on this post something to the effect of, "Last quarter's SHU training," signaling that the post is, in fact, directed toward me.

About one month ago, I was working with an inmate in a private office space in SHU. Mr. Hellman entered the office and said he needed to use the space. He undermined me in the presence of the inmate. I expressed my hesitancy to relocate, but complied with the staff member's demand to use the office. The inmate and I relocated to another office. At the time, I was speaking with the inmate about his mother's recent passing. The interaction with the staff member was an inappropriate distraction. I believe this post also highlights that the staff member "got his way" and me, as "Psychology," did not.

Page **29** of **48**



This post makes light of inmate suicide and the exceptionally problematic history of slavery.



At the end of last quarter, I decided to talk to SHU staff about having a gathering at my residence to build camaraderie and thank them for their help throughout the quarter. Many staff members were kind and said they looked forward to the gathering. Later, this meme was posted, which led to my decision to cancel the gathering. I am disappointed that I, as a staff member who is a woman, cannot invite people to my home without incredibly sexist and sexually inappropriate jokes being made about things like a "gang bang." Many posts, like this one, reflect conversations or events that have happened in the institution. They are not random posts; they target individuals, departments, executive staff, the bureau, and inmates.



I believe Mr. Hellman was informed on 02-19-2020 that I expressed my dissatisfaction with the page. These posts attempt to shame individuals who report unethical, problematic, and hostile behavior that violates policy. The message of the memes perpetuates a culture of silence when it comes to addressing behavior that violates policy. Further, the posts demonstrate that Mr. Hellman was aware his posts made staff members uncomfortable, but he chose to continue posting anyway.

Page **32** of **48**



This image depicts a woman, likely in a pornographic video, being choked by a man. The message of the meme is exceptionally inappropriate.



This meme makes light of inappropriate inmate sexual behavior toward female staff members. The caption at the bottom of the meme insinuates that female staff members are "hoes."





These posts, and the ones on the previous page, diminish the importance of psychology's role, make light of inmate suicide, and are transphobic.



This post is blatantly sexist and offensive, comparing female staff members ("girls") to "retards."



This post is blatantly homophobic.



This post is blatantly transphobic and makes light of inmate deaths.

Page **38** of **48**



This post is derogatory to both working mothers and transgender individuals.



This post targets a staff member by using his name. Further, the content of the meme is racist, attempting use one's Native American heritage as the punchline in a joke.



This meme makes light of inmate deaths. As Bureau of Prison employees, we are charged with caring about the wellbeing of inmates, regardless of their crimes. This meme highlights a pattern of problematic sentiments toward inmates who are sex offenders. Posting statements like this, publicly, could pose public relation issues for the Bureau of Prisons.

3-ER-0298



I believe these posts are also targeted toward me as the former SHU psychologist. My job required me to request SHU staff to remove inmates from their cells for policy driven clinical contacts. I believe the posts also reflect Mr. Hellman's pattern of critiquing my physical appearance.

Page **42** of **48**



This post jokes about staff members asking inmates to perform physical tasks to avoid getting hurt themselves. Again, as Bureau of Prison employees, were are charged with keeping inmates safe to the best of our abilities.

Page **43** of **48**



This interaction on the page is clearly directed toward me and Psychology Services. The interaction also includes problematic racist content.



This post is homophobic and also makes light of issues related to the Holocaust.



This post explicitly jokes about the serious issue of sexual harassment in the workplace.



This meme is an example of a post that is clearly about an individual, without stating their name. If you are an employee at FCC Lompoc, you likely know who this post is referencing. There are several memes of this nature on the Instagram page.



This post is exceptionally problematic. The message of the post likens members of Religious Services to child molesters.

# EXHIBIT 2

Attachment E



UNITED STATES GOVERNMENT
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

03-27-2020

**MEMORANDUM FOR:**     To whom it may concern

**FROM:**     L. Okonowsky, Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy – Continued Concerns Regarding Institution's Handling of Situation**

On 03-25-2020, after postponing our meeting several times, SIA Gonzales requested to meet with me for an interview pertaining to my previous report of SIS Lieutenant Steven Hellman's problematic use of personal social media creating a hostile work environment. I asked to have union representative, Theo Cintora, present for the interview. Prior to meeting with SIA Gonzales, I briefed Mr. Cintora on the current situation. I expressed my concerns that SIA Gonzales has demonstrated bias and has led me to question his ability to maintain confidentiality (discussed in a previous memorandum). Further, Mr. Cintora and I discussed our concerns that SIA Gonzales conducting the interview would be ill advised given Mr. Hellman is SIA Gonzales' subordinate and that they work in the same department/office. A clear conflict of interest issue is involved if SIA Gonzales investigates a matter related to Mr. Hellman's misconduct.

When Mr. Cintora and I met with SIA Gonzales on 03-25-2020, I immediately raised my concerns related to the conflict of interest and my perception that SIA Gonzales may be biased, given he has shared his unsolicited opinions about the Instagram page with me multiple times. I inquired about whether a member of OIA could come to conduct the interview. SIA Gonzales stated he did not see a conflict of interest and encouraged me to proceed with the interview. He asserted several times that OIA delegated the investigation to him. At that point, Mr. Cintora requested to call Warden Engleman prior to beginning the interview. SIA Gonzales left the room and Mr. Cintora called Warden Engleman. Mr. Cintora raised the conflict of interest issue and requested that Warden Engleman speak with OIA again about bringing someone else in to conduct my interview and the investigation. To my knowledge, Warden Engleman stated he would follow up with Mr. Cintora about this request. As of 03-27-2020, no further information has been provided to me on the status of my request or the interview.

Later in the day, on 03-25-2020, I received a phone call from my co-worker, Dr. Anne Clemmer, NRDAP Coordinator, who stated she ran into SIA Gonzales in a public area of the institution. She stated that SIA Gonzales mentioned that he met with me earlier, but that I did not wish to proceed with the interview at that time. Further, he, again, asserted to Dr. Clemmer, allegedly without being asked, that he did not see anything wrong with Mr. Hellman's Instagram postings. Mr. Gonzales' actions demonstrate continued failure to maintain confidentiality and continued bias regarding my complaint. As I stated in a previous memorandum, I have serious concerns about SIA Gonzales' ability to complete my interview or the

Page **1** of **3**

Attachment E

investigation with any sense of fiduciary responsibility.

As of 03-27-2020, I continue to work every day without having been provided any information about where in the institution Mr. Hellman is working. Further, Mr. Hellman continues to post multiple posts every day on his page that are sexist and use sexually explicit/inappropriate language. The message of one posts from earlier this week suggests that when female co-workers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" Despite the fact that I reported Mr. Hellman's misconduct to Executive Staff on 02-18-2020, his inappropriate posts continue.

The Bureau of Prisons Anti-Harassment Policy (3713.26; dated 06-16-2014) states that the Bureau of Prisons (BOP), "…prohibits not only unlawful harassment, but all harassing conduct in the interest of stopping harassment before it becomes a violation of the EEO laws." At this point, Mr. Hellman's behavior and Warden Engleman's failure to curb the behavior, perpetuating continued sexism and sexual harassment, is in violation of EEO laws. Further, the policy states, "BOP employees will work in an environment free from harassing conduct and intimidation from all employees, contract workers and inmates, regardless of their position." Additionally, the policy states, "Employees who make claims of harassing conduct or provide information related to such claims will be protected against further harassing conduct or retaliation." Mr. Hellman's harassment continues and I have not been protected or informed, of actions the institution has even considered to protect me. Further, my (and my supervisor's) request for a workplace violence/threat assessment committee meeting was denied.

Guidelines under "Responsibilities of Supervisors and Management Officials" included in policy 3713.26 indicate, "All supervisors and management officials are responsible for:
- Preventing harassing conduct…
- Preventing retaliation…
- Reporting to the CEO or other appropriate authority any incident of harassing conduct that they witness…
- Receiving and handling allegations of harassing conduct promptly and appropriately…
- Maintaining confidentiality of individual complaints brought to their attention consistent with the other provisions of this policy, and not subjecting the individuals to retaliation for bringing issues forward.
- Providing prompt, interim relief, when necessary, to alleged victims of harassing conduct to ensure that further misconduct does not occur. To the greatest extent practical, the desires of the alleged victim and any adverse impact to them will be taken into consideration. If interim relief is provided, the relief will be provided until the investigation/review is concluded, at which point a determination of final relief will be made.
- The BOP is responsible for promptly initiating appropriate corrective and disciplinary action, up to and including removal, against personnel who are found to have engaged in harassing conduct, or who have not carried out their responsibilities under this policy…".

Guidelines under "Responding to Allegations of Harassing Conduct included in policy 3713.26 indicate, "A supervisor or management official who receives an allegation of or witnesses harassing conduct must:
- Speak with the relevant parties…
- Provide appropriate corrective action to stop any harassing conduct and prevent further harassing conduct, including granting appropriate interim relief, when necessary, to the alleged victim if the allegations are being investigated. (Examples include cease and desist letters and schedule changes).
- Consider the concerns of the alleged victim in cases where management is considering separating the alleged victim and the alleged harasser.
- Determine if a threat assessment is needed in accordance with the Program Statement Workplace Violence Prevention, Staff.

Finally, policy 3713.26 emphasizes the importance of confidentiality, stating, "All information will be maintained on a confidential basis to the greatest extent possible."

Page **2** of **3**

3-ER-0308

Attachment E

I believe Warden Engleman has failed to prevent continued harassing conduct; has failed to prevent retaliation; has not handled my allegations promptly; has not maintained confidentiality of my complaint, which has subjected me to retaliation (I believe Mr. Hellman and potentially other staff were informed of my memo and maybe even saw portions of the memo); has failed to provide interim relief to ensure future misconduct does not occur; and has not initiated prompt corrective action. Further, Warden Engleman and Associate Warden Gutierrez have not responded to my emails, and have therefore failed to consider my concerns regarding being separated from Mr. Hellman. Finally, my request for a threat assessment and workplace violence committee meeting was denied, without any follow-up contact. The manner in which my situation has been handled over the past five weeks clearly and repeatedly violates policy, placing me in continued vulnerable and victimizing situations.

Sincerely,

Lindsay Okonowsky, Ph.D., Staff Psychologist

3-ER-0309

# EXHIBIT 3

Attachment F



UNITED STATES GOVERNMENT
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

03-30-2020

**MEMORANDUM FOR:**  To whom it may concern

**FROM:**  L. Okonowsky, Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy – Continued Concerns Regarding Institution's Handling of Situation**

On the evening of 03-27-2020, I observed an Instagram post on Mr. Hellman's Instagram page that I believed was targeted toward me. The caption of the post stated, "The one staff member that's a giant cunt, loves inmates, and relentlessly tells on staff:". The picture below the caption is of USP Big Sandy's front entrance signage, with the words "Big Sandy" underlined in red. The bottom caption states, "You know, on account of their vaganga." Either Mr. Hellman spelled "vagina" incorrectly, or he was making a reference to a previous post targeting me that referenced a "gangbang" (discussed in previous memos). Several FCC Lompoc staff members "liked" the post, including SIS Technician Justin Bender and Acting Safety Manager Robert Grice, both of whom are mentioned in previous memos I submitted.

I emailed Warden Engleman to express my serious concerns about this post on 03-27-2020 at approximately 9:30pm, from my personal email address (email attached). In my email, I emphasized my discouragement that the problematic posts, clearly targeting me, have continued. I asked Mr. Engleman, explicitly, if anything was going to be done to curb Mr. Hellman's behavior in the interim, while the investigation is completed. I shared my belief that I should not have to work in an environment with someone who refers to me as a "cunt" on a public forum. I also highlighted that policy indicates something should be done to curb Mr. Hellman's behavior and protect me from continued bullying and harassment (relevant policy attached). The attached policy also describes situations in which threat assessments or workplace violence committees are warranted, which I believe is relevant in this case, but did not occur.

Once again, I did not receive a response from Warden Engleman. Despite not receiving any reassurance that my concerns are being taken seriously, that something will be done to stop Mr. Hellman's behavior, and that I will be protected from continuing to experience sexism and sexual harassment, I showed up for work today to complete my job duties. Mr. Hellman was the first person I saw in the parking lot this morning. I saw Warden Engleman at the Training Center this morning, but I did not bring up my concerns to him because the space was not confidential and, at this point, I believe it is Warden Engleman's duty to initiate face-to-face communication about my concerns, of which he is certainly aware. His failure to address my concerns has placed me in continued positions of experiencing sexism and sexual harassment contributing to a hostile work environment.

L. Okonowsky, Ph.D., Staff Psychologist

Page **1** of **12**

Attachment F

Mail From: Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu>

File Edit View Actions Tools Window Help

Close Reply Reply All Forward

Mail Properties Personalize Message Source Discussion Thread

**From:** Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu> 3/27/2020 9:32:37 P
**To:** Engleman, James
**BC:** Lindsay Okonowsky
**Subject:** Posts

Warden Engleman,

I know you're busy. I understand there is a lot going on right now and I appreciate the difficulties you are facing. That being said, these posts continue on a daily basis and I'm growing more and more discouraged. It is obvious these posts are targeted toward me. Is anything going to be done to curb this behavior as the investigation takes place? I shouldn't have to work in an environment with people who refer to me as a "cunt" on a public forum. I've been nothing but professional and continue to be forced to tolerate this bullying and harassment. Policy says something can be done to protect me in the interim. What will be done? This has gone, and continues to go, too far.

T-Mobile 9:16 PM

8_AND_HITTHE_GATE
Posts Follow

8_and_hitthe_gate ...

The one staff member that's a giant cunt, loves inmates, and relentlessly tells on staff:

3 likes

8_and_hitthe_gate You know, on account of their vaganga



Attachment F



3-ER-0313

# EXHIBIT 4



**UNITED STATES GOVERNMENT**
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

04-27-2020

**MEMORANDUM FOR:**     To whom it may concern

**FROM:**     L. Okonowsky, Staff Psychologist

**SUBJECT: Continued Postings after Workplace Violence Assessment**

On 04-13-2020, I participated in a Workplace Violence Assessment pertaining to the previously documented situation involving Mr. Hellman. To my knowledge, he participated in his portion of the meeting later that same week. I did not receive information on whether a cease and desist letter was provided to him, which I believe was warranted given his continued inappropriate postings on his Instagram page, despite being aware that I was uncomfortable with his behavior. Not surprisingly, even after the Workplace Violence Assessment, and as recently as this weekend, Mr. Hellman continues to post memes that are sexist and sexually harassing in nature. Further, he has posted a meme explicitly targeting Psychology Services, a department of which I am a part. His posts continue to create an exceptionally hostile work environment for female employees, despite him likely being counseled on his behavior. During the Workplace Violence Assessment, I would imagine he was advised of the problematic nature of his posts, and, I would hope, he was encouraged to discontinue posting offensive, harassing, and discriminatory memes on his Instagram page. If he was in fact counseled on his behavior, his willful decision to continue posting sexually harassing and sexist memes demonstrates flawed decision-making abilities; defiance toward authority and policy; disregard for the concerns of others; explicit disrespect for women; and a repeated, informed choice to perpetuate sexist and harassing messages on his public Instagram page. An individual engaging in decision-making and the associated behaviors of Mr. Hellman's, after being informed of the inappropriateness of his behavior by his supervisors, should not continue to serve in a position of trust or as a supervisor of others (especially women). Attached are examples of his recent posts.

Lindsay Okonowsky, Ph.D.
Staff Psychologist, FCC Lompoc

Page **1** of **6**



When you assault staff and threaten to kill everybody's family, but don't get a shot because you're not responsible for your actions:





8 likes

8_and_hitthe_gate He doesn't adjust well in SHU...

View all 2 comments

5 hours ago

In this post, Mr. Hellman refers to the Institution Disciplinary Process Reports that Psychology Services completes when an inmate with significant mental health issues receives an incident report. What is notable about this post, other than his continued choice to diminish the role of Psychology Services, is the headline, "Gossip: Why people are taking about you," which is an antagonistic statement. The statement is intended to communicate to members of Psychology Services that they are being negatively discussed among staff, simply for doing their jobs, per policy.

Page **2** of **6**



FCC Lompoc employs two female Unit managers.  This image, likely taken from pornography, carries a highly sexualized message that explicitly disrespects female employees.

Page **3** of **6**



Several of Mr. Hellman's posts imply that male staff members view and comment on the appearances of female employees. Female employees, again, are reduced to sex objects. These types of posts, of which there are many, are explicit forms of sexual harassment and perpetuate/condone sexual harassment in the workplace.

Page **4** of **6**



This post is another example of reducing female employees to sex objects and diminishing their roles.

Page **5** of **6**



Mr. Hellman has posted several problematic and discriminatory memes about mothers.  This post is explicitly sexually graphic and is a clear form of sexual harassment.

Page **6** of **6**

# EXHIBIT 5

Attachment B



UNITED STATES GOVERNMENT

# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

05-12-2020

**MEMORANDUM FOR:**    Associate Warden C. Rodriguez

**FROM:**    L. Okonowsky, Ph.D., Staff Psychologist

**SUBJECT: Mr. Hellman's Continued Problematic Social Media Postings/Perpetuation of a Hostile Work Environment**

As of 05-12-2020, Mr. Hellman continues to post significantly problematic content on his Instagram account. A significant portion of the content is explicitly sexist, racist, and homophobic. Many of the posts are unambiguous forms of sexual harassment. More recently, his posts have focused on publicly criticizing Executive Staff's approach to COVID-19 in inappropriate and sexually explicit manners. I attached several of the posts below, but I encourage readers of this memorandum to visit Mr. Hellman's public Instagram page to grasp fully the scope of his behavior.

Notably, Mr. Hellman's decisions to post content in violation of policy and the standards of conduct continues, even after he participated in a Workplace Violence Assessment and after potentially being made aware that he is under investigation. I have outlined my concerns regarding Mr. Hellman's conduct in several previous memos (also attached to this email), so I will not again highlight his most problematic behavior and the potential consequences the Bureau of Prisons/FCC Lompoc could face if his behavior continues (i.e., public relations issues, EEO filings, staff attrition, continued staff misconduct cases, low staff morale, conflict/bullying in the workplace, etc.).

What I will highlight is the following: I am not aware of another workplace as large as the Bureau of Prisons that would allow Mr. Hellman's sexist, racist, and sexually harassing behavior go on for so long (three months now), even during an investigation. I say this while understanding "investigations take time" and while also acknowledging that the Bureau of Prisons/FCC Lompoc are addressing a public health crisis. The current issue began, and was reported, long before COVID-19 was a problem. The Bureau of Prisons must do better to protect employees from discrimination and harassment; as this investigation slowly proceeds, Mr. Hellman continues to put his subordinates in positions of being discriminated against and harassed multiple times per day, with each post he chooses to publish. Every time an FCC Lompoc staff member "likes" or comments on a meme, the sting of the harassment becomes potentially more harmful to employees in protected classes and cements the hostility of our work culture. Further, as a supervisor, he has begun regularly posting in a manner targeting Executive Staff, which only serves to interfere with the cohesiveness of the institution, which is desperately needed given our current situation.

3-ER-0322

Attachment B

The Bureau of Prisons must take a risk by taking a swift stand against Mr. Hellman's behavior. The Bureau of Prisons must make a point to demonstrate to staff that discriminatory behavior is not tolerated and is addressed expediently. I understand those working on this case may see Mr. Hellman's behavior as falling into a "gray area," but this is simply an inaccurate reading of the situation. Policy and the standards of conduct outline his behavior as clear misconduct, especially in his role as a supervisor (a previous memo I submitted crystallizes this fact). While I adamantly believe Mr. Hellman's behavior is in clear violation of policy, I suggest that policy regarding issues like these is expeditiously updated to avoid any confusion about the wrongfulness of this type of behavior moving forward. Right now, the Bureau of Prisons is operating on the wrong side of history. We need to catch up with other organizations and places of employment that clearly and expediently condemn employees' (especially supervisors') uses of social media accounts to create hostile work environments for employees belonging to protected classes. A rudimentary internet search demonstrates that there have been countless cases of employees in various organizations who have been terminated for social media postings far less problematic than Mr. Hellman's posts, of which there are over 900.

The fact that Mr. Hellman maintains his position as an SIS Lieutenant as this investigation proceeds is striking. I understand that this case may set a precedent, which takes time, intentionality, and thoughtfulness on the parts of all involved. I also understand the Bureau of Prisons will obviously want to have sufficient evidence of misconduct before potentially imposing sanctions (which I understand could take time), but Mr. Hellman continues to post sexually harassing and other discriminatory content, creating a hostile work environment, as the investigation takes place. I sincerely hope the costs and benefits of taking a significant amount of time to complete this investigation and waiting to subsequently take action are weighed against the potential consequences of leaving Mr. Hellman in his current position, thereby granting him access to continue discriminating against and harassing subordinates as the investigation continues.

Lindsay Okonowsky, Ph.D.
Staff Psychologist, FCC Lompoc

10

Attachment B



These three memes are explicitly discriminatory and derogatory toward mothers. Mr. Hellman has demonstrated a longstanding pattern of harassing and discriminating against employees who are mothers.

3-ER-0324

Attachment B









These posts are forms of explicit sexual harassment of employees who are women. The memes reduce women to sex objects and even make light of stalking behavior (figure 3). The pink panther picture (figure 1) is particularly disturbing, painting the imagery of male staff standing in key line with erections as they look at female TDY staff simply walking into work.

12

3-ER-0325

Attachment B







This page contains additional memes that serve to reduce employees who are women to sex objects. FCC Lompoc employs two Unit Managers who are women. Figure 1 explicitly targets female Unit Managers using an image pulled from pornography. The image suggests there is a sexual overtone when female employees work with inmates. Images like these are sexist and, again, are explicit forms of sexual harassment. Figure 2 is explicitly homophobic; Mr. Hellman has demonstrated a pattern of posting images of women and referring to them as "dykes" in some way or another. Figure 3 is another example of Mr. Hellman making light of men ogling at female staff, which is blatant sexual harassment.

13

3-ER-0326

Attachment B









These memes are problematic for several reasons, but particularly due to the public attention FCC Lompoc and the Bureau of Prisons are receiving. The posts explicitly target FCC Lompoc Executive Staff in attempts to undermine their leadership. The posts are hostile, critical, defamatory, and promote dissent among staff. Given Mr. Hellman is a supervisor, his pattern of perpetuating disregard for authority figures is striking. If the media were to see these images, they would be able to surmise that FCC Lompoc staff are not united could also posit that "poor decisions" are being made. It is imperative that we avoid perpetuating that message.

14

Attachment B

These memes are additional examples of Mr. Hellman attempting to undermine Executive Staff and the new Captain using explicitly sexual content.



Attachment B




This post suggests staff are being encouraged to purchase their own PPE with coupons. What is particularly problematic (outside of Mr. Hellman's continued, targeted, and defamatory posts toward Executive Staff) is that one of the page's followers uses an AW's name in the comments section. Other staff members support the comment. Posting staff members' names on a public page could be dangerous for those staff members given our line of work. Mr. Hellman has demonstrated a pattern of using staff member's names on his page or allowing others to leave comments including staff members' names.

3-ER-0329

Attachment B





These posts demonstrate that Mr. Hellman feels comfortable posting about the previous Workplace Violence Assessment in which he and I previously participated. His comment, "Where's my soldiers" insinuates he is looking for others to rally behind his poor decisions. As a supervisor with influence over subordinates, this is exceptionally problematic; he should be setting a positive example for others. He continues to demonstrate reckless and poor decisions without regarding the consequences of his behaviors.

17

Attachment B



These posts also demonstrate that Mr. Hellman feels comfortable continuing to post about Psychology Services, even after the Workplace Violence Assessment. Psychology Services staff should be able to perform the duties of their jobs, per policy and under the guidance of the Psychology Services Branch, without facing bullying behavior at the hands of a staff member in a supervisory position.

During the Workplace Violence Assessment meeting, I was informed that Mr. Hellman would be educated on the consequences for continued problematic posts. The posts above are clearly targeted toward our current situation (especially the second post). His willful decision to make these posts demonstrates disregard for what he was likely told during the meeting, pointing to his compromised ability to make professional decisions, listen to authority figures, and act professionally.

18

3-ER-0331

Attachment B




These memes should not require an explanation; they are wildly inappropriate and could pose significant public relations problems if community members were to link them to FCC Lompoc. As correctional workers, we are charged with supporting the rehabilitation processes of all inmates, regardless of their crimes.  The meme on the right dances around the "n-word," which is shockingly inappropriate.  Mr. Hellman feels comfortable posting brazenly offensive content (over 930 posts since January, 2020) on his Instagram page; his behavior warrants assessment into his decision-making abilities and reasonably puts into question his ability to serve in a supervisory capacity (especially as SIS Lieutenant).

3-ER-0332

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **DECLARATION OF LINDSAY OKONOWSKY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY  JUDGMENT** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

_____
Jessica Sanchez

9
**PROOF OF SERVICE**

**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an individual,

        Plaintiff,

   vs.

MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,

        Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**DECLARATION OF LINDSAY L. BOWDEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*[Plaintiff's Notice of Opposition and Opposition to Defendant's Motion for Summary Judgment; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay Okonowsky; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**
**Courtroom: 6A**

**DECLARATION OF LINDSAY L. BOWDEN**

3-ER-0334

# DECLARATION OF LINDSAY L. BOWDEN

I, Lindsay L. Bowden, do hereby declare as follows:

1.     I am an attorney duly licensed to practice before all courts of the State of California and the Central District of California, and am an associate at Brock & Gonzales, LLP, the attorneys of record for Plaintiff LINDSAY OKONOWSKY ("Plaintiff" or "Ms. Okonowsky") herein. I am familiar with the issues and discovery conducted by all parties in this case. If called as a witness, I could and would testify competently to the matters set forth herein as they are based upon my personal knowledge and belief. This Declaration is submitted in support of Plaintiff's Notice Of Opposition And Opposition To Defendant's Motion For Summary Judgment. *Further, this Declaration serves as "<u>Plaintiff's Compendium of Evidence</u>" in support of Plaintiff's Opposition to Defendant's Motion*.

2.     Attached hereto as **<u>Exhibit A</u>** are true and correct copies of excerpts from the Deposition of Lindsay Okonowsky, taken on October 11, 2022.

3.     Attached hereto as **<u>Exhibit B</u>** are true and correct copies of excerpts from the Deposition of James Engleman, taken on November 16, 2022.

4.     Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of a declaration from Lieutenant Steven Hellman from September 10, 2020, made pursuant to Title 28 U.S.C. §1746 [OKONOWSKY_000322-326].

5.     Attached hereto as **<u>Exhibit D</u>** will be a true and correct copy of the Cease and Desist Order issued to Lieutenant Steven Hellman on April 16, 2020 [USA00000296]. Plaintiff has filed an Application for Leave to File Under Seal pursuant to Local Rule 79-5.1.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed on March 13, 2023 in Los Angeles, California.



Lindsay L. Bowden, Esq.

# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT

 2   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3   No. 2:21-cv-07581-VAP-AS

 4   ------------------------------------x

 5   LINDSAY OKONOWSKY,

 6             Plaintiff,

 7        vs.

 8   MERRICK GARLAND, ATTORNEY GENERAL

 9   UNITED STATES DEPARTMENT OF JUSTICE,

10   FEDERAL BUREAU OF PRISONS,

11             Defendants.

12   ------------------------------------x

13                    Remote Deposition

14                    October 11, 2022

15                      10:01 a.m.

16

17        DEPOSITION OF LINDSAY OKONOWSKY

18             VIA VIDEOCONFERENCE

19

20

21

22

23             lipka.com, inc.

24              888.lipka.com

25           transcripts@lipka.com
```

lipka.com, inc.
transcripts@lipka.com
(888) 547-5226
3-ER-0337
1

1    page.

2        Q.   And did you have -- and other than being a

3    follower, I should say, was there any other extent of

4    the participation that you believe Mr. McGinnis engaged

5    in?

6        A.   I don't recall at this time, but if there

7    was, I included that in the memos I had previously

8    submitted.

9        Q.   And in terms of the interactions with

10   Mr. McGinnis, did you at all have any conversations

11   with him in person in the office or what was the nature

12   of the interactions or is it similar to Mr. Enos in

13   which it was purely his activity on the page?

14       A.   I don't recall ever having a conversation

15   with Mr. McGinnis about it.

16       Q.   Okay.  And then in terms of Dr. Ann Clemmer,

17   could you describe what your interactions with

18   Dr. Clemmer were?

19       A.   Dr. Clemmer and I had a friendly collegial

20   relationship.

21       Q.   And do you -- did you discuss the Instagram

22   page with her?  Did she also -- are you contending that

23   she also participated in the page?

24       A.   She did not participate in the page, no.  But

25   I did discuss my concerns with her.

1    Q.   And when did you discuss those concerns?

2    A.   It would have been around February 17th, I

3    believe.

4    Q.   And what do you recall from that

5    conversation?

6    A.   I recall showing her some of the problematic

7    posts and talking to her about the content of them and

8    that they were inappropriate, and I talked to her about

9    how I felt they were targeting me multiple times.  So

10   yeah, we -- we had extensive conversations about

11   that.

12   Q.   Okay.  And other than that interaction you've

13   described for me, any other interactions that you had

14   with Dr. Clemmer?

15   A.   Yes.  I had talked to Dr. Clemmer about the

16   situation multiple times.  She accompanied me to the

17   first talk that I had with Victor Gonzales, the SIA.

18   And so she was there for that -- that interaction.

19   Q.   Okay.  And then in terms of Acting Warden

20   James Engelman --

21   A.   Yes.

22   Q.   -- what was your interactions with Acting

23   Warden Engelman?

24   A.   I believe I went to him in person for the

25   first time to talk about the content of the page and my

1    concerns on the 18th, which was the day after I had
2    become aware.  So I met with him face-to-face and then
3    subsequently sent multiple E-mails to him and multiple
4    memos to him that went unanswered.
5         Q.    And in terms of the Instagram page, do you
6    contend that Acting Warden Engelman participated in the
7    page?
8         A.    No, I do not contend that.  I don't -- no.
9         Q.    In terms of your conversation with Warden
10   Engelman that you mentioned, what do you remember from
11   the conversation?
12        A.    Can you repeat that question?
13        Q.    Sure.  You had mentioned that you had a
14   conversation with AW Engelman and I'm wondering what
15   you remember from that conversation.
16        A.    Okay.  I remember going and talking to him
17   individually and saying, you know, I've become aware of
18   this Instagram page that is inappropriate, it's racist,
19   it's sexist, it's homophobic.  There's some material on
20   that page that could pose a significant public
21   relations issue for the prison and the BOP as a whole
22   if somebody from the public were to see the page.
23   There are, you know, posts that are targeting specific
24   departments.  And that was the most significant parts
25   of our conversation.

```
1    Q.   And did you ever see that content posted by
2  any of the employees in work rooms or otherwise in the
3  office?
4    A.   No.
5    Q.   So is it fair to say that that -- when you
6  saw that meme at that point and after, it was just on
7  that page?
8    A.   Correct.
9    Q.   Okay.  And what conversations did you have
10 with anyone once you discovered that meme?
11   A.   I reported that meme to Dr. Clegg and I
12 believe I also included it in a memo that I then
13 circulated to executive staff.
14   Q.   And if you could tell me what was your
15 interaction or what do you remember from your
16 conversation with Dr. Clegg?
17   A.   Dr. Clegg, I don't recall specifically.  I
18 can't say specifically.  I think -- actually, no, I do.
19 At that point it became apparent I think to both of us
20 that the meme was targeted, and he suggested a
21 workplace -- that we request a workplace violence
22 committee.  And so that's what we then did to AW
23 Gutierrez, and he also suggested maybe I transition to
24 working at the Low.
25   Q.   Okay.  And so were you reassigned then to the
```

 1   Low facility?

 2        A.   Yeah, it wasn't, you know, necessarily

 3   formal, but yeah, soon after I did start working at the

 4   Low.  But what was exceptionally concerning to me was

 5   that the first day I reported to the Low, Hellman was

 6   at the Low.  And so I sent an E-mail to AW Gutierrez,

 7   asking for more information, like you know, I've

 8   been -- I'm moving to Low to be away from Lieutenant

 9   Hellman but he's here.  So can you provide -- you know,

10   while maintaining his confidentiality and rights, can

11   you provide me some information about what's going on

12   here so that I can feel comfortable.  And never

13   received any information.

14             And then subsequent to that memo I was given

15   an EAP referral and also Dr. Clegg told me that AW

16   Gutierrez told him that he didn't want to be included

17   on any more of my memos.  He didn't want me to include

18   him on those E-mails.

19        Q.   So in terms of you had mentioned you saw

20   Mr. Hellman in the Low, could you tell me a little bit

21   more about that?  Did you interact with him, did you

22   speak with him or how did you see him in the Low?

23        A.   We passed each other in the parking lot, and

24   then somebody had told me he was in receiving and

25   discharge, but I just kept my head down and I didn't --

```
1    I was really uncomfortable, so I just tried to get
2    through it and get to my office.
```

3          Q.   In terms of the interaction in the parking

4    lot, how far apart were you from each other?  Was it

5    just like if you and I walked past each other in the

6    hallway, was it a different part of the parking lot?

7    Can you describe that for me?

8          A.   I don't recall specifically.  I don't recall

9    specifically.

10         Q.   Did he notice you or you noticed him and then

11   you moved the other way?

12         A.   I can't speak to whether he noticed me or

13   not, but I certainly noticed him.

14         Q.   Okay.  And then other than that, did you

15   interact with Lieutenant Hellman at all later in that

16   day or was that the extent of it?

17         A.   Not that day.

18         Q.   Okay.  And then after that day, did you have

19   any other interactions with Lieutenant Hellman?

20         A.   Yes, I did.

21         Q.   In person or I guess could you describe?

22         A.   Yes.  In person.  So the nature of our work

23   as psychologists in prison settings requires us to work

24   on call, and so if an inmate expresses, you know,

25   suicidal thinking or statements, we have to come in.

lipka.com, inc.
(888) 547-5226        transcripts@lipka.com

3-ER-0343        38

```
 1    So I was on call and had to come into the Medium
 2    component where Mr. Hellman was working and I had to
 3    have interaction with him about the inmate.
 4        Q.   And generally if you could pinpoint it for
 5    me, when was that interaction?
 6        A.   I couldn't say for sure.
 7        Q.   Would it have been, if you had to guess,
 8    March or in terms of the timeline would it have been
 9    after February or --
10        A.   Yes.  It was after February.
11        Q.   And I guess so when was the, if you remember,
12    the parking lot interaction?
13        A.   It was the day that I reported to the Low for
14    the first time.  I submitted a memo that day that would
15    have that date, but I think it would have been early
16    March, but I can't say for sure.  There's a date
17    with -- there's a memo that's dated that same day.
18        Q.   And in terms of the interaction that you had
19    with Mr. Hellman, separate from the parking lot, the
20    one where you had discussed an inmate, what do you
21    recall from that conversation?
22        A.   It was a neutral conversation.  But it was
23    exceptionally uncomfortable for me.
24        Q.   I'm sorry.  You said it was mutual?
25        A.   It was a neutral conversation.  But it was
```

lipka.com, inc.
(888) 547-5226                transcripts@lipka.com
3-ER-0344        39

1    Threat Assessment meeting?

2        A.   I think her comment and some other people's

3    comment, you know, just not to look at the page, again,

4    yes, it was focusing on my emotion.  Right?  Rather

5    than his behavior.  And also, during that meeting, they

6    said well, don't look at the page, but then at the --

7    you know, towards the end of the meeting, they also

8    said if it continues to happen, of course let us know.

9    Right?

10           So I was really between a rock and a hard

11   place.  I was being advised not to look at the page,

12   but then they also told me that they didn't have the

13   resources to monitor the page but to tell them if it

14   kept happening.  Right?  So I was kind of like --

15   that's all I could say, I was between a rock and a hard

16   place.  Like I felt nobody was going to -- again,

17   nobody was communicating that they were going to

18   protect me or do any kind of monitoring, and so again,

19   I felt I was on my own and -- and had to take care of

20   myself.

21       Q.   So just to make sure I fully understand,

22   other than the comment or comments that were saying

23   just stop looking at the page or some variation of stop

24   looking at the page, were there any other comments that

25   you felt were sexist that were made at the Threat

1    memes that you believe were -- that you believe were

2    directed at you and were subsequently discussed in the

3    workplace?

4         A.   Not that I can recall.  And it's like

5    while -- while I can't recall conversations happening

6    in the workplace, there were -- there's comments on the

7    posts from people who work in the workplace referencing

8    the workplace.  Right?  So it's bidirectional.

9         Q.   And I'm just clarifying.  So there was no

10   other memes that you felt were directed at you and

11   subsequently discussed in the workplace other than what

12   you just --

13        A.   Not that I can recall, in my presence.

14        Q.   Okay.  And in terms of the meme that you had

15   mentioned with referencing the psychology department,

16   how did you find out about this meme?

17        A.   I saw it on the page.

18        Q.   Did anyone send you the meme?

19        A.   No, but if I'm in the workplace violence

20   assessment and they tell me to continue to monitor the

21   page and let them know if any additional behavior comes

22   up.  Right?  Then I'm in a position of having to look

23   at that page.  Furthermore, I don't want to be kind of

24   a sitting duck.  If there is going to be content on

25   that page that's about me, juxtaposed with a previous

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com

3-ER-0346    70

```
 1   meme about tomorrow's forecast hot enough to melt a
 2   snowflake.  Right?  I felt that I needed to know what
 3   was going on on that page to -- to potentially protect
 4   myself from a heated situation.
 5            If everybody in the institution knows and not
 6   me, that's potentially an unsafe situation because we
 7   rely on each other as coworkers, especially in a prison
 8   environment.  Right?  So if there are things
 9   circulating on this page that are about me that are,
10   you know, characterizing me in a problematic manner.
11   Right?  And I potentially have an emergency in the
12   institution and it's -- it's these employees who engage
13   with this page who are going to be responding to the
14   emergency, I have to rely on them.  And so I felt like
15   I needed to know what was going on on that page to --
16   to -- I needed to be well informed.
17        Q.   In terms of that post specifically, though,
18   did you feel that that post was sexist?
19        A.   I -- the -- I don't recall.  I think the post
20   did have something to do with emotionality, but I don't
21   have it in front of me, so I can't say specifically.
22        Q.   So other than -- I guess what do you mean by
23   emotionality?
24        A.   I don't have the post in front of me, so I
25   don't know, but if it included some reference to
```

lipka.com, inc.
(888) 547-5226                transcripts@lipka.com
3-ER-0347          71

Do Not Copy

```
 1    with you without your consent?

 2         A.   Did they discuss the post with me, and then

 3    what was the last part of your question?

 4         Q.   Without your consent.

 5         A.   No.

 6         Q.   And in terms of the paragraph here, which if

 7    you'd like to take some time to read it, my question is

 8    does this capture why you believe the post was directed

 9    at you or are there other reasons other than what's

10    written here?

11         A.   Can I read it?

12         Q.   Of course.  And just let -- take your time

13    and just let me know when you've had a chance to read

14    it.  If you want me to adjust the screen, I can do that

15    as well.

16         A.   It's fine the way it is.  Okay.  Yes, I felt

17    this post was targeted towards me.  The staff member

18    that I'm referencing in this memo is Mr. Grice.  So two

19    hours before this post was made, I had had a

20    conversation with Mr. Grice about the post, and on that

21    same day, I had talked to Warden Engelman and the chief

22    psychologist about it.

23         Q.   And anything else?

24         A.   No, I just think the timing makes it quite

25    obvious that it's related to me and my report.
```

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com
3-ER-0348          101

```
 1        Q.   Okay.  And did anyone ever expressly say this
 2   was specifically directed at you?
 3        A.   No, I don't recall.
 4        Q.   Okay.  So the next one is 168.  So we'll go
 5   to 168.  And just so Lindsay can see as well, this is
 6   168.  And similarly in terms of formatting, there's a
 7   post and then a paragraph.  This paragraph was written
 8   by you.  Right?
 9        A.   Yes.
10        Q.   Okay.  So more series of questions.  How did
11   you learn about this post?
12        A.   I saw it on the Instagram page.
13        Q.   And no one sent it to you before you saw it
14   on the Instagram page.  Is that right?
15        A.   That's correct.
16        Q.   And no one sent it to you after?
17        A.   Correct.
18        Q.   And this post was not displayed in the
19   workplace.  Right?
20        A.   Correct.
21        Q.   And it was also never shown to you in the
22   workplace either.  Right?
23        A.   Correct.
24        Q.   And no one approached you to discuss the post
25   without your consent.  Right?
```

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com
3-ER-0349   102

1        A.    Correct.

2        Q.    And in terms of what's written here, this

3    paragraph that you wrote, are there any other reasons

4    as to why you believe the post was directed at you or

5    does this paragraph that you've written here capture

6    it?

7        A.    Let me -- can I read it?

8        Q.    Of course.  Of course.

9        A.    Yes.  So again, this one comes down to

10   timing.  So Mr. Hellman had blocked my Instagram page

11   from being able to look at the posts, which I didn't

12   even know he knew the name of my own Instagram page.

13   So there had to be some conversations with other staff

14   members about what my Instagram name was.  But right

15   before this was posted, he blocked me from being able

16   to look at the page.  So the timing indicates that it's

17   about me or targeting me.  I believe the woman in the

18   photo is kind of like, you know, it exaggerated

19   likeness to some degree.

20            And I -- you know, my role was frequently to

21   be involved in suicide risk assessments at the

22   institution.  So yes, you know, especially given he had

23   blocked me from being able to see the page right before

24   posting this, that led me to believe that it absolutely

25   targets me.

lipka.com, inc.
(888) 547-5226                transcripts@lipka.com
3-ER-0350        103

1   171 is the next one.  Okay.  So -- so if you could just

2   take a second to review and read the paragraphs which I

3   believe were written by you, and then whenever you're

4   ready, just let me know.

5        A.   Okay.  Okay.

6        Q.   Okay.  So how did you learn of this post?

7        A.   I saw it on the Instagram page.

8        Q.   And no one sent it to you before you saw it

9   on the Instagram page.  Right?

10       A.   That's correct.

11       Q.   And no one sent it to you after you saw it on

12  the Instagram page.  Right?

13       A.   That's correct.

14       Q.   And it was never displayed at the workplace.

15  Right?

16       A.   Correct.

17       Q.   And it was also never shown to you at the

18  workplace -- I'm sorry.  It was never shown to you at

19  the workplace either.  Right?

20       A.   That's correct.

21       Q.   And no one discussed it with you without your

22  consent.  Right?

23       A.   That's correct.  But I don't think, you know,

24  these -- this line of questioning about these posts and

25  whether it was shown to me in the workplace or not

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com
3-ER-0351    106

1  really captures, you know, the situation.  Like with

2  this post in particular, there was a comment from an

3  employee referencing a meeting that did happen in the

4  workplace.  So this is kind of what I'm referencing

5  with that kind of bidirectional relationship with the

6  workplace and the Instagram page.  It was a page

7  created by a Lompoc employee for Lompoc employees where

8  Lompoc matters were discussed.  So I just think that's

9  important.

10      Q.   And in terms of why you believe the post was

11  directed at you, is that captured in this paragraph or

12  is there additional information?

13      A.   Yeah, I mean I think it's captured in what's

14  written, that I had interactions with Hellman where,

15  you know, he had asked me in the middle of me doing a

16  task to move offices when a captain before him had told

17  me to work in that office, and then the SHU training

18  that I reference in the paragraph as well.  I was the

19  only psychologist present for that SHU training.  So

20  again, that employee's comment references a meeting

21  that I was part of and not any other psychologist.

22      Q.   And in terms of the interaction you mentioned

23  with Hellman, that was prior to discovering -- your

24  discovery of Instagram things.  Right?

25      A.   I do not recall.

lipka.com, inc.
(888) 547-5226                        transcripts@lipka.com
3-ER-0352      107

1    Q.   Okay.  And did anyone ever say this post was
2  specifically directed at you?
3    A.   No, but the employee's comment references a
4  SHU meeting that I and only I, the only psychologist,
5  was part of.  So that to me indicates that yes, other
6  people had the idea that it targeted me as well.
7    Q.   And what was the name of that employee?
8    A.   I don't recall, but it's definitely included
9  as a screen shot in another memo that I submitted.
10   Q.   It wasn't Hellman, just to be clear.
11 Right?
12   A.   No, Hellman create -- created the post.
13   Q.   And in terms of why you believe Hellman
14 created the post, that's again, just to be clear, so
15 we're on the same page, that's what's captured here.
16 Right?  Those are your reasons why you believe Hellman
17 created it?
18   A.   Yes.
19   Q.   Okay.  In -- yeah.  Yeah.
20   Q.   And then in terms of -- the next set I want
21 to show you is 173.  Okay.  So this is -- just you can
22 see, Lindsay, 173.  And then after you have a chance --
23 as before, after you have a chance to look at it, let
24 me blow this up a little bit more so you can see, just
25 let me know.

lipka.com, inc.
(888) 547-5226
transcripts@lipka.com
3-ER-0353    108

```
 1        Q.   After you have a chance to look at this, just
 2   let me know.
 3        A.   Okay.
 4        Q.   Okay.  So let me flip it back so we can --
 5   sorry.  Okay.  There we go.  All right.  Sorry.  Are
 6   you getting dizzy?  Oh, my gosh.  Okay.  Sorry.  All
 7   right.  Apologies for that.  Okay.  So as before,
 8   Ms. Okonowsky, how did you learn of this post?
 9        A.   I saw it on the page.
10        Q.   And did anyone send it to you before you saw
11   it on the page?
12        A.   No.
13        Q.   Did anyone send it to you after you saw it on
14   the page?
15        A.   No.
16        Q.   And was this post ever displayed at the
17   workplace?
18        A.   No.
19        Q.   And --
20        A.   Again, I don't believe it has to be.  All of
21   the people on the next page that liked the post are
22   Lompoc employees.  So whether it's displayed or not,
23   it's something that permeated the workplace.
24        Q.   I'm just trying to understand what happened.
25   That's all.  And in terms of this post, was this post
```

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com
3-ER-0354        121

```
 1        A.    No.
 2        Q.    And did anyone send it to you after you saw
 3   that page?
 4        A.    No.
 5        Q.    And was that post ever displayed in the
 6   workplace?
 7        A.    No.
 8        Q.    And was it ever shown to you in the
 9   workplace?
10        A.    No.
11        Q.    And did anyone ever approach you to discuss
12   that post without your consent?
13        A.    No.
14        Q.    And did anyone ever say that that post was
15   specifically directed at you?
16        A.    No.  But I will say about that post, it left
17   me feeling exceptionally concerned and scared honestly
18   because him and I -- Hellman and I both went through a
19   workplace violence committee meeting where the nature
20   of the situation was discussed at length with me and
21   then, you know, about a week later, to my knowledge,
22   him.  And he was, you know, advised -- I don't know
23   what he was advised of, but I -- for me the situation
24   seemed very serious because of who was involved, who
25   was present, so on and so forth.
```

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com

3-ER-0355    127

1    And they had -- the committee showed Hellman

2   all of my memos.  He was able to see it all.  And so to

3   see that him and I have both been through a very

4   serious meeting and then he was, like, kind of

5   flaunting his disregard for that meeting with a post

6   and had seen everything I had written left me feeling

7   scared because it kind of demonstrated to me that like

8   where his thinking was.  Like he didn't care what they

9   said about the situation.  He didn't take it seriously

10   and he didn't stop posting at that point.  So it made

11   me feel -- yeah, it made me feel scared.

12    Q.   And in terms of the post on the page, I just

13   want to make sure for completeness we walk through it.

14   Other than the post we've discussed, were any of the

15   posts sent to you before you viewed them on the page?

16    A.   No.

17    Q.   And were any of them sent to you after you

18   viewed them on the page?

19    A.   I -- no.

20    Q.   And were any of the posts displayed in the

21   workplace?

22    A.   No.

23    Q.   Were any of them ever shown to you in the

24   workplace?

25    A.   No.

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com
3-ER-0356                    128

1    it was when the legal proceedings and all that had

2    started.

3        Q.   Okay.  And I wanted to ask you about a few

4    things that are mentioned in here which I've

5    highlighted for ease of reference, but just generally,

6    and we'll walk through some of the memo, but what do

7    you remember about the threat assessment meeting, for

8    lack of a better phrase?  You were in the meeting.

9    Right?

10       A.   Yeah.  Yeah.

11       Q.   Just to help --

12       A.   I remember a lot about it.

13       Q.   Okay.

14       A.   But yeah, I sat down with a group of people

15   and they asked me questions and -- yeah.

16       Q.   And in terms of the questions that you were

17   asked, what questions do you remember being asked?

18       A.   I don't remember the specific questions that

19   I was asked.

20       Q.   Okay.  Totally fair.  And then in terms of

21   the threat assessment team, were all -- when you did

22   your interview with them, were all these individuals

23   present?  Let me zoom in so you can see them.

24       A.   Yes.  They were.

25       Q.   Okay.  And we've talked about Dr. Clegg

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com
3-ER-0357   131

1    before.  Did you talk with Dr. Clegg after the threat

2    assessment meeting?

3         A.    Not about the threat assessment meeting.  I

4    think there were either instructions or it was kind of

5    implied that it's something we don't discuss after the

6    meeting is held.

7         Q.    Okay.  Totally understand.  And in terms

8    of -- I guess here too, did the threat assessment team

9    disclose to you that they reviewed your memorandum?

10        A.    Yes.  I remember specifically the lawyer,

11   Mr. Blau (phonetic). He kicked the meeting off and said

12   that he reviewed everything and he made some kind of

13   statement about how he wouldn't want to fight this

14   case, which I thought was striking and always stuck

15   with me and kind of validated some of my concerns.

16        Q.    And in terms of the concerns you expressed to

17   the threat assessment team, we'll walk through those as

18   well, but a few things I wanted to clarify based on

19   what we've been discussing today.  In the interviews it

20   notes that you admitted that you had no personal or

21   direct knowledge that Lieutenant Hellman is, in fact,

22   the sole owner of and contributor to the Instagram

23   account.  So does this refresh your recollection that

24   at the time of this meeting, which is, just so we have

25   it in front of us, April 16, 2020, that you did not at

lipka.com, inc.
(888) 547-5226                          transcripts@lipka.com

3-ER-0358                    132

1          REPORTER'S CERTIFICATE

2

3   STATE OF CALIFORNIA          ) ss:

4   COUNTY OF SAN BERNARDINO )

5          I, Terri L. Emery, a Certified Shorthand

6   Reporter within and for the State of California, do

7   hereby certify:

8          That Lindsay Okonowsky, the witness whose

9   testimony is hereinbefore set forth, was duly sworn by

10  me, and that such testimony given by the witness was

11  taken down stenographically by me and then transcribed.

12          I further certify that I am not related by

13  blood or marriage to any of the parties or counsel in

14  this matter and that I am in no way interested in the

15  outcome of this matter.

16          That any copy of this transcript obtained

17  from a source other than the court reporting firm,

18  including from the adversary or co-counsel in the

19  matter, is uncertified and may not be used at trial.

20          IN WITNESS WHEREOF, I have hereunto set my

21  hand this 23rd day of October, 2022.

22  (SIGNED ELECTRONICALLY)

23  _____

24  Terri L. Emery,

25  California CSR No. 11598

# EXHIBIT B

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

3

4    LINDSAY OKONOWSKY, an      )
     individual,                )
5                               )
              Plaintiff,        )
6                               )
              vs.               )Case No. 2:21-CV-07581-VAP-ASx
7                               )
     WILLIAM P. BARR, ATTORNEY  )
8    GENERAL, UNITED STATES     )
     DEPARTMENT OF JUSTICE,     )
9    FEDERAL BUREAU OF PRISONS, )
                                )
10            Defendants.       )
     _____)

11

12

13

14

15            VIDEOCONFERENCE DEPOSITION OF

16                  JAMES ENGLEMAN

17               NOVEMBER 16, 2022

18

19

20

21

22

23
     Reported by:  Joyce A. Griffith
24   CSR No.:       11010
     NDS Job No.:   267160
25

                                                              1

 1   but you never know in this agency.

 2        Q    You worked for the Federal Bureau of Prisons at

 3   FCC Lompoc in 2020 with Ms. Okonowsky, the plaintiff in

 4   this lawsuit, correct?

 5        A    That's correct.

 6        Q    What was your position at that time?

 7        A    I was associate warden.

 8        Q    In February 2020, Ms. Okonowsky made some

 9   complaints to you, correct, regarding harassment and

10   discrimination?

11        A    Correct.

12        Q    And at some point you were involved in

13   investigating those complaints; is that also correct?

14        A    I don't do the investigations, ma'am.  I just

15   refer on to investigators.

16        Q    Did you have any participation in the

17   investigation into Ms. Okonowsky's complaints?

18        A    No.  I don't do the investigations.

19        Q    So you had no involvement in the investigation

20   into her complaints?

21        A    No.  Not the investigation, no.

22        Q    Did you take any action in response to any

23   complaints that she made to you?

24        A    Yeah.  I referred her allegations to the

25   investigator.

7

3-ER-0362

```
 1        Q     Understood.

 2              That's the extent of your involvement; is that

 3    correct?

 4        A     Correct.
```

```
 5        Q     Backing up a little bit.

 6              Are you represented by counsel today?

 7        A     No.

 8              I'm sorry.  I have got Zak here, so my bad.

 9        Q     So you are represented by counsel today; is that

10    correct?

11        A     Yes.

12        Q     Have you ever had your deposition taken before?

13        A     No.

14        Q     I'm sure that your attorney has gone over some

15    rules with you already.  I just want to go over some brief

16    rules, just to make sure that we are all on the same page

17    as we move forward today.

18              A couple of things are really important because

19    we are on Zoom and there's a court reporter that's taking

20    down everything being said.

21              Just a reminder, let me finish my question before

22    you start answering the question, and I will do my best to

23    let you finish any answers before I ask my next question.

24              Again, it's really important that we speak one at

25    a time.  Okay?
```

8

3-ER-0363

```
 1   STATE OF CALIFORNIA        )
                                ) ss:
 2   COUNTY OF ORANGE           )

 3

 4          I, JOYCE GRIFFITH, do hereby certify:

 5

 6          That I am a duly qualified Certified Shorthand

 7   Reporter, in and for the State of California, holder of

 8   certificate number 11010, which is in full force and

 9   effect and that I am authorized to administer oaths and

10   affirmations;

11          That the foregoing deposition testimony of the

12   herein named witness was taken before me at the time and

13   place herein set forth;

14          That prior to being examined, the witness named

15   in the foregoing deposition, was duly sworn or affirmed

16   by me, to testify the truth, the whole truth, and

17   nothing but the truth;

18          That the testimony of the witness and all

19   objections made at the time of the examination were

20   recorded stenographically by me, and were thereafter

21   transcribed under my direction and supervision;

22          That the foregoing pages contain a full, true

23   and accurate record of the proceedings and testimony to

24   the best of my skill and ability;

25
```

95

3-ER-0364

# EXHIBIT C

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
REPORT OF INVESTIGATION

| | | |
|---|---|---|
| Lindsey Okonowsky | * | |
| | * | |
| Complainant, | * | |
| | * | |
| vs. | * | Agency Case Number: BOP-2020-01035 |
| | * | |
| United States Department of Justice | * | |
| Federal Bureau of Prisons | * | |
| 320 First Street, Northwest | * | |
| Washington, District of Columbia 20534 | * | |
| | * | |
| | * | |
| Agency | | |

---

## INTERROGATORY FOR STEVEN HELLMAN, LIEUTENANT

---

### INSTRUCTIONS FOR ANSWERING INTERROGATORY

Pursuant to the Equal Employment Opportunity Commission's Management Directive 110, dated August 5, 2015, the Investigator may use Interrogatories in conducting investigations. The use of this Interrogatory is to give you an opportunity to "respond fully" with your testimony as if you were being interviewed by the Investigator. Should you fail to fully answer the questions in this Interrogatory, the Investigator may either issue you a Supplemental Interrogatory and/or require your participation in an oral interview in which an affidavit will be drafted from the interview for your signature.

Should you refuse without good cause to respond fully to this Interrogatory, a Supplemental Interrogatory, or participate in an oral interview, sanctions may be imposed. Pursuant to 29 C.F.R. § 1614.108(c)(3) "a party to a complaint - the complainant as well as the agency - may be subject to sanctions where it fails without good cause shown to respond fully and in a timely fashion to a request of the investigator for documents, records, comparative data, statistics, affidavits, or the attendance of witnesses." In addition, you are declaring under the penalty of perjury that your answers are both truthful and correct.

The Investigator may or may not know the full extent of your involvement or your knowledge of the allegations being investigated, prior to drafting these Interrogatory questions. Consequently, there may be questions asked in general terms, but still specific to the issue(s) fully identified

below. Therefore, you should be forthcoming in your answers and provide as much information as you have regarding the issue(s) under investigation. The last question asked gives you an opportunity to add any information you have regarding the issue(s) being investigated; and you should provide that additional information, regardless if there were any direct questions posed to you regarding that specific information.

If after answering these questions and returning a signed copy of the Interrogatory to the Investigator, you determine your answers were incorrect or you failed to provide your full testimony, you should immediately contact the Investigator to amend your answers via an Addendum to your Interrogatory. Keep in mind, your original answers to the Interrogatory may still be included in the Report of Investigation.

## ACCEPTED ISSUES UNDER INVESTIGATION

Complainant alleges management subjected her to sexual harassment from January 2020 through May 2020, when her reports of inappropriate behavior were minimized, often ignored, and delayed in processing. Complainant further alleges that her requests for a workplace violence committee were initially denied, she was provided an Employee Assistance Program (EAP) referral, and encouraged to ignore her aggressor's behavior.

## INTERROGATORY QUESTIONS

Q1. What is your name, current position title, series, grade, and organizational unit?

A. Steven Hellmann, GS-11 Lieutenant, Department of Justice, Federal Bureau of Prisons.

Q2. How long have you been in this position? How long have you worked for the Agency?

A. 12 years for the agency, 5 as a Lieutenant.

Q3. Who are currently your first **and** second-level supervisors, by name (first/last) and position title?

A. Captain Ryan Taillon and Associate Warden Brannon Grady.

Q4. As of the date of the alleged discrimination, who were your supervisors? Please identify by name, position title, organizational units.

A. Acting Captain Josh Robsion and Associate Warden Brannon Grady.

Page 2 of 5

Affiant Initials _____

**Adept Services, Inc.**

Q5.  What is your sex/gender?

A.  No comment.

Q6.  Have you ever participated in EEO activity before?

A.  Never.

Q7.  Are you aware of Complainant complaining about you allegedly posting memes?
A.  Yes.

Q8.  Did you post memes that targeted Complainant?
A.  Never.

Q9.  Was there an investigation?
A.  Apparently there is one going on, but I have not been interviewed.

Q10.  Who investigated?
A.  I have no idea.

Q11.  What was the outcome?
A.  My understanding is that it is still ongoing.

Q12.  Did you ever speak to any managers about this claim? Wardens? If so, who?

A.  I was notified of the claims during a workplace violence threat assessment.  This was
    attended by Executive Assistant Suzanna Scott, Associate Warden Catalina Rodriguez,
    Chief Psychologist Carl Clegg, Drug Abuse Program Coordinator, and Assistant General
    Counsel Darrel Waugh.

Q13.  What did the mangers tell you?
A.  They let me read the complainant's memo detailing the extent of her complaints.

Q14.  Did the Complainant notify you that she felt harassed?
A.  Never.

Q15.  If so, what action(s) did you take? What was your response?
A.  I was never given the opportunity to explain myself or remedy the situation.

Q16.  Did you harass Complainant in any way?

Page 3 of 5                                    Affiant Initials

**Adept Services, Inc.**

3-ER-0368

A.  Never.  I avoid her due to her habit of making inappropriate statements about my appearance at previous times.

Q17.  Do you have any witnesses you would like to suggest?
A.  Justin Bender, Special Investigative Services Technician.

Q18.  Do you have anything you wish to add?

A.  I believe the complainant has a personal grudge against me.  Sometime around January 2020 she began making comments to me in passing about my hair and noting how tan I looked.  Being a married man, this made me feel very uncomfortable, so I attempted to avoid her as much as possible.  At some point she was given temporary access to an office in the Special Housing Unit that belongs to my department and is intended to be used for confidential inmate interviews.  This created tension, as she began to move her personal items into the office and remained in there all day every day, making it impossible for myself and other investigators to do their job.  She would often tell me to go find a different office.  After talks with Acting Captain Josh Robsion, her key to the office was taken.  It was around this time that she was moved from the Special Housing Unit to the Low security institution across the street.  This is the point where she began making allegations against me.  I know this because it was when I was informed that I was no longer allowed at the Low.  From this point on, she has used every avenue at her disposal to attack and harass me.  I was banned from the Low institution where I was assigned.  I was removed from the Special Investigative Office.  I have been passed over for promotion.  I was forced to come in while on vacation and was interrogated by several people, two of which are her friends and colleagues in the Psychology Services department.  Dr. Clegg, her supervisor, is involved in the ongoing investigation as a witness for her allegations.  He was allowed to be present during this "Workplace Violence Committee" meeting, despite my protests.  I was made to answer questions about my personal life and social media activity that is unrelated to my workplace.  I have never sent this person anything on social media and I have never said or done anything unprofessional towards her in the workplace or out of it.  When I became aware of the complainants displeasure at the content of the social media account in question, I removed some of the content and blocked the complainant to avoid any problems and also to not cause her any further distress.  By her own admission, she circumvented my attempt at distancing myself from her by opening a second account in order to be able to continue to monitor the page she finds so offensive.  I have never sent her a friend request nor have I ever attempted to follow her on social media.  The page in question never mentions her name, my name, the agency's name, the institution's name, or any other staff's name.  All posts are satire and aimed to entertain Correctional Officers, not psychologists.  Due to this matter, the page was taken down several months ago.

Page 4 of 5

**Adept Services, Inc.**

Affiant Initials

Pursuant to Title 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing statement, consisting of _____ pages, is true and correct to the best of my knowledge and belief. I understand the information I have given is not considered confidential and that it may be shown to interested parties.

_____
Signature of Affiant
Steven Hellman, Lieutenant

09.10.2020
_____
Date Signed

_____
Signature of Investigator
Natosha Farrell, EEO Investigator

9-10-20
_____
Date Signed

Page 5 of 5

**Adept Services, Inc.**

Affiant Initials_____

# EXHIBIT D

*Plaintiff has filed an Application for Leave to File Under Seal pursuant to Local Rule 79-5.1*

1

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

2

3    I am employed in the County of Los Angeles, State of California. I am over
the age of 18 and not a party to the within action. My business address is 6701
4    Center Drive West, Ste. 610, Los Angeles, CA 90045.

5    On March 13, 2023, I served the foregoing document described as
**DECLARATION OF LINDSAY L. BOWDEN IN SUPPORT OF**
6    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT** on the interested parties in this action, addressed as
7    follows:

8

9    Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
10   Federal Building, Suite 7516
300 North Los Angeles Street
11   Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
12   *Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY*
*GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU*
13   *OF PRISONS*

14   ☒ **By E-Mail**, I transmitted the document to the e-mail address of the
addressee(s).
15

16   ☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed
above to be served through this Court's electronic transmission facilities via the
17   Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who
are determined this date to be registered CM/ECF Users set forth in the service list
18   obtained from this Court on the Electronic Mail Notice List.

19   ☒ (Federal) I declare that I am employed in the office of a member of
the Bar of this Court, at whose direction the service was made.
20

21   Executed on March 13, 2023, at Los Angeles, California.

22

23   Jessica Sanchez

24

25

26

27

28

3
**PROOF OF SERVICE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWKSY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an individual,

      Plaintiff,

  vs.

MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,

      Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

*[Plaintiff's Notice of Opposition and Opposition to Defendant's Motion for Summary Judgment; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay Okonowsky; Declaration of Lindsay L. Bowden; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**

**Courtroom: 6A**

1

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

# PLAINTIFF'S OBJECTIONS TO DEFENDANT'S EVIDENCE

| Material Objected to: | Grounds for Objection: |
|---|---|
| **OBJECTION NO. 1:** Declaration of James Engleman ¶ 6: "On February 19, 2020, SIA Gonzales spoke with Ms. Okonowsky to a meeting to discuss her complaints." | Lacks personal knowledge and foundation. The declarant does not state how he knows this occurred. Witnesses are prohibited from testifying as to matters that they lack personal knowledge of. Fed.R.Evid. 602. The personal knowledge standard of 602 is also applicable to affidavits and declarations submitted in connection with motions for summary judgment. *See* Fed.R.Evid. 56(e) which requires, in part, that: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also*, *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991) ("Declarations and other evidence of the moving party that would not be admissible are subject to a timely objection and may be stricken."). |

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| **OBJECTION NO. 2:** Declaration of James Engleman ¶ 7: "On February 26, 2020, SIA Gonzales met with Ms. Okonowsky to discuss her complaints." | Lacks personal knowledge and foundation. The declarant does not state how he knows this occurred. Witnesses are prohibited from testifying as to matters that they lack personal knowledge of. Fed.R.Evid. 602. The personal knowledge standard of 602 is also applicable to affidavits and declarations submitted in connection with motions for summary judgment. *See* Fed.R.Evid. 56(e) which requires, in part, that: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also*, *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991) ("Declarations and other evidence of the moving party that would not be admissible are subject to a timely objection and may be stricken."). |
|---|---|
| **OBJECTION NO. 3:** Declaration of James Engleman ¶ 12: "On March 11, 2020, as a result of Ms. Okonowsky's allegation in her memo as to the identity of the Page's creator, that individual was assigned to a | Lacks personal knowledge. The declarant does not state how he knows this occurred. Witnesses are prohibited from testifying as to matters that they lack personal knowledge of. Fed.R.Evid. 602. The personal knowledge standard of 602 is also applicable to affidavits and declarations submitted in connection with motions for summary judgment. *See* Fed.R.Evid. 56(e) which |

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| | |
|---|---|
| different facility at FCC Lompoc while her complaints were investigated." | requires, in part, that: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also*, *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991) ("Declarations and other evidence of the moving party that would not be admissible are subject to a timely objection and may be stricken."). |
| **OBJECTION NO. 4:** Declaration of Carl Clegg ¶ 4: "During this meeting, Ms. Okonowsky expressed that she 'did not know, but believed they were likely made and viewed by staff working in SHU,' but we 'discussed and she agreed to immediately be reassigned duties at the Low.' *Id*." | Hearsay. Declarant offers this out of court document to prove the truth of the matters asserted, i.e., she was unsure of who viewed the page. Fed.R.Evid. 801-802. |

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| **OBJECTION NO. 5:** | Lacks proper authentication: The statement lacks proper authentication. Fed.R.Evid. 901, 902. |
|---|---|
| Declaration of Zakariya K. Varshovi ¶ 7: "Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery." | No personal knowledge. Witnesses are prohibited from testifying as to matters that they lack personal knowledge of. Fed.R.Evid. 602. The personal knowledge standard of 602 is also applicable to affidavits and declarations submitted in connection with motions for summary judgment. *See* Fed.R.Evid. 56(e) which requires, in part, that: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *See also*, *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991) ("Declarations and other evidence of the moving party that would not be admissible are subject to a timely objection and may be stricken."). |

5

| **OBJECTION NO. 6:** Varshovi Decl. ¶ 2, Ex. A-1 (Pl.'s Dep. 100:14-101:5): "Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |
|---|---|
| **OBJECTION NO. 7:** Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 102:13-103:1)" "Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |

6

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| **OBJECTION NO. 8:** Varshovi Decl. ¶ 4, Ex. C, at 3; Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 103:10-103:11): "Even after Plaintiff was blocked from viewing the Page that day by its creator, she nevertheless created a fake Instagram account to continue viewing it on a daily basis as she had since February 18, 2020." | Lacks proper authentication and personal knowledge: This deposition transcript is not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt is a "true and correct copy" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |
|---|---|
| **OBJECTION NO. 9:** Varshovi Decl. ¶ 2, Ex. A-3 (Pl.'s Dep. 104:16-105:6): "Plaintiff admitted the meme of the "stay in your lane" traffic sign was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| **OBJECTION NO. 10:** Varshovi Decl. ¶ 2, Ex. A-4 (Pl.'s Dep. 106:6-106:23): "Plaintiff admitted that the meme of a cartoon character appearing sad was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |
|---|---|
| **OBJECTION NO. 11:** Varshovi Decl. ¶ 2, Ex. A-5 (Pl.'s Dep. 116:15-117:7): "Plaintiff admitted that the meme of a woman wearing a sweater stating "the struggle is real," was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |

8

**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

| **OBJECTION NO. 12:** Varshovi Decl. ¶ 2, Ex. A-6 (Pl.'s Dep. 109:2-109:1: "Plaintiff admitted that the meme of a man's face was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent." | Lacks proper authentication and personal knowledge: This deposition transcript and exhibit are not properly authenticated. The reporter's certification is missing. The statement in Varshovi's affidavit that this excerpt and exhibit are "true and correct copies" does not provide authentication because Varshovi lacks personal knowledge of Dr. Okonownsy's deposition. *See* Fed.R.Evid. 901(b)(1); *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). |
|---|---|

DATED:  March 13, 2023            BROCK & GONZALES, LLP


By: _____

D. AARON BROCK
CORY H. HURWITZ
LINDSAY L. BOWDEN
Attorneys for Plaintiff

9
**PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE**

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **PLAINTIFF'S WRITTEN OBJECTIONS TO DEFENDANT'S EVIDENCE** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

_____
Jessica Sanchez

10
**PROOF OF SERVICE**

3-ER-0382