No. 23-55404

---

# In the United States Court of Appeals for The Ninth Circuit

---

LINDSAY OKONOWSKY,
Plaintiff-Appellant,

v.

MERRICK B. GARLAND, ATTORNEY GENERAL,
UNITED STATES ATTORNEY GENERAL
Defendant-Appellee.

---

Appeal from the United States District Court
for the Central District of California
Honorable Virginia A. Phillips, Chief District Judge
(2:21-cv-07581-VAP-AS)

---

## EXCERPTS OF RECORD – VOLUME 4 of 5

---

LINDSAY L. BOWDEN
  *Counsel of Record*
BROCK & GONZALES, LLP
6701 Center Drive West
  Suite 610
Los Angeles, CA 90045
(310) 294-9595
*lb@brockgonzales.com*

ANDREW S. PLETCHER
PLETCHER LAW, APC
3435 E. Thousand Oaks Blvd.
  Suite 6457
Westlake Village, CA
  91359-7997
(805) 630-3245
*Andrew@pletcher-law.com*

*Counsel for Plaintiff and Appellant*

4-ER-0383

1  E. MARTIN ESTRADA
   United States Attorney
2  DAVID M. HARRIS
   Assistant United States Attorney
3  Chief, Civil Division
   JOANNE S. OSINOFF
4  Assistant United States Attorney
   Chief, General Civil Section
5  ZAKARIYA K. VARSHOVI[1]
   Assistant United States Attorney
6        Federal Building, Suite 7516
         300 North Los Angeles Street
7        Los Angeles, California 90012
         Telephone: (213) 894-3994
8        Facsimile: (213) 894-7819
         E-mail: zakariya.varshovi@usdoj.gov
9  *Attorneys for Defendant Merrick Garland*

10

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13                **WESTERN DIVISION**

14  | | |
    |---|---|
    | LINDSAY OKONOWSKY, | No. CV 21-07581-VAP-AS |
15  | *Plaintiff,* | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
16  | v. | [*Statement of Undisputed Facts and Conclusions of Law; Declaration of Zakariya K. Varshovi; Declaration of James Engleman; Declaration of Carl Clegg; and Proposed Judgment filed concurrently herewith*] |
17  | MERRICK GARLAND, | |
18  | *Defendant.* | |

Date:          April 4, 2023
Time:          2:00 PM
Ctrm:          6A

Hon. Virginia A Phillips

---

[1] Admitted to practice under Local Rule 83-2.1.4.1. *See* Order, In Re Application of Zakariya K. Varshovi for Admission Pursuant to Local Rule 83-2.1.4.1, C.D. Cal. No. 2:22-cm-14-PSG (Jan. 30, 2023).

# **<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ............................................................................................1

II.    FACTUAL BACKGROUND ...........................................................................2

     A.    Plaintiff's Complaints and Defendant's Investigation. ......................2

     B.    Plaintiff's Post-Complaint Career at BOP. .......................................5

III.   ARGUMENT ...................................................................................................6

     A.    PLAINTIFF DOES NOT—*AND CANNOT*—ESTABLISH A HOSTILE WORK ENVIRONMENT CLAIM ...............................6

          1.    Plaintiff Complains About Conduct Outside the Workplace. ............6

          2.    The Alleged Conduct Was Neither Severe Nor Pervasive. ...............7

     B.    EVEN ASSUMING PLAINTIFF HAD PRESENTED ACTIONABLE HARASSMENT, DEFENDANT PROMPTLY AND REASONABLY REMEDIATED IT. ..........................................10

IV.   CONCLUSION ..............................................................................................13

i

4-ER-0385

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Alioto v. Assoc. Exch. Inc.*,
   482 F. App'x 222, 223 (9th Cir. 2012)................................................................9

*Alvarez v. Joy*, No. 2:20-cv-10132,
   2022 U.S. Dist. LEXIS 236221, at *38-39 (C.D. Cal. Dec. 20, 2022) ............6, 7

*Armstrong v. City of Dallas*,
   997 F.2d 62, 67 n. 19 (5th Cir. 1993) ..............................................................8

*Bottenberg v. Carson Tahoe Hosp.*,
   No. 5-cv-684, 2007 WL 9771085, at *4 (D. Nev. May 17, 2007)...................7

*Candelore v. Clark Cnty. Sanitation Dist.*,
   975 F.2d 588, 590 (9th Cir. 1992)..................................................................6, 7

*Domingo v. Brennan*,
   639 F. App'x 418, 420 (9th Cir. 2016) ...........................................................7

*EEOC v. Prospect Airport Servs., Inc.*,
   621 F.3d 991, 998 (9th Cir. 2010) .................................................................9

*Fuller v. Idaho Dep't of Corr.*,
   865 F.3d 1154, 1161 (9th Cir. 2017) ..............................................................6

*Fuller v. Idaho Dep't of Corr.*,
   694 F. App'x 590, 591 (9th Cir. 2017).........................................................6, 7

*Isiramen v. Yuma Reg'l Med. Ctr.*,
   838 F. App'x 298, 299 (9th Cir. 2021) ...........................................................9

*Jenott v. St. Alphonsus Reg'l Med. Ctr.*,
   No. 8-cv-322, 2009 WL 5200524, at *7 (D. Idaho Dec. 23, 2009) .................7

*Kortan v. Cal. Youth Auth.*,
   217 F.3d 1104, 1111 (9th Cir. 2000) ...............................................................10

*Lappin v. Laidlaw Transit*,
   179 F. Supp. 2d 1111, 1122 (N.D. Cal. 2001)..................................................11

*Manatt v. Bank of America, NA*,
   339 F.3d 792 (9th Cir. 2003) ........................................................................9, 10

*Nagar v. Found. Health Sys.*,
   57 F. App'x 304, 306 (9th Cir. 2003).........................................................6, 10

*Nixon v. Franciscan Health Sys.*,
   No. 11-cv-5076, 2012 WL 1068070, at *4 (W.D. Wash. Mar. 29, 2012) ........11

*Patton v. Indianapolis Pub. Sch. Bd.*,
   276 F.3d 334, 339 (7th Cir. 2002) ................................................................7

4-ER-0386

**Cases**                                                                    **Page(s)**

*Sanchez v. City of Santa Ana*,
    936 F.2d 1027, 1031, 1036-37 (9th Cir. 1990)..................................10

*Swenson v. Potter*,
    271 F.3d 1184, 1198 (9th Cir. 2001) ................................ 2, 10, 11, 12

*Taylor v. Small*,
    350 F.3d 1286, 1292 (D.C. Cir. 2003)..........................................8

*Yaa Asante-Addae v. Sodexo, Inc.*,
    No. 3:13-cv-489, 2015 WL 1471927, at *13 (D. Conn. Mar. 31, 2015) ..........8, 9

*Vasquez v. County of Los Angeles*,
    307 F.3d 884, 893 (9th Cir. 2002) ...................................10

*Watson v. Las Vegas Valley Water Dist.*,
    268 F. App'x 624, 626 (9th Cir. 2008)........................................10, 11

4-ER-0387

## **DEFENDANT'S NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on April 4, 2023 at 2:00 PM, Defendant Merrick Garland hereby moves this Court for an order entering judgment against all of Plaintiff's claims and dismissing her action with prejudice under Rule 56 of the Federal Rules of Civil Procedure. This motion will be made before the Honorable Virginia A. Phillips, U.S. District Judge, Courtroom 6A, in the First Street Courthouse, located at 350 W. 1st Street, Los Angeles, California 90012.

Defendant brings the Motion pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there is no triable issue of fact as to Plaintiff's claims, as detailed in the accompanying Memorandum of Points and Authorities. This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the attached Statement of Undisputed Facts and Contentions of Law ("SUF"), the Declaration of James Engelman ("Engleman Decl."), the Declaration of Zakariya K. Varshovi ("Varshovi Decl.") and the Declaration of Carl Clegg ("Clegg Decl."), the pleadings and papers on file herein, any oral argument that may be heard by the Court, and any other matters that the Court deems appropriate.

This motion is made following conference of counsel under Local Rule 7-3 which was held on February 22, 2023.

Dated: March 6, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

/s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI
Assistant United States Attorney

*Attorneys for Defendant Merrick Garland*

iv

# INTRODUCTION

While ostensibly claiming to present a hostile work environment claim, Plaintiff's action seeks to dramatically expand Title VII's reach well beyond the workplace. Plaintiff's claim rests entirely on personal social media content that occurred wholly outside the workplace and remained exclusively online. Indeed, Plaintiff openly admits such content was *never* sent to her, *never* displayed in the workplace, and *never* shown to her in the workplace. Instead, she went online to view another employee's personal Instagram page on a daily basis. The Ninth Circuit routinely finds summary judgment proper where, as here, a hostile work environment claim rests solely on conduct outside of the workplace.

But even considering the limited content Plaintiff claims is directed at her—despite such memes never naming, picturing, referencing, nor otherwise identifying her—the overwhelming majority of such memes are not based on protected characteristics, as they must be to implicate Title VII. The memes, instead, deride correctional psychologists or display women Plaintiff claims are overweight and thus resemble herself. Even assuming such memes were actually directed at Plaintiff, courts widely agree comments regarding an employee's weight find no protection under Title VII. Nor are correctional psychologists a protected class. Ultimately, only three memes Plaintiff speculatively claims are directed at her could be characterized as implicating protected characteristics, one of which is undated, while the other two were posted over a month apart. The Ninth Circuit repeatedly finds such isolated incidents insufficient to show a hostile work environment.

And even if Plaintiff could present an actionable claim (she does not), Defendant promptly investigated and remediated the alleged harassment. The same day Plaintiff complained to Defendant of the Instagram page (the "Page"), it began investigating. Also that same day, Plaintiff's supervisor, with her consent, re-assigned her to a different part of the Federal Correctional Complex ("FCC") Lompoc to avoid any contact with suspected authors of the Instagram content. Defendant made a referral to its Office of Internal

1

Affairs, convened a Threat Assessment Team, interviewed Plaintiff and the alleged creator of the Page, and issued him a Cease-and-Desist Order. Thereafter, Plaintiff did not assert a single meme was directed at her—the alleged harassment stopped. And the Page's creator deleted the entire Instagram Page. Where, as here, "the employer takes prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation." *Swenson v. Potter*, 271 F.3d 1184, 1198 (9th Cir. 2001).

Accordingly, the Court should enter summary judgment in Defendant's favor.

## FACTUAL BACKGROUND

Plaintiff, a former staff psychologist at FCC Lompoc, alleges she was subjected to a hostile work environment due to memes posted on an employee's personal Instagram Page. Compl. ¶¶ 12, 15. The Page was deleted on May 12, 2020. *Id.* ¶ 26. Plaintiff's action does not allege that she was subjected to a hostile work environment before February 18, 2020 nor after May 12, 2020. *Id.* For each meme on the Page, including those Plaintiff asserted were targeted at her, she admitted that none were *ever* sent to her, *ever* displayed in the workplace, *ever* shown to her in the workplace, nor *ever* discussed with her without her consent. SUF ¶¶ 6, 14, 21, 23, 25, 26, 33. Instead, Plaintiff went to the Page—*on a daily basis*—to view each offending meme and even created a fake account to continue viewing them when blocked from the Page by its creator. SUF ¶ 15.

### A.    Plaintiff's Complaints and Defendant's Investigation.

On February 18, 2020, Plaintiff complained to Acting Warden ("AW") James Engelman regarding content on the Page. SUF ¶ 1. Plaintiff did not know nor identify the author of the Page. SUF ¶ 2. Even so, that same day, AW Engleman instructed Special Investigative Agent ("SIA") Victor Gonzales to investigate Plaintiff's complaints. SUF ¶ 3. Also, that day, Plaintiff's immediate supervisor, Chief Psychologist Dr. Carl Clegg re-assigned her, with her consent, from FCC Lompoc's Medium Facility to the Low Facility because she believed that staff working in the Special Housing Unit ("SHU") at the Medium Facility likely made the memes on the Page. SUF ¶ 4.

Later that day, Plaintiff again visited the Page, viewing a meme containing a picture

of former Speaker Nancy Pelosi tearing the State of the Union of Address in half, captioned with "When you get butthurt by memes," "Tomorrow's forecast?  Hot enough to melt a snowflake #youcantakeadickbutnotajoke."  SUF ¶ 5.  On February 19, 2020, at 7:07 AM, Plaintiff e-mailed the meme to AW Engleman, writing in relevant part, "I think the most recent post I sent you may warrant another conversation.  If you have time today, please give me a call . . .."  SUF ¶ 7.  At 7:50 AM, AW Engelman forward Plaintiff's e-mail to SIA Gonzales.  SUF ¶ 8.  That morning, SIA Gonzales called Plaintiff to schedule a meeting to discuss her complaints.  SUF ¶ 9.

On February 26, 2020, SIA Gonzalez met with Plaintiff to discuss her complaints regarding the Page.  SUF ¶ 10.

On March 7, 2020, at 12:46 PM, Plaintiff e-mailed AW Engleman, attaching a meme from the Page, writing in relevant part "This is completely inappropriate and is setting the tone for a strikingly hostile work environment."  SUF ¶ 11.  The meme, which Plaintiff viewed by visiting the Instagram page, captioned a picture of a woman holding a milkshake, with "Feeling cute, might put on a watch later," and "If psychology had to cover the morning watch shifts all weekend, nobody'd [*sic*] ever go on watch #changemymind."  SUF ¶ 12.  Even after Plaintiff was blocked from viewing the Page that day by its creator, she nevertheless created a fake Instagram account to continue viewing it on a daily basis as she had since February 18, 2020.  SUF ¶ 15.

On Monday, March 9, 2020, at 7:52 AM, AW Engleman forwarded Plaintiff's e-mail to SIA Gonzales, and later that day, he directed SIA Gonzales to refer Plaintiff's complaints regarding the Page to the Bureau of Prisons' Office of Internal Affairs in addition to the ongoing FCC Lompoc Investigation.  SUF ¶¶ 16-17.

On March 11, 2020, Plaintiff sent AW Gutierrez a 48-page memo regarding the Page, including 20 pages of memes, which the next day, at 7:47 AM, AW Engelman forwarded to SIA Gonzales.  SUF ¶¶ 18, 27.  Also on March 11, 2020, AW Engelman directed SIA Gonzales to provide Ms. Okonowsky's memo to OIA in connection with the original referral submitted on March 9, 2020.  SUF ¶ 28.  Also that day, as a result of

3

Plaintiff's allegation in her memo as to the identity of the Page's creator, that individual was assigned to a different facility at FCC Lompoc while her complaints were investigated. SUF ¶ 29.

On March 13, 2020, Dr. Clegg provided Plaintiff with information regarding the Employment Assistance Program ("EAP"), which provides free, voluntary counseling to employees. SUF ¶ 30.

On March 27, 2020, at 9:32 PM, Plaintiff e-mailed AW Engleman, attaching a meme she viewed on the Page, asserting "It is obvious these posts are targeted toward me. Is anything going to be done to curb this behavior as the investigation takes place? I shouldn't have to work in an environment with people who refer to me as a [c***] on a public forum." SUF ¶ 31. The next day, at 11:50 AM, AW Engelman forwarded Plaintiff's e-mail to SIA Gonzales. SUF ¶ 31. The meme had the caption "The one staff member that's a giant [c***], loves inmates, and relentlessly tells on staff," with a colon before a picture of "United States Penitentiary Big Sandy, Kentucky," in which "Big Sandy" is underlined in red, with a second caption beneath stating "You know, on account of their vaganga [*sic*]." SUF ¶ 32.

In early April 2020, Barbara Von Blanckensee was assigned as Warden at FCC Lompoc. SUF ¶ 34. Shortly thereafter, AW Engleman apprised her of Plaintiff's complaints regarding the Page. SUF ¶ 35.

On April 13, 2020, Warden Von Blanckensee convened a six-member Threat Assessment Team to review Plaintiff's concerns regarding the Page. SUF ¶ 36. That same day, the Team reviewed Plaintiff's March 11, 2020 memo and interviewed her in-person. SUF ¶ 37. She stated that she had "no personal or direct knowledge" as to who ran the Page and that the offending conduct occurred exclusively online. SUF ¶ 38. On April 15, 2020, the Team interviewed the Page's creator in-person upon his return from previously scheduled leave. SUF ¶ 39. The Page's creator, a correctional officer, admitted that he was the Page's owner and sole contributor, and stated that the "account was just a joke, 'dark prison humor,' and a way for him to blow off steam." SUF ¶ 40. The Page's creator

4

denied that any of his memes were directed at Plaintiff and said he never intended to offend her nor anyone else.  SUF ¶ 41.

On April 16, 2020, the Team issued a memo to Warden Von Blanckensee, concluding that Plaintiff "did not suffer physical harm or damage to her property, nor was she exposed to potential danger or harm as a result of" the actions of the Page's creator. SUF ¶ 42.  But because the Team found that the actions of the Page's creator could constitute bullying, specifically "posting of several memes that reasonably appear to have been directed solely at her," the Team recommended that the Page's creator be issued a Cease-and-Desist Order and that he and Plaintiff should continue to remain in separate complexes.  SUF ¶ 43.

That same day, following the Threat Assessment Team's recommendations, a Cease-and-Desist Order was issued on April 16, 2020 to the Page's creator, ordering him to cease and desist posting content on social media in violation of BOP policy, including content that could reasonably be deemed harassing or bullying of another employee.  SUF ¶ 44.  Also, that same day, following the Threat Assessment Team's recommendations, the Page's creator was provided information about EAP, a program which among other things offers free, voluntary confidential counseling to BOP employees to help them address concerns that may negatively impact job performance and overall well-being. SUF ¶ 45.

Thereafter, Plaintiff identified no further memes on the Page based on protected characteristics.  SUF ¶ 46.  Even so, Plaintiff subsequently Plaintiff complained of new memes she found offensive, none of which she alleged were directed at her.  SUF ¶ 46. On May 12, 2020, the Page's creator deleted the Page entirely.  SUF ¶ 47.

## B. Plaintiff's Post-Complaint Career at BOP.

Subsequent to the deletion of the Page, Plaintiff made no further complaints and remained a BOP employee for over two years.  SUF ¶ 48.  Plaintiff continued to receive retention bonuses.  SUF ¶ 49.  On January 24, 2021, she was promoted to a new position at Federal Correctional Institute Seagoville, Texas, which she received along with a pay

4-ER-0393

raise.  SUF ¶ 50.  On July 6, 2022, Plaintiff resigned from the Bureau of Prisons.  SUF ¶ 51.

**ARGUMENT**

**A.     PLAINTIFF DOES NOT—*AND CANNOT*—ESTABLISH A HOSTILE WORK ENVIRONMENT CLAIM**

To establish a hostile work environment claim, Plaintiff must demonstrate that (1) she was subjected to verbal or physical conduct of a harassing nature based on a protected characteristic, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.  *Nagar v. Found. Health Sys.*, 57 F. App'x 304, 306 (9th Cir. 2003).  Such "conduct must be extreme in order to amount to a change in the terms and conditions of employment."  *Id.*

**1.     <u>Plaintiff Complains About Conduct Outside the Workplace.</u>**

It is undisputed that the conduct Plaintiff complained of occurred outside of the workplace.  The Ninth Circuit and its courts have repeatedly held that conduct outside the workplace standing alone cannot establish a hostile *work* environment.  *See, e.g.*, *Fuller v. Idaho Dep't of Corr.*, 694 F. App'x 590, 591 (9th Cir. 2017) ("Fuller argues that her rapes created a hostile work environment.  But, the rapes occurred outside the workplace"); *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (holding that "conduct away from the workplace or outside business hours" was not actionable); *Alvarez v. Joy*, No. 2:20-cv-10132-FWS, 2022 U.S. Dist. LEXIS 236221, at *38-39 (C.D. Cal. Dec. 20, 2022) ("Conduct occurring outside the workplace" is "insufficient 'to alter the conditions of the victim's employment and create an abusive work environment'") (quoting *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017)).  Yet Plaintiff complains about just that.  In fact, Plaintiff has admitted with respect to every single meme she has complained of that:

- No such memes were *ever* sent to her.  SUF ¶¶ 6, 14, 21, 23, 25, 26, 33.
- No such memes were *ever* displayed in the workplace.  *Id.*

6

- No such memes were *ever* shown to her in the workplace. *Id.*

- No such memes were *ever* discussed with her without her consent. *Id.*

Instead, Plaintiff viewed all such memes when she visited the Instagram page—on a daily basis—on her own time. SUF ¶ 15. Courts within the Ninth Circuit routinely find summary judgment proper where, as here, a hostile work environment claim rests on conduct outside of the workplace. *See, e.g.*, *Fuller*, 694 F. App'x at 591 (affirming summary judgment "[b]ecause [plaintiff] does not claim that Cruz sexually harassed her in the workplace or a related environment, or that he returned to work after the rapes"); *Candelore*, 975 F.2d at 590 (affirming summary judgment because "[m]uch of" the plaintiff's evidence "involved conduct away from the workplace or outside business hours"); *Alvarez*, 2022 U.S. Dist. LEXIS 236221, at *38 (granting summary judgment where the "facts Plaintiff relies on as evidence of sex discrimination indicate that the harassment occurred outside the workplace"); *Jenott v. St. Alphonsus Reg'l Med. Ctr.*, No. 8-cv-322, 2009 WL 5200524, at *7 (D. Idaho Dec. 23, 2009) (granting summary judgment where offensive incidents "occurred off-site, after work hours and without [her] in attendance," and "during a birthday party and not in the workplace"); *Bottenberg v. Carson Tahoe Hosp.*, No. 5-cv-684, 2007 WL 9771085, at *4 (D. Nev. May 17, 2007) (granting summary judgment where "most of the incidents of harassment did not occur at work").

Accordingly, summary judgment is proper on this basis alone.

### 2. <u>The Alleged Conduct Was Neither Severe Nor Pervasive.</u>

Among the limited memes Plaintiff identifies as purportedly directed at her, the overwhelming majority do not reference protected characteristics, as they must be to implicate Title VII. *See, e.g.*, *Domingo v. Brennan*, 639 F. App'x 418, 420 (9th Cir. 2016) ("a plaintiff cannot establish a prima facie case where he presents no evidence that comments were based on protected characteristics") (citation omitted); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("As long as the hostility was not based on a protected characteristic, Title VII is not implicated").

7

Instead, such memes malign correctional psychologists and correctional psychology departments. *See* SUF ¶ 12 (captioning meme, depicting smiling woman holding a milkshake, with "Feeling cute, might put on a watch later," with "If psychology had to cover the morning watch shifts all weekend, nobody'd [sic] ever go on watch #changemymind"); SUF ¶ 19 (captioning meme picturing "stay in your lane" traffic sign, with "When Psychology tries to tell you where you can n [sic] can't cell somebody"); *id.* (captioning meme picturing cartoon character appearing sad, with "when psychology doesn't get their way"); *id.* (captioning meme picturing woman wearing sweater stating "the struggle is real," with "When you piss off the SHU crew, and now you have to pull your own inmates" and "Don't bite the hand that feeds you").

Plaintiff admitted as much. *See* SUF ¶ 13 ("This post . . . diminishes the role of Psychology Services . . . and challenges the competency of the Psychology Services department"); SUF ¶ 20 ("This post clearly highlights a lack of respect for psychology services."); SUF ¶ 22 ("During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. . . . the staff member 'got his way' and me, as 'Psychology,' did not"); SUF ¶ 24 ("I believe these posts targeted me as the former SHU psychologist"). But Plaintiff's occupation as correctional psychologist is not a protected characteristic.

Additionally, Plaintiff asserts that some of the memes above, in addition to mocking correctional psychologists, depict women whom Plaintiff claims are overweight, thus resembling her. *See* SUF ¶ 13 ("This post is derogatory toward women, is critical of women's (specifically my) bodies"); SUF ¶ 24 ("I believe the posts also reflect [the Page's creator's] pattern of critiquing my physical appearance."). But courts widely agree that Title VII does not proscribe comments regarding an employee's weight. *See, e.g.*, *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) ("Title VII does not proscribe discrimination based upon an employee's excessive weight"); *Armstrong v. City of Dallas*, 997 F.2d 62, 67 n. 19 (5th Cir. 1993) ("obesity . . . is [not] protected by Title VII"); *Yaa*

8

1    *Asante-Addae v. Sodexo, Inc.*, No. 3:13-cv-489, 2015 WL 1471927, at *13 (D. Conn. Mar.

2    31, 2015) ("remarks regarding a person's weight are not actionable under Title VII").

3         Only three memes Plaintiff identifies could be characterized as based on protected

4    characteristics. *See* SUF ¶ 5 (2/18/2020 Speaker Nancy Pelosi tearing the State of the

5    Union of Address in half, captioned with "When you get butthurt by memes,"

6    "Tomorrow's forecast? Hot enough to melt a snowflake #youcantakeadickbutnotajoke");

7    SUF ¶ 32 (3/27/2020 Instagram post, containing caption "The one staff member that's a

8    giant [c***], loves inmates, and relentlessly tells on staff," with a colon before a picture

9    of "United States Penitentiary Big Sandy, Kentucky," in which "Big Sandy" is underlined

10    in red, with a second caption beneath stating "You know, on account of their vaganga

11    [*sic*]"); SUF ¶ 19 (undated Instagram picture of a man's face, preceded by a caption stating

12    "When a female co-worker invites guys only for an 'End of Quarter' Party" and followed

13    by a caption, stating "I'm here for the gang bang"). Undoubtedly, such memes are

14    offensive. But, again, such memes never name, picture, reference, or otherwise identify

15    Plaintiff. And all such memes—as Plaintiff admits—were *never* sent to her, were *never*

16    displayed in the workplace, were *never* shown to her in the workplace, and were *never*

17    discussed with her without her consent. SUF ¶¶ 6, 14, 21, 23, 25, 26, 33.

18         At bottom, Plaintiff presents three offensive memes posted over at least a month a

19    part. But such isolated incidents fail to establish the existence of a hostile work. *See, e.g.*,

20    *Isiramen v. Yuma Reg'l Med. Ctr.*, 838 F. App'x 298, 299 (9th Cir. 2021) ("isolated

21    incidents are insufficient to show severe or pervasive harassment"); *Alioto v. Assoc. Exch.*

22    *Inc.*, 482 F. App'x 222, 223 (9th Cir. 2012) (conduct that is "episodic at best" is

23    "insufficient to establish a prima facie case" for hostile work environment); *EEOC v.*

24    *Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) ("A violation is not

25    established merely by evidence showing sporadic use of abusive language, gender-related

26    jokes, and occasional teasing") (cleaned up).

27         The Ninth Circuit routinely finds similar conduct, while patently offensive,

28    insufficient to show a hostile work environment. *See, e.g.*, *Manatt v. Bank of America,*

*NA*, 339 F.3d 792, 795-96 (9th Cir. 2003) (finding no hostile work environment where plaintiff observed her coworkers laughing and saying "China Man," pulled back "their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians," ridiculed her for mispronouncing the word "Lima" and referred to her as "China woman"); *Nagar*, 57 F. App'x at 306 ("instances of national origin harassment taken together show that Nagar was subjected only to offhand comments and isolated incidents of offensive conduct" were "insufficiently severe or pervasive to alter the terms and conditions of her employment"); *Vasquez v. County of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile work environment where plaintiff was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110-11 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," "histrionics," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036-37 (9th Cir. 1990) (finding no hostile work environment where employer posted a racially offensive cartoon, made racially offensive slurs, targeted Hispanics when enforcing rules, provided unsafe vehicles to Hispanics, and did not provide adequate police backup to Hispanics officers).

Accordingly, Plaintiff cannot show, as she must, that she was subject to "extreme conduct" severe or pervasive enough to alter the conditions of her employment. *Nagar*, 57 F. App'x at 306. Summary judgment is proper on this basis, too.

**B.  EVEN ASSUMING PLAINTIFF HAD PRESENTED ACTIONABLE HARASSMENT, DEFENDANT PROMPTLY AND REASONABLY REMEDIATED IT.**

Even assuming Plaintiff had presented an actionable claim, she must prove that Defendant acted negligently, namely "that the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swenson*, 271 F.3d at 1192. But because Defendant undertook "remedial measures reasonably calculated to end the

10

harassment," Plaintiff cannot do so. *Watson v. Las Vegas Valley Water Dist.*, 268 F. App'x 624, 626 (9th Cir. 2008) (cleaned up).

The Ninth Circuit and its courts have repeatedly found employers not liable where, as here, it promptly investigates and takes remedial measures reasonably calculated to end the alleged harassment. *See, e.g.*, *Watson*, 268 F. App'x at 626 (employer not liable where its "response to the December 4th incident was prompt and effective: Nguyen was interviewed, admitted his grossly inappropriate conduct and received an unpaid, one-day suspension; neither he nor any other employee has engaged in similar conduct since"); *Swenson*, 271 F.3d at 1197 ("Even assuming that the investigation was less than perfect, the Postal Service nevertheless took prompt action to remedy the situation. The harassment stopped."); *Nixon v. Franciscan Health Sys.*, No. 11-cv-5076, 2012 WL 1068070, at *4 (W.D. Wash. Mar. 29, 2012) (employer not liable because it "promptly initiat[ed] an investigation, advis[ed] Mian not to retaliate or engage in harassing behavior, offer[ed] Nixon additional services to ensure her safety, and encourag[ed] her to take additional steps to ensure her own safety"); *Lappin v. Laidlaw Transit*, 179 F. Supp. 2d 1111, 1122 (N.D. Cal. 2001) (employer not liable because it "initiated an investigation that involved interviews of all witnesses and a meeting of the parties involved" and warned both parties"). Indeed, Defendant promptly investigated Plaintiff's Complaints and its remedial measures addressed the alleged harassment.

On February 18, 2020, Plaintiff complained to Defendant regarding the Page. SUF ¶ 1. That same day, Defendant began investigating her complaints. SUF ¶ 3; *Swenson*, 271 F.3d at 1193 ("The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified."). Also that same day, Dr. Clegg re-assigned Plaintiff, with her consent, to FCC Lompoc's Low facility to limit any potential contact SHU staff she suspected authored memes on the Page. SUF ¶ 4. And upon her allegation as to the identity of the Page's creator, that individual was assigned to a different facility at FCC Lompoc while her complaints were investigated. SUF ¶ 29. *Swenson*, 271 F.3d at 1192

11

(finding no liability where employer, among other things, "separated the two employees pending the outcome of an investigation by moving Swenson to a different location within the same facility"). On February 26, 2020, Defendant met with her to discuss and further investigate her complaints. SUF ¶ 10. Less than two weeks later, Defendant referred Plaintiff's complaint to its Office of Internal Affairs. SUF ¶ 17. In early April 2020, incoming Warden Blanckensee was apprised of Plaintiff's complaints regarding the Page. SUF ¶ 35. A Threat Assessment Team was convened on April 13, 2020, which reviewed Plaintiff's March 11, 2020 memo and interviewed her in-person. SUF ¶¶ 36-37. Two days, later the Team interviewed the Page's creator in-person. SUF ¶ 39. The next day, the Page's creator was issued the Cease-and-Desist Order. SUF ¶ 44. Thereafter, Plaintiff did not assert a single meme was directed at her—the alleged harassment stopped. SUF ¶ 46.

Nevertheless, Plaintiff complained about subsequent memes posted after the Threat Assessment meeting which she perceived as offensive—that same day, the Page's creator deleted the Page entirely. SUF ¶¶ 46-47. Subsequent to the deletion of the Page, Plaintiff made no further complaints and remained a BOP employee for over two years until her voluntary resignation. SUF ¶ 51. And while Plaintiff will critique Defendant's investigation where, as here, "the employer takes prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation." *Swenson*, 271 F.3d at 1198. Defendant diligently investigated and addressed the harassment as COVID-19 swept through FCC Lompoc, infecting *over a third* of its inmate population.[2]

Accordingly, even if Plaintiff could demonstrate that a hostile work environment existed (she cannot), Defendant is nevertheless not liable and summary judgment is proper.

---

[2] By May 11, 2020, COVID-198 had infected 25 staff and 912 inmates (over a third of FCC Lompoc's inmate population). Remote Inspection of FCC Lompoc, DOJ, OIG (July 14, 2020), *available at* https://oig.justice.gov/sites/default/files/reports/20-086.pdf (last accessed March 6, 2023).

**CONCLUSION**

Ultimately, Plaintiff's action invites this Court to transform Title VII into a general civility code regarding conduct outside the workplace, occurring exclusively online, that is *never* sent to Plaintiff, *never* shown to her in the workplace, *never* displayed in the workplace, and *never* discussed with her without her consent. Defendant respectfully requests that the Court reject Plaintiff's invitation and grant summary judgment in its favor.

Dated: March 6, 2023                Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

/s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI
Assistant United States Attorney

*Attorneys for Defendant Merrick Garland*

13

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Merrick Garland certifies that this brief contains 4,319 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 6, 2023                    Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

/s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI
Assistant United States Attorney

*Attorneys for Defendant Merrick Garland*

14

1  E. MARTIN ESTRADA
   United States Attorney
2  DAVID M. HARRIS
   Assistant United States Attorney
3  Chief, Civil Division
   JOANNE S. OSINOFF
4  Assistant United States Attorney
   Chief, General Civil Section
5  ZAKARIYA K. VARSHOVI[1]
   Assistant United States Attorney
6          Federal Building, Suite 7516
           300 North Los Angeles Street
7          Los Angeles, California 90012
           Telephone: (213) 894-3994
8          Facsimile: (213) 894-7819
           E-mail: zakariya.varshovi@usdoj.gov
9  Attorneys for Defendant

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                   WESTERN DIVISION

13  LINDSAY OKONOWSKY,                   No. CV 21-07581-VAP-AS

14          Plaintiff,                   **DEFENDANT'S
                                         STATEMENT OF
15      v.                              UNDISPUTED FACTS
                                        AND CONCLUSIONS
16  MERRICK GARLAND,                     OF LAW**

17          Defendant.                   Hon. Virginia A. Phillips

18

19

20

21

22

23

24

25

26

27  _____
    [1] Admitted to practice under Local Rule 83-2.1.4.1. *See* Order, In Re Application
28  of Zakariya K. Varshovi for Admission Pursuant to Local Rule 83-2.1.4.1, C.D. Cal. No.
    2:22-cm-14-PSG (Jan. 30, 2023).

Defendant Merrick Garland in his official capacity as Attorney General of the United States hereby submits the following Statement of Undisputed Facts and Conclusions of Law in support of his Motion for Summary Judgment, pursuant to L.R. 56-1 and this Court's Standing Order.

## I.  UNDISPUTED FACTS

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| **1.** | On February 18, 2020, Plaintiff complained to Acting Warden ("AW") James Engelman regarding content on the Page. | Engleman Decl. ¶ 3 |
| **2.** | At the time of Plaintiff's meeting with AW Engleman, Plaintiff did not know nor identify the author of the Page. | Engleman Decl. ¶ 3 |
| **3.** | On February 18, 2020, AW Engleman instructed Special Investigative Agent ("SIA") Victor Gonzales to investigate Plaintiff's complaints. | Engleman Decl. ¶ 4 |
| **4.** | On February 18, 2020, Plaintiff's immediate supervisor, Chief Psychologist Dr. Carl Clegg re-assigned her, with her consent, from FCC Lompoc's Medium Facility to the Low Facility because she believed that staff working in Special Housing Unit ("SHU") likely made the memes on the Page. | Clegg Decl. ¶ 4, Ex. A |
| **5.** | On February 18, 2020, Plaintiff again visited the Page, viewing a meme containing a picture of former Speaker Nancy Pelosi tearing the State of the Union of Address in half, captioned with "When you get butthurt by memes," "Tomorrow's forecast?   Hot enough to melt a snowflake #youcantakeadickbutnotajoke." | Varshovi Decl. ¶ 2, Ex. A-1 (Pl.'s Dep. 100:12-100:13); *id.* ¶ 3, Ex. B-1 (copy of Speaker Pelosi meme) |
| **6.** | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-1 (Pl.'s Dep. 100:14-101:5) |
| **7.** | On February 19, 2020, at 7:07 AM, Plaintiff e-mailed the meme to AW Engleman, writing in relevant part, "I think the most recent post I sent | Engleman Decl. ¶ 5, Ex. A |

1

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
|  | you may warrant another conversation. If you have time today, please give me a call . . ." |  |
| 8. | On February 19, 2020, at 7:50 AM, AW Engelman forwarded Plaintiff's e-mail to SIA Gonzales. | Engleman Decl. ¶ 5, Ex. A |
| 9. | On February 19, 2020, SIA Gonzales called Plaintiff to schedule a meeting to discuss her complaints. | Engleman Decl. ¶ 6 |
| 10. | On February 26, 2020, SIA Gonzalez met with Plaintiff to discuss her complaints regarding the Page. | Engleman Decl. ¶ 7 |
| 11. | On March 7, 2020, at 12:46 PM, Plaintiff e-mailed AW Engleman, attaching a meme from the Page, writing in relevant part "This is completely inappropriate and is setting the tone for a strikingly hostile work environment." | Engleman Decl. ¶ 8, Ex. B, at 1-2 |
| 12. | The meme, attached to Plaintiff's March 7, 2020 e-mail, which Plaintiff viewed by visiting the Instagram page, captioned a picture of a woman holding a milkshake, with "Feeling cute, might put on a watch later," and "If psychology had to cover the morning watch shifts all weekend, nobody'd [sic] ever go on watch #changemymind." | Engleman Decl. ¶ 8, Ex. B, at 2; Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 102:10-102:12). |
| 13. | Plaintiff asserted that the meme "is derogatory toward women, is critical of women's (specifically my) bodies"), and diminishes the role of Psychology Services . . . and challenges the competency of the Psychology Services department." | Varshovi Decl. ¶ 3, Ex. B-2 |
| 14. | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 102:13-103:1) |
| 15. | Even after Plaintiff was blocked from viewing the Page that day by its creator, she nevertheless created a fake Instagram account to continue | Varshovi Decl. ¶ 4, Ex. C, at 3; Varshovi Decl. ¶ 2, Ex. A-2 (Pl.'s Dep. 103:10- |

2

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| | viewing it on a daily basis as she had since February 18, 2020. | 103:11) |
| 16. | On March 9, 2020, at 7:52 AM, AW Engleman forwarded Plaintiff's e-mail to SIA Gonzales. | Engleman Decl. ¶ 8, Ex. B, at 1 |
| 17. | On March 9, 2020, AW Engleman directed SIA Gonzales to refer Plaintiff's complaints regarding the Page to the BOP's Office of Internal Affairs, in addition to the ongoing FCC Lompoc investigation. | Engleman Decl. ¶ 9 |
| 18. | On March 11, 2020, Plaintiff sent AW Gutierrez a 48-page memo regarding the Page. | Engleman Decl. ¶ 10 |
| 19. | Plaintiff asserted that, in addition to the meme picturing Nancy Pelosi, the following memes, which she viewed by visiting the Page, were targeted at her: (1) a picture of "stay in your lane" traffic sign, captioned with "When Psychology tries to tell you where you can n [sic] can't cell somebody"; (2) a picture of a cartoon character appearing sad, captioned with "when psychology doesn't get their way"; (3) a picture of a woman wearing a sweater stating "the struggle is real," captioned with "When you piss off the SHU crew, and now you have to pull your own inmates" and "Don't bite the hand that feeds you"; and (4) an undated picture of a man's face, preceded by a caption stating "When a female co-worker invites guys only for an 'End of Quarter' Party" and followed by the caption: "I'm here for the gang bang." | Varshovi Decl. ¶ 3, Ex. B-3 (copy of stay in your lane meme); Ex. B-4 (copy of meme of cartoon character); Ex. B-5 (copy of meme of a woman with "struggle is real" sweater); Ex. B-6 (copy of meme of man's face) |
| 20. | Regarding the meme of "stay in your lane" traffic sign, Plaintiff asserted "This post clearly highlights a lack of respect for psychology services." | Varshovi Decl. ¶ 3, Ex. B-3. |
| 21. | Plaintiff admitted the meme of the "stay in your lane" traffic sign was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-3 (Pl.'s Dep. 104:16-105:6) |

3

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| 22. | Regarding the meme of a cartoon character appearing sad, Plaintiff asserted that "During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. . . . the staff member 'got his way' and me, as 'Psychology,' did not." | Varshovi Decl. ¶ 3, Ex. B-4 |
| 23. | Plaintiff admitted that the meme of a cartoon character appearing sad was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-4 (Pl.'s Dep. 106:6-106:23) |
| 24. | Regarding the meme of a woman wearing a sweater stating "the struggle is real," Plaintiff asserted that "I believe these posts targeted me as the former SHU psychologist. . . . I believe the posts also reflect Mr. Hellman's pattern of critiquing my physical appearance." | Varshovi Decl. ¶ 3, Ex. B-5 |
| 25. | Plaintiff admitted that the meme of a woman wearing a sweater stating "the struggle is real," was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-5 (Pl.'s Dep. 116:15-117:7) |
| 26. | Plaintiff admitted that the meme of a man's face was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-6 (Pl.'s Dep. 109:2-109:17) |
| 27. | On March 11, 2020, at 3:41 PM, Plaintiff e-mailed AW Engelman a copy of her memo. At 7:47 AM, AW Engelman forwarded Plaintiff's memo to SIA Gonzales. | Engleman Decl. ¶ 10, Ex. C |
| 28. | Also on March 11, 2020, AW Engelman directed SIA Gonzales to provide Ms. Okonowsky's memo to OIA in connection with the original referral submitted on March 9, 2020. | Engleman Decl. ¶ 11 |
| 29. | On March 11, 2020, as a result of Plaintiff's | Engleman Decl. ¶ 12 |

4

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| | allegation in her memo as to the identity of the Page's creator that individual was assigned to a different facility at FCC Lompoc while her complaints were investigated. | |
| 30. | On March 13, 2020, Dr. Clegg referred Plaintiff to the Employment Assistance Program ("EAP"), which provides free, voluntary counseling to employees. | Clegg Decl. ¶ 5, Ex. B |
| 31. | On March 27, 2020, at 9:32 PM, Plaintiff e-mailed AW Engleman, attaching a meme she viewed on the Page, asserting "It is obvious these posts are targeted toward me. Is anything going to be done to curb this behavior as the investigation takes place? I shouldn't have to work in an environment with people who refer to me as a [c***] on a public forum." The next day, at 11:50 AM, AW Engleman forwarded Plaintiff's e-mail to SIA Gonzales. | Engleman Decl. ¶ 13, Ex. D, at 1; Varshovi Decl. ¶ 2, Ex. A-7 (121:8-122:9) |
| 32. | The meme had the caption "The one staff member that's a giant [c***], loves inmates, and relentlessly tells on staff," with a colon before a picture of "United States Penitentiary Big Sandy, Kentucky," in which "Big Sandy" is underlined in red, with a second caption beneath stating "You know, on account of their vaganga [sic]." | Engleman Decl. ¶ 13, Ex. D, at 2 |
| 33. | Plaintiff admitted that this meme was never sent to her, never displayed in the workplace, never shown to her in the workplace, and never discussed with her without her consent. | Varshovi Decl. ¶ 2, Ex. A-7 (121:10-122:5) |
| 34. | In early April 2020, Barbara Von Blanckensee was assigned as Warden at FCC Lompoc. | Engleman Decl. ¶ 14 |
| 35. | Shortly thereafter, Warden Von Blanckensee was assigned as Warden, AW Engleman apprised her of Plaintiff's complaints regarding the Page and the ongoing investigation into the same. | Engleman Decl. ¶ 15 |

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| 36. | On April 13, 2020, Warden Von Blanckensee convened a six-member Threat Assessment Team to review Plaintiff's concerns regarding the Page. | Engleman Decl. ¶ 16 |
| 37. | On April 13, 2020, the Team reviewed Plaintiff's March 11, 2020 memo and interviewed her in-person. | Engleman Decl. ¶ 17, Ex. E, at 2. |
| 38. | During her April 13, 2020, Plaintiff stated that she had "no personal or direct knowledge" as to who ran the Page and that the offending conduct occurred exclusively online. | Engleman Decl. ¶ 17, Ex. E, at 2. |
| 39. | On April 15, 2020, the Team interviewed the Page's creator in-person upon his return from previously scheduled leave. | Engleman Decl. ¶ 17, Ex. E, at 2. |
| 40. | The Page's creator, a correctional officer, admitted that he was the Page's owner and sole contributor, and that the "account was just a joke, 'dark prison humor,' and a way for him to blow off steam." | Engleman Decl. ¶ 17, Ex. E, at 2. |
| 41. | But the Page's creator denied that any of his memes were directed at Plaintiff and that he never intended to offend her nor anyone else. | Engleman Decl. ¶ 17, Ex. E, at 2. |
| 42. | On April 16, 2020, the Team issued a memo to Warden Von Blanckensee, concluding that Plaintiff "did not suffer physical harm or damage to her property, nor was she exposed to potential danger or harm as a result of" the Page's creator actions. | Engleman Decl. ¶ 17, Ex. E, at 3. |
| 43. | But because the Team found Page's creator actions towards Plaintiff, specifically "posting of several memes that reasonably appear to have been directed solely at her," could constitute bullying, the Team recommended that Page's creator be a Cease-and-Desist Order and that he and Plaintiff should continue to remain in separate complexes. | Engleman Decl. ¶ 17, Ex. E, at 4-5. |
| 44. | On April 16, 2020, following the Threat Assessment Team's recommendations, a Cease-and-Desist Order was issued to the Page's creator, | Engleman Decl. ¶ 18 |

6

| Def.'s SUF No. | Undisputed Facts | Supporting Evidence |
|---|---|---|
| | which ordered the Page's creator to cease and desist posting content on social media in violation of BOP policy, including content that could reasonably be deemed harassing or bullying of another employee. | |
| 45. | Also on April 16, 2020, following the Threat Assessment Team's recommendations, a referral to the Employee Assistance Program was issued to the Page's creator, which offers free, voluntary confidential counseling to BOP employees to help them address concerns that may negatively impact job performance and overall well-being. | Engleman Decl. ¶ 19 |
| 46. | Subsequently, Plaintiff complained of new memes she found offensive, none of which she alleged were directed at her. | Pl.'s Compl. ¶ 25 |
| 47. | On May 12, 2020, the Page's creator deleted the Page entirely. | Pl.'s Compl. ¶ 26 |
| 48. | Following the deletion of the Page, Plaintiff made no further complaints and remained a BOP employee for over two years. | Varshovi Decl. ¶ A, Ex. A-8 (Pl.'s Dep. 92:8-92:12); Pl.'s Compl. ¶ 26 |
| 49. | Plaintiff continued to receive retention bonuses. | Varshovi Decl. ¶ 2, Ex. A-8 (Pl.'s Dep. 87:13-87:16) |
| 50. | On January 24, 2021, she was promoted to a new position at Federal Correctional Institute Seagoville, Texas, which she received along with a pay raise. | Varshovi Decl. ¶ 2, Ex. A-8 (Pl.'s Dep. 91:13-91:25) |
| 51. | In July of 2022, Plaintiff resigned from the Bureau of Prisons. | Varshovi Decl. ¶ 2, Ex. A-8 (Pl.'s Dep. 90:21) |

## II. CONCLUSIONS OF LAW

1. To establish a hostile work environment claim, Plaintiff must demonstrate that (1) she was subjected to verbal or physical conduct of a harassing nature based on a

4-ER-0410

protected characteristic, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Nagar v. Found. Health Sys.*, 57 F. App'x 304, 306 (9th Cir. 2003). Such "conduct must be extreme in order to amount to a change in the terms and conditions of employment." *Id.*

2.   It is undisputed that the conduct Plaintiff complained of occurred outside of the workplace. The Ninth Circuit and its courts have repeatedly held that conduct outside the workplace standing alone cannot establish a hostile *work* environment. *See, e.g.*, *Fuller v. Idaho Dep't of Corr.*, 694 F. App'x 590, 591 (9th Cir. 2017) ("Fuller argues that her rapes created a hostile work environment. But, the rapes occurred outside the workplace"); *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (holding that "conduct away from the workplace or outside business hours" was not actionable); *Alvarez v. Joy*, No. 2:20-cv-10132-FWS, 2022 U.S. Dist. LEXIS 236221, at *38-39 (C.D. Cal. Dec. 20, 2022) ("Conduct occurring outside the workplace" is "insufficient 'to alter the conditions of the victim's employment and create an abusive work environment'") (quoting *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017)).

3.   Courts within the Ninth Circuit routinely find summary judgment proper where, as here, a hostile work environment claim rests on conduct outside of the workplace. *See, e.g.*, *Fuller*, 694 Fed. App'x at 591 (affirming summary judgment "[b]ecause [plaintiff] does not claim that Cruz sexually harassed her in the workplace or a related environment, or that he returned to work after the rapes"); *Candelore*, 975 F.2d at 590 (affirming summary judgment because "much of" the plaintiff's evidence "involved conduct away from the workplace or outside business hours"); *Alvarez*, 2022 U.S. Dist. LEXIS 236221, at *38 (granting summary judgment where "facts Plaintiff relies on as evidence of sex discrimination indicate that the harassment occurred outside the workplace"); *Jenott v. St. Alphonsus Reg'l Med. Ctr.*, No. 8-cv-322, 2009 WL 5200524, at *7 (D. Idaho Dec. 23, 2009) (granting summary judgment where offensive incidents

"occurred off-site, after work hours and without [her] in attendance," and "during a birthday party and not in the workplace"); *Bottenberg v. Carson Tahoe Hosp.*, No. 5-cv-684, 2007 WL 9771085, at *4 (D. Nev. May 17, 2007) (granting summary judgment where "most of the incidents of harassment did not occur at work"). Summary judgment is proper on this basis alone.

4.      Among the limited memes Plaintiff identifies as purportedly directed at her, the overwhelming majority do not reference protected characteristics, as they must be to implicate Title VII. *See, e.g.*, *Domingo v. Brennan*, 639 F. App'x 418, 420 (9th Cir. 2016) ("a plaintiff cannot establish a prima facie case where he presents no evidence that comments were based on protected characteristics"); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("As long as the hostility was not based on a protected characteristic, Title VII is not implicated").

5.      Plaintiff asserts that some of the memes above, in addition to mocking correctional psychologists, depict women whom Plaintiff claims are overweight, thus resembling her. *See* SUF ¶ 13 ("This post is derogatory toward women, is critical of women's (specifically my) bodies"); SUF ¶ 24 ("I believe the posts also reflect [the Page's creator's] pattern of critiquing my physical appearance."). But courts widely agree that Title VII does not proscribe comments regarding an employee's weight. *See, e.g.*, *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) ("Title VII does not proscribe discrimination based upon an employee's excessive weight"); *Armstrong v. City of Dallas*, 997 F.2d 62, 67 n. 19 (5th Cir. 1993) ("obesity . . . is [not] protected by Title VII"); *Yaa Asante-Addae v. Sodexo, Inc.*, No. 3:13-cv-489, 2015 WL 1471927, at *13 (D. Conn. Mar. 31, 2015) ("remarks regarding a person's weight are not actionable under Title VII").

6.      At bottom, Plaintiff presents three offensive memes posted over at least a month a part. But such isolated incidents fail to establish the existence of a hostile work. *See, e.g.*, *Isiramen v. Yuma Reg'l Med. Ctr.*, 838 F. App'x 298, 299 (9th Cir. 2021) ("isolated incidents are insufficient to show severe or pervasive harassment"); *Alioto v. Assoc. Exch. Inc.*, 482 F. App'x 222, 223 (9th Cir. 2012) (conduct that is "episodic at best"

9

is "insufficient to establish a prima facie case" for hostile work environment); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) ("A violation is not established merely by evidence showing sporadic use of abusive language, gender-related jokes, and occasional teasing").

7.    The Ninth Circuit routinely finds similarly conduct, while patently offensive, insufficient to show a hostile work environment.   *See, e.g.*, *Manatt v. Bank of America, NA*, 339 F.3d 792 (9th Cir. 2003) (finding no hostile work environment where plaintiff observed her coworkers laughing and saying "China Man," pulled back "their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians," ridiculed her for mispronouncing the word "Lima" and referred to her as "China woman"); *Nagar*, 57 F. App'x at 306 ("instances of national origin harassment taken together show that Nagar was subjected only to offhand comments and isolated incidents of offensive conduct" were "insufficiently severe or pervasive to alter the terms and conditions of her employment"); *Vasquez v. County of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile work environment where plaintiff was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," "histrionics," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036-37 (9th Cir. 1990) (finding no hostile work environment where employer posted a racially offensive cartoon, made racially offensive slurs, targeted Hispanics when enforcing rules, provided unsafe vehicles to Hispanics, and did not provide adequate police backup to Hispanics officers).

8.    Accordingly, Plaintiff cannot show, as she must, that she was subject to "extreme conduct" severe or pervasive enough to alter the conditions of her employment. *Nagar*, 57 F. App'x at 306.  Summary judgment is proper on this basis, too.

9.    Even assuming Plaintiff had presented an actionable claim, she must prove

10

that Defendant acted negligently, namely "that the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swenson*, 271 F.3d at 1192 (9th Cir. 2001). But because Defendant undertook "remedial measures reasonably calculated to end the harassment," Plaintiff cannot do so. *Watson v. Las Vegas Valley Water Dist.*, 268 F. App'x 624, 626 (9th Cir. 2008) (cleaned up).

10. The Ninth Circuit and its courts have repeatedly found employers not liable where, as here, it promptly investigates and takes remedial measures reasonably calculated to end the alleged harassment. *See, e.g.*, *Watson*, 268 F. App'x at 626 (employer not liable where its "response to the December 4th incident was prompt and effective: Nguyen was interviewed, admitted his grossly inappropriate conduct and received an unpaid, one-day suspension; neither he nor any other employee has engaged in similar conduct since"); *Swenson*, 271 F.3d at 1197 ("Even assuming that the investigation was less than perfect, the Postal Service nevertheless took prompt action to remedy the situation. The harassment stopped."); *Nixon v. Franciscan Health Sys.*, No. 11-cv-5076, 2012 WL 1068070, at *4 (W.D. Wash. Mar. 29, 2012) (employer not liable because it "promptly initiat[ed] an investigation, advis[ed] Mian not to retaliate or engage in harassing behavior, offer[ed] Nixon additional services to ensure her safety, and encourag[ed] her to take additional steps to ensure her own safety"); *Lappin v. Laidlaw Transit*, 179 F. Supp. 2d 1111, 1122 (N.D. Cal. 2001) (employer not liable because it "initiated an investigation that involved interviews of all witnesses and a meeting of the parties involved" and warned both parties"). Indeed, Defendant promptly investigated Plaintiff's Complaints and its remedial measures addressed the alleged harassment.

11. Accordingly, even if Plaintiff can demonstrate a hostile work environment existed (she cannot), Defendant is nevertheless not liable and summary judgment is proper.

Dated: March 6, 2023                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney
                                        DAVID M. HARRIS
                                        Assistant United States Attorney
                                        Chief, Civil Division
                                        JOANNE S. OSINOFF
                                        Assistant United States Attorney
                                        Chief, General Civil Section

                                        /s/ *Zakariya K. Varshovi*
                                        ZAKARIYA K. VARSHOVI
                                        Assistant United States Attorney

                                        Attorneys for Defendant
                                        Merrick Garland

## **DECLARATION OF CARL CLEGG**

I, Carl B. Clegg, do hereby declare and state as follows:

1.      I am the Chief Psychologist at Federal Correctional Complex ("FCC") Lompoc, California.  I make this declaration based upon information which is personally known to me and based upon records maintained in the ordinary course of business.  If called as a witness, I could and would competently testify thereto.

2.      I have served as the Chief Psychologist at FCC Lompoc since February 2018. Among other responsibilities, as Chief Psychologist, I supervise all correctional psychologist staff within FCC Lompoc's Correctional Psychology Department.

3.      From September 17, 2018 until her transfer to Federal Correctional Institution Seagoville, I supervised Lindsay Okonowsky, a staff psychologist within FCC Lompoc's Correctional Psychology Department.

4.      As I explained in a March 9, 2020 memorandum to Acting Complex Warden James Engleman, "on the morning of February 18, 2020, I met with Lindsay Okonowsky in my office to discuss an Instagram website page which she considered offensive."  (A copy is attached as **Exhibit A**).  During this meeting, Ms. Okonowsky expressed that she "did not know, but believed they were likely made and viewed by staff working in SHU," but we "discussed and she agreed to immediately be reassigned duties at the Low."  *Id.*

5.      On March 13, 2020, I provided Ms. Okonowsky a referral to the Employee Assistance Program.  (A copy is attached as **Exhibit B**).

6.      On April 13 and 16, 2020, I participated in a Workplace Violence Committee meeting, during which Ms. Okonowsky was interviewed and her concerns regarding the Instagram page were discussed.

7.      The documents referenced above are true and correct copies of records which were made or kept by the Federal Bureau of Prisons ("BOP") and its employees at or near the time of the incidents recorded therein as part of regularly conducted business activities regarding employees, and are kept and relied upon by the BOP in the course of said regularly conducted business activity.

1

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 28, 2023, at Lompoc, California.

CARL B. CLEGG

2

**Clegg Decl., Exhibit A**



**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Federal Correctional Complex*
*3901 Klein Blvd.*
*Lompoc, California 93436*

March 9, 2020

**MEMORANDUM FOR J. ENGLEMAN, ACTING COMPLEX WARDEN**

**FROM:**        C. Clegg, Chief Psychologist

**SUBJECT:**        Social Media Posts

On the morning of February 18, 2020, I met with Lindsay Okonowsky in my office to discuss an Instagram website page which she considered offensive. This included memes specifically targeting her. She did not know, but believed they were likely made and viewed by staff working in SHU. We discussed and she agreed to immediately be reassigned duties at the Low. She also expressed her intention of speaking directly with executive staff. That afternoon she advised me she had spoken to Acting Warden J. Engleman and had been advised V. Gonzales, SIA, would be following up with her.

On Saturday, March 7, 2020, she sent me a text indicating these social media posts targeting her had continued. At approximately 8:30 am on Monday, March 10, we discussed her concerns further via phone while at work. She stated she believed Lt. S. Hellman was responsible for the memes as she had previous interactions with him which were negative and/or were later a topic of the memes. She expressed significant concerns due to his job position and the number of other staff who have seen the memes and/or have spoken with him about them. She stated she believes this behavior is a violation of policy and unethical in general, and constitutes a "textbook hostile work environment" for her specifically.

**Ex. 23**

<span style="color:red">**Clegg Decl., Exhibit B**</span>



**U.S. Department of Justice**

Federal Bureau of Prisons

---

Federal Correctional Complex<br>
Lompoc, CA 93436

March 13. 2020

TO:          Lindsay Okonowsky, Staff Psychologist

FROM:     Carl Clegg, Chief Psychologist

SUBJECT:   Employee Assistance Program Referral

In light of recent workplace concerns you have brought to my attention, and in my capacity as EAP Coordinator for FCC Lompoc, I am issuing this memorandum as a reminder that consultation with an Employee Assistance Program (EAP) Counselor may be a useful resource for you.    The Employee Assistance Program (EAP) is available to all Bureau of Prisons staff members and their families to help them address concerns that may negatively impact job performance and overall well-being. I encourage you to contact EAP via Federal Occupational Health at 1-800-222-0364 for a confidential referral to a service provider in your community.

Please be advised that this EAP referral does not imply fault in any way and is not indicative of negative work performance. It is intended strictly as a resource that may be of assistance.

Your participation in EAP services is entirely voluntary and is confidential within the limits set in the EAP Confidentiality Statement (P.S. 3792.07). I hope that you take advantage of this resource and that you find it to be a positive experience.

# **DECLARATION OF JAMES ENGLEMAN**

I, James Engleman, do hereby declare and state as follows:

1.      I am the Warden at Federal Correctional Institution ("FCI") Terminal Island in San Pedro, California.   I make this declaration based upon information which is personally known to me and based upon records maintained in the ordinary course of business.  If called as a witness, I could and would competently testify thereto.

2.      From February 19, 2017 to January 2, 2022, I served as an Associate Warden at Federal Correctional Complex ("FCC") Lompoc, and specifically during January 17, 2020, to April 5, 2020, I served as Acting Complex Warden of FCC Lompoc.  As Acting Complex Warden, I was responsible for day-to-day oversight, supervision, and management of all correctional staff at FCC Lompoc.

3.      On February 18, 2020, I met with Lindsay Okonowsky, a staff psychologist, at FCC Lompoc.  During this meeting, Ms. Okonowsky complained to me about an Instagram page (the "Page"), however, she did not know nor identify the author of the Page.

4.      Also on February 18, 2020, after I met with Ms. Okonowsky, I instructed Special Investigative Agent ("SIA") Victor Gonzales to investigate her complaints.

5.      On February 19, 2020, at 7:07 AM, Ms. Okonowsky e-mailed me regarding the Page, which I forwarded at 7:50 AM to SIA Gonzales in connection with the investigation into her complaints. (Copies of these e-mails are attached as **Exhibit A**).

6.      On February 19, 2020, SIA Gonzales spoke with Ms. Okonowsky to arrange a meeting to discuss her complaints.

7.      On February 26, 2020, SIA Gonzales met with Ms. Okonowsky to discuss her complaints.

8.      On Saturday, March 7, 2020, at 12:46 PM, Ms. Okonowsky e-mailed me again regarding the Page, which I forwarded on Monday, March 9, 2020, at 7:52 AM, to SIA Gonzales in connection with the investigation into her complaints.  (Copies of these e-mails are attached as **Exhibit B**).

1

9. On March 9, 2020, I directed SIA Gonzales to refer Ms. Okonowsky's complaints regarding the Page to the Bureau of Prisons' Office of Internal Affairs ("OIA"), in addition to the ongoing FCC Lompoc investigation.

10. On March 11, 2020, Ms. Okonowsky sent Associate Warden ("AW") Gabriel Gutierrez a 48-page memo detailing her complaints regarding the Page. At 3:41 PM, Ms. Okonowsky sent me a copy of that memo, which I forwarded on March 12, 2020, at 7:47 AM, to SIA Gonzales in connection with the investigation into her complaints. (Copies of these e-mails are attached as **Exhibit C**).

11. Also on March 11, 2020, I directed SIA Gonzales to provide Ms. Okonowsky's memo to OIA in connection with the original referral submitted on March 9, 2020.

12. On March 11, 2020, as a result of Ms. Okonowsky's allegation in her memo as to the identity of the Page's creator, that individual was assigned to a different facility at FCC Lompoc while her complaints were investigated.

13. On March 27, 2020, at 9:32 PM, Ms. Okonowsky e-mailed me, again, regarding the Page, which I forwarded on March 28, 2020, at 11:50 AM, to SIA Gonzales in connection with the investigation into her complaints. (Copies of these e-mails are attached as **Exhibit D**).

14. In early April 2020, Barbara Von Blanckensee was assigned as Warden at FCC Lompoc.

15. Shortly after Warden Von Blanckensee's arrival, I apprised her of Ms. Okonowsky's complaints regarding the Page and the ongoing investigation into the same.

16. On April 13, 2020, Warden Von Blanckensee convened a six-member Threat Assessment Team, including myself, to further investigate Ms. Okonowsky's concerns regarding the Page.

17. On April 16, 2020, the Threat Assessment Team sent a memo, summarizing its findings and recommendations, to Warden Von Blanckensee. (A copy of this memorandum is attached as **Exhibit E**).

2

1    18.    On April 16, 2020, following the Threat Assessment Team's

2  recommendations, a Cease-and-Desist Order was issued to the Page's creator, which

3  ordered the Page's creator to cease and desist posting content on social media in violation

4  of BOP policy, including content that could reasonably be deemed harassing or bullying

5  of another employee.

6    19.    Also on April 16, 2020, following the Threat Assessment Team's

7  recommendations, a referral to the Employee Assistance Program was issued to the Page's

8  creator, which offers confidential counseling to BOP employees to help them address

9  concerns that may negatively impact job performance and overall well- being.

10    20.    The documents referenced above are true and correct copies of records which

11  were made or kept by the Federal Bureau of Prisons ("BOP") and its employees at or near

12  the time of the incidents recorded therein as part of regularly conducted business activities

13  regarding employees, and are kept and relied upon by the BOP in the course of said

14  regularly conducted business activity.

15                                            * * *

16  I declare under penalty of perjury that the foregoing is true and correct.

17  Executed on March 2, 2023, at San Pedro, California.

18

19

20                                      JAMES ENGLEMAN

21

22

23

24

25

26

27

28

4-ER-0422

**Engleman Decl., Exhibit A**

**Maria E. Aceves - Fwd: Today**

| | |
|---|---|
| **From:** | James Engleman |
| **To:** | Gonzales, Victor |
| **Date:** | 2/19/2020 7:50 AM |
| **Subject:** | Fwd: Today |

>>> Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu> 2/19/2020 7:07 AM >>>
Warden Engleman,

I'm still really sick today...I'm not going to make it into the institution.  I was already scheduled to be out of town tomorrow through Monday.  I think the most recent post I sent you may warrant another conversation.  If you have time today, please give me a call at 303-257-5798.

Thanks,

Lindsay

Sent from my iPhone

**Engleman Decl., Exhibit B**

**Maria E. Aceves - Fwd: Post**

| | |
|---|---|
| **From:** | James Engleman |
| **To:** | Gonzales, Victor |
| **Date:** | 3/9/2020 7:52 AM |
| **Subject:** | Fwd: Post |

>>> Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu> 3/7/2020 12:46 PM >>>
Warden Engleman,

Is there any update on this situation? I'm growing increasingly more uncomfortable. This is completely inappropriate and is setting the tone for a strikingly hostile work environment.

Thanks,

Lindsay
303-257-5798



8_AND_HITTHE_GATE
**Posts**

**Follow**

4 minutes ago



8_and_hitthe_gate

• • •



Fealing cute, might put one on watch later

MEMES

   

**2 likes**

**8_and_hitthe_gate** If psychology had to cover the

4-ER-0425
file:///C:/Users/bop01536/AppData/Local/Temp/2/XPgrpwise/5F50DFC9LOXDOM1LO... 10/21/2020

Sent from my iPhone

**Maria E. Aceves - Fwd: Lindsay Okonowsky Memo.pdf**

**Engleman Decl., Exhibit C**

| | |
|---|---|
| **From:** | James Engleman |
| **To:** | Gonzales, Victor |
| **Date:** | 3/12/2020 7:47 AM |
| **Subject:** | Fwd: Lindsay Okonowsky Memo.pdf |
| **Attachments:** | Lindsay Okonowsky Memo.pdf |

>>> Lindsay Okonowsky 3/11/2020 3:41 PM >>>
Please see attached.

Thank you,

Lindsay

Lindsay Okonowsky, Ph.D.
Staff Psychologist
FCC Lompoc
LOkonowsky@bop.gov
(805) 735-2771 ext. 5531

**Maria E. Aceves - Posts**

| | |
|---|---|
| **From:** | Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu> |
| **To:** | "jengleman@bop.gov" <jengleman@bop.gov> |
| **Date:** | 3/27/2020 9:32 PM |
| **Subject:** | Posts |

Warden Engleman,

I know you're busy. I understand there is a lot going on right now and I appreciate the difficulties you are facing. That being said, these posts continue on a daily basis and I'm growing more and more discouraged. It is obvious these posts are targeted toward me. Is anything going to be done to curb this behavior as the investigation takes place? I shouldn't have to work in an environment with people who refer to me as a "cunt" on a public forum. I've been nothing but professional and continue to be forced to tolerate this bullying and harassment. Policy says something can be done to protect me in the interim. What will be done? This has gone, and continues to go, too far.





  

Lindsay
303-257-5798

Sent from my iPhone

file:///C:/Users/bop01536/AppData/Local/Temp/2/XPgrpwise/5F50DFE2LOXDOM1LO... 10/21/2020

Engleman Decl., Exhibit E



**U.S. Department of Justice**
Federal Bureau of Prisons

---

*Federal Correctional Complex*
*3901 Klein Blvd*
*Lompoc, California 93436*

April 16, 2020

**MEMORANDUM FOR B. VON BLANCKENSEE, ACTING COMPLEX WARDEN**

**FROM:**          Darrel Waugh, Attorney

**SUBJECT:**       Threat Assessment Report

On April 13, 2020, a Threat Assessment Team was convened pursuant to Program Statement 3730.05, <u>Workplace Violence Prevention, Staff</u>, to review Staff Psychologist Lindsay Okonowsky's "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in a memorandum & supporting documentation she submitted to management on March 11, 2020.

In that memorandum, Dr. Okonowsky stated that in February 2020 she became aware of an Instagram page/account she described as "containing hundreds of 'memes' clearly targeting the Bureau of Prisons, FCC Lompoc staff, and inmates. Further, I felt several of the memes targeted me, specifically, given they clearly referenced previous conversations I have had with staff and also included derogatory images resembling my likeness in an exaggerated, defamatory manner." Attached to the memorandum were a 2014 DOJ "Guidance on the Personal Use of Social Media by Department Employees," and dozens of examples of the memes Dr. Okonowsky deemed offensive. According to Dr. Okonowsky, the name of the Instagram account is "8_andhitthe_gate," and its owner is Lieutenant Steve Hellman.

**<u>Threat Assessment Team</u>**
Darrel Waugh, Attorney
James Engleman, Associate Warden
Catalina Rodriguez, Associate Warden
Suzanne Scott, Executive Assistant
Carl Clegg, Chief Psychologist
Kenneth Liberatore, RDAP Coordinator

**<u>Documents Reviewed</u>**
In addition to reviewing Dr. Okonowsky's memorandum and supporting documentation, the Team reviewed Program Statement 3730.05, <u>Workplace Violence Prevention, Staff</u>, Program Statement 3713.26, <u>Bureau of Prisons Anti-Harassment Policy</u>, and Program Statement 3420.11, <u>Standards of Employee Conduct</u>.

---

4-ER-0431

**Interviews Conducted**

The Team interviewed Dr. Okonowsky in-person on April 13, 2020.  As her six-page memorandum provides a detailed discussion of her allegations, they will not be rehashed here.  At the outset of her interview with the Team, Dr. Okonowsky admitted that she has no personal or direct knowledge that Lt. Hellman is in fact the sole owner of & contributor to the Instagram account "8_andhitthe_gate."  Rather, as stated in her memorandum, she bases this assumption on what others have told her (including having been told that similar memes appear on Hellman's personal Facebook page), and also infers it from the substance of several of the memes which she maintains were directed at her in response to specific work-related incidents.  When asked by the Team what she believed prompted Hellman to do this (i.e., whether there had been any conflicts or issues between the two of them since she started working at FCC Lompoc in September 2018), she stated that she was unaware of any such problems until February 2020, when she first found out about his Instagram.

Dr. Okonowsky acknowledged that on February 18, 2020, at her supervisor's (Dr. Clegg's) directive, she was transferred from working at the Medium to the Low, and that she has had little interaction with Lt. Hellman since that time (as he works primarily at the Medium).  She stated that Hellman has not spoken to her in-person, and reiterated (as detailed in her memorandum) that his offensive actions towards her & others all occur on-line (i.e., via Instagram).  She stated that since submitting her memorandum to management on March 11, 2020, she continues to occasionally see memes on Hellman's Instagram which she believes are directed at her.  When asked by the Team what she would like as relief/what would resolve this situation, she stated that she does not want to work around Hellman, and that her preference is to remain at the Low, where she has less interaction with him.  She also indicated that she would like his Instagram to be "taken down," or at least to have no memes targeting her.  She further opined that Hellman should not be in the position of SIS Lieutenant.

The Team was unable to interview Lt. Hellman on April 13, 2020, because he was on previously-scheduled leave.  The Team spoke with him in-person on April 15, 2020, and first sought to determine whether he is in fact the owner of the Instagram account "8_andhitthe_gate."  Hellman readily admitted that he is the account's owner, and that no one else contributes to it.  The Team then let him read Dr. Okonowsky's memo, and asked him to respond to her claims.  After reading the memo, Hellman became very agitated and defensive.  He stated that the Instagram account was just a joke, "dark prison humor," and a way for him to blow off steam.  He emphasized that the account was "anonymous," yet had no response when the Team pointed out that numerous FCC Lompoc employees appear to be well aware that he is its owner.  He acknowledged that he had chafed with Dr. Okonowsky when they were both working in the Medium's SHU in early 2020, but denied -- unconvincingly, in the Team's opinion -- that any of his memes were directed at her.  He stated that he is aware of policy which prohibits employees from engaging in activity which discredits the Agency, and maintained that none of his memes (even the Jeffrey Epstein suicide example) violated this policy.  At the end of the interview, however, Hellman appeared to

4-ER-0432

accept some measure of responsibility for his actions, stating that he never intended to hurt Dr. Okonowsky, or anyone, by his social media postings, and that he would be willing to meet with her in an attempt to "clear the air," and apologize.

**Threat Assessment Guidelines/Analysis**
The Threat Assessment Team used the guidelines established in Program Statement 3730.05, <u>Workplace Violence Prevention, Staff</u>, to conduct its assessment. The following is a summary of relevant information.

Severity: The Team determined that Dr. Okonowsky did not suffer physical harm or damage to her property, nor was she exposed to potential danger or harm as a result of Lt. Hellman's actions. As noted above, those actions all occurred on-line (via the posting of memes on social media/Instagram); there was no physical interaction between the parties. Nevertheless, Dr. Okonowsky stated that she feels threatened by Lt. Hellman's actions (for example, she did not go to work one day in February due to a meme that she deemed "menacing"), especially given his status as a Complex Lieutenant.

Motivation: It is unclear precisely what "triggered" Lt. Hellman's Instagram postings regarding Dr. Okonowsky; the Team suspects that they stem from Hellman's negative attitude towards the Psychology Department in general -- not solely towards Dr. Okonowsky -- as evidenced by many of the memes she submitted to management with her memorandum which mock and criticize all Psychologists (e.g., warning Psychology staff to "stay in your lane" and not tell Custody staff how to make cell assignments in SHU). Hellman's adversarial "Custody Department versus the Psychology Department" mentality towards Dr. Okonowsky appears to have commenced in early 2020, when both of them were working in SHU and having conflicts pertaining to difficult inmates. As to whether the same or similar triggers are likely to reoccur, the Team notes that Dr. Okonowsky is no longer working directly with Lt. Hellman in SHU, and is primarily assigned to a different institution than him. However, the Team believes that Hellman may continue to post inappropriate memes on social media until he is ordered by management to cease doing so, investigated for misconduct, and -- if a finding of misconduct is sustained -- disciplined as appropriate. (This will be discussed further in the "Recommendations" section below).

Aftermath: Since being transferred from the Medium to the Low in February 2020, Dr. Okonowsky no longer works directly with Lt. Hellman, and has little to no interaction with him at the Complex. However, she states that he continues to occasionally post offensive memes that are directed at her. This should be addressed by following the various recommendations outlined below.

Violence History: There is no evidence of current or previous violence or threatening behavior by Lt. Hellman, either on or off the job.

Individual & Environmental Factors: There is no evidence of alcohol or other substance abuse by Lt. Hellman, nor is he known to be preoccupied with weapons or violent themes. There is no evidence that he has a past or present psychiatric condition, nor has there been a recent,

4-ER-0433

abrupt change in his behavior.  The Team is not aware of any stressors or negative changes in Hellman's life, and believes that he has quality social support available to him.

Work Performance/Conduct: The Team is not aware of other interpersonal difficulties or conflicts between Hellman and other coworkers or supervisors, save for a minor verbal conflict with a Food Service Department employee last fall that did not rise to the level of either workplace violence or bullying.  Hellman has no other performance or conduct problems, nor have there been any prior investigations or adverse actions taken against him that the Team is aware of.  He does not have poor work habits or a negative attitude.

**Conclusion/Recommendations**
Based on the above information, it is the Team's opinion that Hellman's actions towards Dr. Okonowsky do not rise to the level of workplace violence as defined in Program Statement 3730.05, Workplace Violence Prevention, Staff.[1]  However, that is not the end of the inquiry, because the Workplace Violence Prevention policy makes clear that "[o]ther Bureau directives prohibit staff behavior which is otherwise intimidating, bullying, or harassing. Inasmuch as this behavior may be a prelude to staff workplace violence, it should never be ignored or tolerated."

Specifically, Program Statement 3713.26, Bureau of Prisons Anti-Harassment Policy, stresses that the Agency "prohibits not only unlawful harassment but all harassing conduct in the interest of stopping harassment before it becomes a violation of the EEO laws." The Anti-Harassment Policy defines "harassing conduct" as "bullying or any unwelcome verbal [or] non-verbal … conduct when such behavior either unreasonably interferes with an employee's work performance, and/or creates an intimidating, hostile, or offensive work environment."  That policy further defines "bullying" as "unwanted actions by an individual … towards an employee … which are intended to intimidate, degrade, humiliate, or undermine the employee…."

The Threat Assessment Team believes that Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within this "bullying" language/definition.  The Team further notes that the majority of the memes she submitted to management with her memorandum were directed by Hellman at "targets" other than her, including the Psychology

---

[1] Per Program Statement 3730.05, staff workplace violence is: "any act or attempted act of violence by a Bureau employee against another employee ….  Staff workplace violence includes: any intentional infliction of physical harm or attempt to inflict physical harm against another; intentional damage to or an attempt to intentionally damage another's possessions or property, including government property; and any verbal, written, or other behavior which an objective reasonable person would interpret as a threat to inflict physical harm against another or another's possessions or property, including government property."

Department as a whole, other FCC Lompoc staff, and inmates. Some of these memes could violate other Agency policies, such as the Standards of Conduct, as constituting conduct unbecoming a supervisor and law enforcement officer. See, e.g., Hellman's meme pertaining to Jeffrey Epstein hanging himself in SHU; as Dr. Okonowsky noted in her memorandum, jokes on social media regarding inmate suicides are highly inappropriate and reflect poorly upon the BOP -- especially when coming from supervisory-level employees who work in SHU.

Accordingly, the Team recommends that management take a variety of responsive actions. First, as previously noted, Dr. Okonowsky is no longer working directly with Lt. Hellman in SHU, and is assigned to a different institution than him (the Low). That separation should continue as practicable until an investigation into Hellman's actions is completed and, if misconduct is sustained, any resulting discipline is implemented. The Team again notes that it is Dr. Okonowsky's preference to continue to remain assigned to the Low, as she has less interaction with Hellman there (since he is assigned to the Medium).

The Team further notes that a referral to the Office of Internal Affairs for investigation of Hellman's alleged misconduct has already been made. That is appropriate because, as described above, his actions appear to have violated several Agency policies. In order to avoid the appearance of a conflict of interest, that investigation should not be conducted by FCC Lompoc staff (given Dr. Okonowsky's allegations in her March 11, 2020, memorandum regarding Special Investigative Agent Victor Gonzales, and Hellman's status as an SIS Lieutenant).

The Team also recommends that Hellman be issued a letter by his supervisor directing him to immediately cease and desist from posting on social media any memes/information which violates Agency policy (including the Bureau of Prisons Anti-Harassment Policy & the Standards of Employee Conduct), including but not limited to any memes/information directed at any Agency employee which reasonably could be construed as harassing /bullying, or which discredit the Bureau of Prisons.

Lastly, the Team recommends that Mr. Hellman be issued an Employee Assistance Program (EAP) referral. The Team does not recommend issuing such a referral to Dr. Okonowsky, as one has already been issued to her (by Dr. Clegg on March 13, 2020, at Associate Warden Gutierrez's suggestion, in response to Dr. Okonowsky's March 11, 2020, memorandum).

<u>**DECLARATION OF ZAKARIYA K. VARSHOVI**</u>

I, Zakariya K. Varshovi, do hereby declare and state as follows:

1.    I am an Assistant United States Attorney for the United States Attorney's Office for the Central District of California.    I have been assigned the primary responsibility for defending the United States in this action.    I have personal knowledge of the following facts and, if called as a witness, I will testify competently thereto, and I hereby submit this corrected declaration.

2.    Exhibits A-1 through A-8 are a true and correct copies of excerpted portions from Lindsay Okonowsky's certified deposition transcript, provided to me on October 25, 2022.

3.    Exhibit B-1 through B-6 are a true and correct copies of documents produced to me or by me in discovery.

4.    Exhibit C is a true and correct copy of excerpted portions from Plaintiff's Responses to Defendant's Second Set of Interrogatories.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 6, 2023, at Los Angeles, California.

/s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI

4-ER-0436

1    Q.   So -- so the -- you respond, "Yes, posts were
2  directed at me," and then you identify the first one is
3  000166, which is -- just so you can see, that's this
4  page here, and this is, I believe, just so we know this
5  document -- okay.  This is attachment -- I'm assuming
6  you wrote this.  "This post is certainly directed
7  towards me."  Do you remember writing this?
8    A.   Yes.
9    Q.   Okay.  And this is a post in which you
10 believe was directed at you.  Right?
11   A.   Yes.
12   Q.   Okay.  And how did you learn of this post?
13   A.   I saw it on the Instagram page.
14   Q.   And prior to seeing it on the Instagram page,
15 was it ever sent to you?
16   A.   No.
17   Q.   Was -- after seeing it on the Instagram page,
18 did anyone send it to you then?
19   A.   No.
20   Q.   And was it ever displayed in the workplace?
21   A.   No.
22   Q.   Did anyone ever show it to you in the
23 workplace?
24   A.   No.
25   Q.   And then did any employee discuss the post

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com

4-ER-0437      100

1    with you without your consent?

2         A.   Did they discuss the post with me, and then

3    what was the last part of your question?

4         Q.   Without your consent.

5         A.   No.

6         Q.   And in terms of the paragraph here, which if

7    you'd like to take some time to read it, my question is

8    does this capture why you believe the post was directed

9    at you or are there other reasons other than what's

10   written here?

11        A.   Can I read it?

12        Q.   Of course.  And just let -- take your time

13   and just let me know when you've had a chance to read

14   it.  If you want me to adjust the screen, I can do that

15   as well.

16        A.   It's fine the way it is.  Okay.  Yes, I felt

17   this post was targeted towards me.  The staff member

18   that I'm referencing in this memo is Mr. Grice.  So two

19   hours before this post was made, I had had a

20   conversation with Mr. Grice about the post, and on that

21   same day, I had talked to Warden Engelman and the chief

22   psychologist about it.

23        Q.   And anything else?

24        A.   No, I just think the timing makes it quite

25   obvious that it's related to me and my report.

lipka.com, inc.
(888) 547-5226                                          transcripts@lipka.com
4-ER-0438    101

1    Q.   Okay.  And did anyone ever expressly say this

2    was specifically directed at you?

3    A.   No, I don't recall.

4    Q.   Okay.  So the next one is 168.  So we'll go

5    to 168.  And just so Lindsay can see as well, this is

6    168.  And similarly in terms of formatting, there's a

7    post and then a paragraph.  This paragraph was written

8    by you.  Right?

9    A.   Yes.

10   Q.   Okay.  So more series of questions.  How did

11   you learn about this post?

12   A.   I saw it on the Instagram page.

13   Q.   And no one sent it to you before you saw it

14   on the Instagram page.  Is that right?

15   A.   That's correct.

16   Q.   And no one sent it to you after?

17   A.   Correct.

18   Q.   And this post was not displayed in the

19   workplace.  Right?

20   A.   Correct.

21   Q.   And it was also never shown to you in the

22   workplace either.  Right?

23   A.   Correct.

24   Q.   And no one approached you to discuss the post

25   without your consent.  Right?

Do Not Copy

lipka.com, inc.
(888) 547-5226        transcripts@lipka.com

4-ER-0439   102

1      A.   Correct.

2      Q.   And in terms of what's written here, this

3  paragraph that you wrote, are there any other reasons

4  as to why you believe the post was directed at you or

5  does this paragraph that you've written here capture

6  it?

7      A.   Let me -- can I read it?

8      Q.   Of course.  Of course.

9      A.    Yes.  So again, this one comes down to

10  timing.  So Mr. Hellman had blocked my Instagram page

11  from being able to look at the posts, which I didn't

12  even know he knew the name of my own Instagram page.

13  So there had to be some conversations with other staff

14  members about what my Instagram name was.  But right

15  before this was posted, he blocked me from being able

16  to look at the page.  So the timing indicates that it's

17  about me or targeting me.  I believe the woman in the

18  photo is kind of like, you know, it exaggerated

19  likeness to some degree.

20        And I -- you know, my role was frequently to

21  be involved in suicide risk assessments at the

22  institution.  So yes, you know, especially given he had

23  blocked me from being able to see the page right before

24  posting this, that led me to believe that it absolutely

25  targets me.

**Varshovi Decl., Exhibit A-3**

1    Q.   And nothing else.  Right?

2    A.   Not to my knowledge.

3    Q.   And did anyone ever expressly state that this

4    post was, in fact, directed at you?

5    A.   Not to my knowledge.

6    Q.   Okay.  Okay.  So the next -- so we've done

7    166.  We've done 168.  So the next is 170.  Okay.  So

8    same series of questions, but why don't we first take a

9    chance for you to review the paragraph, assuming this

10   was written by you.

11   A.   Yes.

12   Q.   Okay.  So why don't you take a moment to

13   review the paragraph and then I'll have my series of

14   questions.

15   A.   Okay.

16   Q.   Okay.  This is another post that you've

17   included, and as before, how did you learn about this

18   post?

19   A.   I saw it on the Instagram page.

20   Q.   And it was not sent to you before you saw it

21   on the page.  Right?

22   A.   That's correct.

23   Q.   And it was not sent to you after you saw it

24   on the page.  Right?

25   A.   That's correct.

1    Q.   And it was not ever displayed in the

2    workplace.  Right?

3    A.   That's correct.

4    Q.   And it was never shown to you in the

5    workplace without your consent.  Right?

6    A.   That's correct.

7    Q.   And as before, this paragraph here that

8    you've written, does this capture why you believe it

9    was directed at you or are there additional reasons?

10   A.   Yeah, so cell assignments are pretty

11   explicitly related to the Special Housing Unit, so I

12   would be involved in conversations about where inmates

13   would be celled and I'd give suggestions or advice on

14   which inmates can cell with other inmates to avoid PREA

15   allegations or assaults just given the inmates' mental

16   health histories and current symptoms.  So I, more than

17   any other psychologist, had conversations about cell

18   assignments.

19   Q.   And that captures it.  Right?  There's

20   nothing else?

21   A.   That's correct.

22   Q.   And did anyone ever say to you that this post

23   was specifically directed to you?

24   A.   No.

25   Q.   Okay.  The next -- that was 170.  Okay.  So

lipka.com, inc.
(888) 547-5226                                         transcripts@lipka.com
4-ER-0442    105

Do Not Copy

1  171 is the next one.  Okay.  So -- so if you could just

2  take a second to review and read the paragraphs which I

3  believe were written by you, and then whenever you're

4  ready, just let me know.

5       A.   Okay.  Okay.

6       Q.   Okay.  So how did you learn of this post?

7       A.   I saw it on the Instagram page.

8       Q.   And no one sent it to you before you saw it

9  on the Instagram page.  Right?

10      A.   That's correct.

11      Q.   And no one sent it to you after you saw it on

12  the Instagram page.  Right?

13      A.   That's correct.

14      Q.   And it was never displayed at the workplace.

15  Right?

16      A.   Correct.

17      Q.   And it was also never shown to you at the

18  workplace -- I'm sorry.  It was never shown to you at

19  the workplace either.  Right?

20      A.   That's correct.

21      Q.   And no one discussed it with you without your

22  consent.  Right?

23      A.   That's correct.  But I don't think, you know,

24  these -- this line of questioning about these posts and

25  whether it was shown to me in the workplace or not

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com

4-ER-0443    106

Case 2:21-cv-00753-DJC-DB Document 44-2 Filed 06/20/25 Page 117 of 232
Case 2:21-cv-00753-DJC-DB Document 40-3 Filed 04/25/25 Page 62 of 87 #:204
Lindsay Okonowsky - Volume 2 - October 12, 2022

Varshovi
Decl.,
Exhibit
A-5

1    A.    Yes.

2    Q.    And are there any other reasons or have we

3  already discussed those in and the paragraph captures

4  it?

5    A.    I mean we've pretty much discussed it, but

6  again, as the SHU psychologist, I was somebody who

7  regularly had to remove inmates from their cells to see

8  them for clinical contacts.  And as referenced above,

9  there was a SHU meeting where the individuals who

10  worked in SHU had said they intentionally don't help

11  me, and so there was some friction there.  So to me

12  that one clearly references my job role and then the

13  dynamics at some points in time between me and the

14  individuals who worked in SHU.

15    Q.    And as before, how did you learn of these

16  posts?

17    A.    I saw them on the Instagram page.

18    Q.    And no one sent them to you before you saw

19  them on the Instagram page.  Right?

20    A.    That's correct.

21    Q.    And no one sent them to you after you saw

22  them on the Instagram page?

23    A.    That's correct.

24    Q.    And were any of these posts ever displayed in

25  the workplace?

lipka.com, inc.
(888) 547-5226    transcripts@lipka.com
4-ER-0444  116

```
 1        A.   No.

 2        Q.   And were these posts ever shown to you in the

 3   workplace?

 4        A.   No.

 5        Q.   And did anyone ever approach you to discuss

 6   these posts without your consent?

 7        A.   No.

 8        Q.   And did anyone ever say that these posts were

 9   specifically directed at you?

10        A.   No.

11        Q.   Okay.  So next we'll turn to 186.  So same as

12   before, if you could just take a look and let me know

13   after you have a chance to read and then I'll have some

14   questions.

15             MS. BOWDEN:  Would you zoom in a little bit?

16             MR. VARSHOVI:  Sure.

17             MS. BOWDEN:  Thanks.

18             MR. VARSHOVI:  I never know how good the view

19   is for anyone.  So I'm more than happy to adjust it.

20             MS. BOWDEN:  That's better.  Thank you.

21             MR. VARSHOVI:  I can zoom in more if you want

22   me to.  Is that better?

23             MS. BOWDEN:  It's fine for me.

24             MR. VARSHOVI:  Okay.

25             THE WITNESS:  Um-hum.
```

Do Not Copy

**Varshovi Decl., Exhibit A-6**

1    A.    Okay.

2    Q.    So how did you learn of this post?

3    A.    I saw it on the Instagram page.

4    Q.    And no one sent it to you before you saw it

5    on the Instagram page.  Is that right?

6    A.    That's correct.

7    Q.    And no one sent it to you afterwards?

8    A.    That's correct.

9    Q.    And it was never displayed in the workplace.

10   Right?

11   A.    That's correct.

12   Q.    And no one showed it to you in the workplace.

13   Right?

14   A.    Correct.

15   Q.    And no one discussed this post with you

16   without your consent.  Right?

17   A.    Correct.

18   Q.    And in terms of why you believe it was

19   directed at you, does this paragraph here capture the

20   reasons why or do you believe there's additional

21   reasons that aren't mentioned in this paragraph?

22   A.    Yes.  Again, it comes down to timing.  So you

23   know, very subsequently to me having a conversation --

24   I was trying to building rapport and camaraderie with

25   the SHU staff and, you know, had talked about having

Varshovi Decl., Exhibit A-7

1    Q.   After you have a chance to look at this, just

2    let me know.

3    A.   Okay.

4    Q.   Okay.  So let me flip it back so we can --

5    sorry.  Okay.  There we go.  All right.  Sorry.  Are

6    you getting dizzy?  Oh, my gosh.  Okay.  Sorry.  All

7    right.  Apologies for that.  Okay.  So as before,

8    Ms. Okonowsky, how did you learn of this post?

9    A.   I saw it on the page.

10    Q.   And did anyone send it to you before you saw

11    it on the page?

12    A.   No.

13    Q.   Did anyone send it to you after you saw it on

14    the page?

15    A.   No.

16    Q.   And was this post ever displayed at the

17    workplace?

18    A.   No.

19    Q.   And --

20    A.   Again, I don't believe it has to be.  All of

21    the people on the next page that liked the post are

22    Lompoc employees.  So whether it's displayed or not,

23    it's something that permeated the workplace.

24    Q.   I'm just trying to understand what happened.

25    That's all.  And in terms of this post, was this post

lipka.com, inc.
(888) 547-5226
transcripts@lipka.com
4-ER-0447
121

```
 1    ever shown to you in the workplace?

 2         A.   No.

 3         Q.   And did anyone ever approach you to discuss

 4    this post without your consent?

 5         A.   No.  And I did not receive -- I did not

 6    receive any reply from Warden Engelman to this E-mail

 7    that's dated 3-27, over a month after my -- almost six

 8    weeks after my initial report of the behavior, and I

 9    received no communication from him reassuring me that

10    there was anything being done.

11         Q.   And in terms of this post, did anyone ever

12    say to you that this post was specifically directed to

13    you?

14         A.   No.

15         Q.   Okay.  And in terms of why you believe this

16    post was specially directed at you, is that captured in

17    what you've already told me and what's written here in

18    this E-mail or are there other reasons?

19         A.   So he knows that I'm making a report of the

20    behavior.  Yeah.  I think I've -- to me -- to me it's

21    clear.

22         Q.   And so then I believe that's -- okay.  So I

23    think we're going to look at one more.  Let me zoom

24    out.  Okay.  So zoom out.  Okay.  Sorry.  Okay.  So as

25    before, please take a moment to review and then just
```

Varshovi
Decl.,
Exhibit
A-8

1          Q.   And in terms of the grade, you increased --

2     you got an increase in grade to GS-13 from previously

3     being GS-12.  Right?

4          A.   That's correct.

5          Q.   Okay.  And did you receive any pay increases

6     as well?

7          A.   So the cost of living allowance was higher in

8     California, so it ended up being relatively even at

9     first, and then I got a retention bonus, all the

10    psychologists have retention bonuses, FCI Seagoville as

11    well, so I can't tell you the exact difference in

12    pay.

13         Q.   Okay.  And so just to clarify, so the

14    retention bonus that you received at Lompoc, that

15    continued through your time at FCI Seagoville?

16         A.   That's correct.

17         Q.   Okay.

18         A.   But it wasn't continued from Lompoc.  FCI

19    Seagoville submitted a request separate under my new --

20    new employment.

21         Q.   And you received that for your time at FCI

22    Seagoville?

23         A.   That's correct.

24         Q.   And was that also the 15 percent or has that

25    percentage changed at all?

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com
4-ER-0449          87

1    and alcohol program.  She's a dedicated," and

2    something, "talent.  Her work is greatly appreciated."

3         Q.   And then in terms of the comment here, do you

4    know who wrote this comment?

5         A.   Warden Rivers.

6         Q.   And do you remember what Warden Rivers wrote

7    here?

8         A.   It looks like he said, "Congratulations.

9    Thanks for your improvement to the program."

10        Q.   And who wrote, to the extent you know, "Your

11   hard work, dedication is infectious.  Much

12   appreciated"?

13        A.   Dr. Ramirez.

14        Q.   Okay.  And then you signed it here at the end

15   on April 4th of 2022.  Right?

16        A.   Correct.

17        Q.   And was this the last performance appraisal

18   you received?

19        A.   I -- I don't recall.  It could have been.

20        Q.   Okay.

21        A.   Because I left there in July.

22        Q.   So one thing I wanted to quickly show you as

23   well, which I meant to show you earlier, is this

24   document that says action request is promotion, which

25   is -- so Lindsay, this is hard to make out, but I think

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com
4-ER-0450          90

```
 1    it's 181.  So USA ending in 181 and it's going to 182.
 2              MS. BOWDEN:  Great.  Thank you.
 3              (Exhibit 5 marked)
 4    BY MR. VARSHOVI:
 5         Q.   So Ms. Okonowsky, have you seen this document
 6    before?  I can zoom in here so you can see it better.
 7    Okay.
 8         A.   I don't recall seeing that document.
 9         Q.   So what it seems to capture is that when you
10    upgraded positions from staff psychologist to the drug
11    abuse program coordinator --
12         A.   Okay.
13         Q.   -- that was considered a promotion and it
14    notes that in terms of the GS grade.  So you recall
15    that when you became a drug abuse program coordinator
16    in 2021, that was a promotion?
17         A.   Yes, it was.  It was -- yeah.
18         Q.   And then in terms of the basic pay, you
19    received it looks like almost $5,000 pay increase based
20    on the adjusted basic salary -- I'm sorry?
21         A.   Adjusted basic pay.  Right.
22         A.   Okay.
23         Q.   And do you recall receiving that pay
24    increase?
25         A.   Yes.
```

lipka.com, inc.
(888) 547-5226          transcripts@lipka.com

4-ER-0451          91

Varshovi Decl., Exhibit B-1



This post is certainly directed toward me. Earlier this day, I first reported my concerns about the page to the Chief Psychologist and Acting Warden. Two hours before this post was published, after the work day had concluded, I had a conversation with another staff member about how I was disappointed about the content of the page and that he was "liking" and commenting on the page. Shortly thereafter, this post was published. The caption at the top of the page states, "When you get butthurt by memes." The other caption at the bottom of the meme says, "Tomorrow's forecast? Hot enough to melt a snowflake." The hashtag says, "#youcantakeadickbutnotajoke?" I interpreted this post as menacing and did not feel comfortable going to work the next day. When I read that "tomorrow's forecast" would include a difficult day for me at work, I felt my best course of action was to refrain from putting myself in a potentially hostile work environment.

4-ER-0452



I believe this post is targeted toward me. Just before the post was published, the owner of the page blocked me from being able to see the page, further cementing my belief that the post is targeted toward me. This post is derogatory toward women, is critical of women's (specifically my) bodies, and diminishes the role of Psychology Services. The post also makes light of the issue of inmate suicide and challenges the competency of the Psychology Services department.

Page **26** of **48**



This post clearly highlights a lack of respect for Psychology Services. Over the past 1.5 years, I have had conversations with SHU staff about cell assignment recommendations. More than once, my recommendations have not been considered, resulting in subsequent PREA allegations and inmate-on-inmate assaults.

Varshovi Decl., Exhibit B-4



This post is also targeted toward me. During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. The staff members went as far as recommending that I work on Saturdays so I did not interfere with their daily tasks when I needed to see inmates, per policy. I emphasized that removing inmates from their cells is part of SHU staff members' responsibilities and stated I have attempted, and would continue to attempt, to make every effort to be helpful (assisting with pulling inmates, etc.) and accommodate their schedules. One staff member stated to me, "I intentionally don't help you" after I highlighted my concerns with their problematic feedback and suggestions. The interactions were uncomfortable and hostile; I felt incredibly disrespected as a fellow employee. I expressed my concerns to the former SHU Lieutenant, an Associate Warden, and SHU 1 after the training. One of the SHU staff present during the training commented on this post something to the effect of, "Last quarter's SHU training," signaling that the post is, in fact, directed toward me.

About one month ago, I was working with an inmate in a private office space in SHU. Mr. Hellman entered the office and said he needed to use the space. He undermined me in the presence of the inmate. I expressed my hesitancy to relocate, but complied with the staff member's demand to use the office. The inmate and I relocated to another office. At the time, I was speaking with the inmate about his mother's recent passing. The interaction with the staff member was an inappropriate distraction. I believe this post also highlights that the staff member "got his way" and me, as "Psychology," did not.

Page **29** of **48**



I believe these posts are also targeted toward me as the former SHU psychologist. My job required me to request SHU staff to remove inmates from their cells for policy driven clinical contacts. I believe the posts also reflect Mr. Hellman's pattern of critiquing my physical appearance.

Page **42** of **48**

4-ER-0456

**Varshovi Decl., Exhibit B-6**



At the end of last quarter, I decided to talk to SHU staff about having a gathering at my residence to build camaraderie and thank them for their help throughout the quarter. Many staff members were kind and said they looked forward to the gathering. Later, this meme was posted, which led to my decision to cancel the gathering. I am disappointed that I, as a staff member who is a woman, cannot invite people to my home without incredibly sexist and sexually inappropriate jokes being made about things like a "gang bang." Many posts, like this one, reflect conversations or events that have happened in the institution. They are not random posts; they target individuals, departments, executive staff, the bureau, and inmates.

Varshovi Decl., Ex. C

**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
LEE A. CIRSCH, STATE BAR NO. 227668
lc@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LINDSAY OKONOWSKY, an individual,<br><br>          Plaintiff,<br><br>     vs.<br><br>WILLIAM P. BARR, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS<br>          Defendants. | **Case No.: 2:21-cv-07581-VAP-ASx**<br>Judge: Hon. Virginia A. Phillips<br><br>**PLAINTIFF LINDSAY OKONOWSKY'S RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:    Defendant, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS**

**RESPONDING PARTY:    Plaintiff, LINDSAY OKONOWSKY**

**SET NUMBER:    TWO**

///

///

1

<u>Hickman v. Taylor</u> 329 U.S. 495 (1947). This interrogatory also seeks premature disclosure of expert opinion in violation of Federal Rule of Civil Procedure 26(b)(3-5). This interrogatory is also vague, ambiguous, overbroad, unintelligible and places an undue burden on responding party. This request violates Plaintiff's right of privacy. This request calls for speculation and/or a legal conclusion. This interrogatory includes discrete subparts designed to avoid designed to avoid the presumptive 25-written interrogatory limitation of Federal Rule of Civil Procedure 33 (a)(1). *See* <u>Superior Communications v. Earhugger, Inc.</u>, 257 F.R.D. 215,218 (C.D. Cal. 2009).

## INTERROGATORY NO. 7:

Describe Your viewing of the Instagram Page, including (i) how many times You viewed the Instagram Page, (ii) when You viewed the Instagram Page's Posts, and (iii) the specific Instagram account from which You accessed the Instagram Page.

## RESPONSE TO INTERROGATORY NO. 7:

Objection. This interrogatory seeks information that is protected from disclosure by the attorney-client privilege. This interrogatory also seeks attorney work product in violation of Federal Rule of Civil Procedure 26(b)(3) and <u>Hickman v. Taylor</u> 329 U.S. 495 (1947). This interrogatory also seeks premature disclosure of expert opinion in violation of Federal Rule of Civil Procedure 26(b)(3-5). This interrogatory is also vague, ambiguous, overbroad, unintelligible and places an undue burden on responding party. This request violates Plaintiff's right of privacy. This request calls for speculation and/or a legal conclusion. This interrogatory includes discrete subparts designed to avoid designed to avoid the presumptive 25-written interrogatory limitation of Federal Rule of Civil Procedure 33 (a)(1). *See* <u>Superior Communications v. Earhugger, Inc.</u>, 257 F.R.D. 215,218 (C.D. Cal. 2009).

///

14

Subject to, and without waiving, the foregoing objections, Plaintiff responds as follows: Plaintiff viewed the Instagram page "8_and_hitthe_gate" daily from in or around February 2020 to in or around May 2020 when the page was taken down. Plaintiff accessed the Instagram page using the following usernames: "thisisacloverpage" and "blankrandom100." Discovery and investigation are ongoing, and Plaintiff expressly reserves the right to supplement this response in reliance on subsequent analysis, including expert analysis, and subsequently discovered information.

**INTERROGATORY NO. 8:**

Do You contend that Posts from the Instagram Page were specifically directed at You? If so, identify each such Post and the basis for Your contention.

**RESPONSE TO INTERROGATORY NO. 8:**

Objection. This interrogatory seeks information that is protected from disclosure by the attorney-client privilege. This interrogatory also seeks attorney work product in violation of Federal Rule of Civil Procedure 26(b)(3) and Hickman v. Taylor 329 U.S. 495 (1947). This interrogatory also seeks premature disclosure of expert opinion in violation of Federal Rule of Civil Procedure 26(b)(3-5). This interrogatory is also vague, ambiguous, overbroad, unintelligible and places an undue burden on responding party. This request violates Plaintiff's right of privacy. This request calls for speculation and/or a legal conclusion. This interrogatory includes discrete subparts designed to avoid designed to avoid the presumptive 25-written interrogatory limitation of Federal Rule of Civil Procedure 33 (a)(1). *See* Superior Communications v. Earhugger, Inc., 257 F.R.D. 215,218 (C.D. Cal. 2009).

Subject to, and without waiving, the foregoing objections, Plaintiff responds as follows: Yes. *See* Plaintiff's production of documents bates labeled, OKONOWSKY_000166, 168, 170, 171, 173, 174, 177-178, 184, 186, 198, and 201. Discovery and investigation are ongoing, and Plaintiff expressly reserves the

15

**PLAINTIFF LINDSAY OKONOWSKY'S RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LINDSAY OKONOWSKY, | No. CV 21-07581-VAP-AS |
| *Plaintiff,* | **PROPOSED JUDGMENT** |
| v. | |
| MERRICK GARLAND, | Hon. Virginia A. Phillips |
| *Defendant.* | U.S. District Judge |

1

Defendant Merrick Garland's Motion for Summary Judgment, having been considered by the Court along with the pleadings, evidence presented, and the Memorandum of Points and Authorities, and in accordance with the Statement of Uncontroverted Facts and Conclusions of Law entered herein,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Motion be granted and judgment is hereby entered for Defendant.

DATED:

_____
VIRGINIA A. PHILLIPS
UNITED STATES DISTRICT JUDGE

Presented by:

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

_____/s/ *Zakariya K. Varshovi*_____
ZAKARIYA K. VARSHOVI
Assistant United States Attorneys

Attorneys for Defendant

2

4-ER-0462

1   **BROCK & GONZALES, LLP**
      6701 CENTER DRIVE WEST, SUITE 610
2             LOS ANGELES, CA 90045
                Tel: (310) 294-9595
3               Fax: (310) 961-3673
    D. AARON BROCK, STATE BAR NO. 241919
4   ab@brockgonzales.com

5   **Attorneys for Plaintiff**
    Lindsay Okonowsky

6

7

8                    **UNITED STATES DISTRICT COURT**

9

10    **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11

12  LINDSAY OKONOWSKY,                 | **Case No.:**

13                                     | **PLAINTIFF'S COMPLAINT FOR**
              Plaintiff,               | **DAMAGES FOR:**
14
         vs.                          |    1. **SEXUAL DISCRIMINATION/**
15                                     |       **HARASSMENT IN VIOLATION**
16                                     |       **OF TITLE VII OF THE CIVIL**
    WILLIAM P. BARR, ATTORNEY          |       **RIGHTS ACT**
17  GENERAL UNITED STATES             |
    DEPARTMENT OF JUSTICE,            | **DEMAND FOR JURY TRIAL**
18  FEDERAL BUREAU OF PRISONS,        |
19                                     |
            Defendant.                |
20
21
22
23
24
25
26
27
28

                                  1
                              **COMPLAINT**

1    Plaintiff, LINDSAY OKONOWSKY, hereby brings her employment

2  complaint, demanding a trial by jury, against the above-named Defendant and

3  states and alleges as follows:

### PARTIES

5    1.    At all times mentioned herein, Plaintiff, LINDSAY OKONOWSKY,

6  was a female individual.

7    2.    At all times mentioned herein, Defendant WILLIAM P. BARR

8  ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE,

9  FEDERAL BUREAU OF PRISONS was the head of the DOJ, a Federal Executive

10 Department of the United States Government that was and still is Plaintiff's

11 employer.

### JURISDICTION & VENUE

13    3.    Jurisdiction is conferred in this Court by Title VII of the Civil Rights

14 Act, U.S.C. § 2000(e), et seq.

15    4.    All complained of conduct occurred in Santa Barbara County,

16 California.

### ALLEGATIONS

18    5.    Defendant has a social media policy that states in part, "Department

19 employees should not make comments that can be perceived as showing prejudice

20 based on race, gender, sexual orientation or any other protected basis." The policy

21 also includes, "The line between public and private, personal and professional, is

22 often blurred, especially when an employee using social media includes his or her

23 Department affiliation or title, or comments on matter related to his or her work, or

24 the work of the Department." Despite this policy, Defendant allowed a

25 "supervisor" to run an Instagram page that  he used to make comments clearly

26 referring to Plaintiff as a "*staff member*" that's a "*giant cunt*" that "*loves inmates*"

27 and "*tells on staff*." Such an Instagram post, which is only one of many that is

28 sexist and derogatory towards women, was viewed by Plaintiff's co-workers,

2

**COMPLAINT**

4-ER-0464

supervisors and human resources, who instead of taking corrective action, "liked" the posts, which created a hostile work environment for Plaintiff, who repeatedly requested Defendant take preventative action.

6. Plaintiff began working as a GS-12 Staff Psychologist at FCI Lompoc, a Federal Correctional Institution under the DOJ, on September 17, 2018.

7. Plaintiff became aware of the Instagram page "8_and_hitthe_gate" on February 16, 2020. Plaintiff viewed the page because she noticed that many of her coworkers at FCI Lompoc were already following the page and liking the posts.

8. Steven Hellman, a Lieutenant at FCI Lompoc, created and ran the Instagram page "8_and_hitthe_gate."

9. Hellman's page was followed by over a hundred employees at FCI Lompoc, including its Human Resources Manager.

10. There were many incredibly sexist and vulgar posts on the page that were overtly demeaning and derogatory towards women.

11. FCI Lompoc employees frequently liked and commented on these offensive posts.

12. The day after she found the Instagram page, on February 17, 2020, Plaintiff reported the page to her supervisors, who suggested Plaintiff speak with Acting Warden James Engelman.

13. The next day, Hellman posted a meme of Nancy Pelosi ripping up President Trump's State of the Union address with captions that said, "*When you get butt hurt by memes*" and "*Tomorrow's forecast: hot enough to melt a snowflake*" and the hashtag, *#youcantakeadickbutnotajoke*.

14. Plaintiff was upset as the meme targeted her because she had just complained about the page.

15. Plaintiff then spoke with Warden Engelman on February 18, 2020, who indicated he would submit a referral to the Office of Internal Affairs.

4-ER-0465

16. Internal Affairs met with Plaintiff on February 26, 2020. At that time, the Internal Affairs officer printed some of the memes and then said things to Plaintiff like, "*I don't see the problem,*" and insisted that Plaintiff explain what was sexist and harassing about each post. Plaintiff was simply told that Hellman was just "*acting like a kid,*" and that she should just stop looking at the page.

17. Immediately thereafter, on March 7, 2020, Hillman posted a meme page of a woman who represented Plaintiff's likeness and included comments that were derogatory towards women and Plaintiff's profession.

18. That same day, Plaintiff texted her supervisor that the social media posts targeting her had continued and she continued to complain throughout March 2020. Plaintiff also wrote a memo and submitted it to Associate Warden on March 11, 2020, detailing the harassing memes that continued to be posted on the page.

19. Plaintiff's complaints were repeatedly dismissed.

20. Another meme targeting Plaintiff was posted on March 27, 2020, after Hellman learned of her complaints from the threat assessment team and clearly referred to Plaintiff as a "*giant cunt.*" Several FCO Lompoc staff members "liked" the post. Plaintiff immediately complained to Warden Engelman:



4-ER-0466

21.   On April 13, 2020, a Threat Assessment Team was finally convened to review Plaintiff's "concerns about [a] hostile work environment and social media use in violation of policy."

22.   The Threat Assessment Team determined that Hellman unconvincingly denied that the memes were directed at Plaintiff.

23.   The Threat Assessment Team made several recommendations to the Agency including referring Hellman to the Office of Internal Affairs for possible policy violations; issuing a cease-and-desist letter from posting on social media any memes/information which violates Agency policy; and a referral to the Employee Assistance Program.

24.   There is nothing indicating that the Agency ever actually issued Hellman a cease-and-desist letter, just that it was recommended by the Threat Assessment Team on April 16, 2020.

25.   Following the Threat Assessment Report on April 16, 2020, almost two months after Plaintiff's initial complaints, Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services.

26.   Plaintiff initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

27.   Plaintiff timely filed charges against Defendant with the Equal Employment Opportunity Commission. Plaintiff received a "Right-to-Sue" notice on August 5, 2021, giving Plaintiff 90 days from that date to file suit. Therefore, Plaintiff has complied with, and exhausted, all administrative remedies, and now seeks a trial in this district court *de novo*.

///
///
///
///

4-ER-0467

# FIRST CAUSE OF ACTION

## SEXUAL DISCRIMINATION/HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### (Against ALL Defendants)

28.   Plaintiff incorporates by reference paragraphs 1 through 27, inclusive, of this Complaint as if fully set forth at this place.

29.   All times herein mentioned, 42 U.S.C. § 2000e *et seq.*, Title VII of the Civil Rights Act of 1964, was in full force and effect and was binding on Defendants.

30.   Title VII requires Defendant to refrain from discriminating against any employee on the basis of sex/gender. Sexual harassment is actionable as "discrimination" on the basis of sex in violation of Title VII when the conduct is so severe and pervasive as to alter the conditions of the victim's employment and create an abusive work environment.

31.   Defendant engaged in unlawful employment practices in violation of Title VII by discriminating/harassing against Plaintiff on account of her sex/gender.

32.   As a proximate result of the wrongful acts of Defendant, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms. Plaintiff is informed and believes, and thereupon alleges, that she will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

33.   As a proximate result of the wrongful acts of Defendant, Plaintiff has been forced to hire attorneys to prosecute her claims herein and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Plaintiff is entitled to recover attorneys' fees and costs under 42 U.S.C. § 2000e-5(k).

B&G BROCK & GONZALES

**WHEREFORE, Plaintiff prays for judgment as follows:**

1.      For general damages, according to proof;

2.      For special damages, according to proof;

3.      For attorney fees and costs of suit;

4.      For prejudgment and post-judgment interest, according to law; and

5.      For such other and further relief as the court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  September 22, 2021                    BROCK & GONZALES, LLP

                                                      By:  _____

                                                      D. AARON BROCK

                                                      Attorneys for Plaintiff

4-ER-0469